**JONATHAN W. BIRDT – SBN 183908**  e-filed _____
**Law Office of Jonathan W. Birdt**
18252 Bermuda Street
Porter Ranch, CA 91326
Telephone:   (818) 400-4485
Facsimile:    (818) 428-1384
jon@jonbirdt.com
Attorney for Plaintiff Robert Thomson

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT THOMSON,<br><br>                    Plaintiff,<br><br>  vs.<br><br>TORRANCE POLICE DEPARTMENT and THE LOS ANGELES COUNTY SHERIFFS DEPARTMENT,<br><br>                    Defendants. | CASE NO.  2:11-cv-06154-SJO-JC<br><br>**OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT BY LASD & TPD**<br><br>**(FILED CONCURRENTLY WITH DECLARATION OF LAWRENCE MUDGETT #15467)**<br><br>DATE: February 27, 2012<br>TIME:  10:00 a.m.<br>HON.:  Judge S. James Otero |

Public safety concerns may justify permissible regulations of protected activities, but the Constitution does not permit fundamental civil rights to be abridged by public safety fears.  See, e.g., Near v. Minnesota, 283 U.S. 697, 721-22 (1931).

## I. INTRODUCTION

Defendants' offer evidence of the existence crime as a reason to deny a fundamental right, but do not proffer even a scintilla of evidence linking crime to CCW holders. In fact, as set forth herein, the opposite is true, there is a strong correlation between the increase in CCW permits and the reduction of violent crime and weapons related injuries. Defendants failure to offer any evidence, and Plaintiffs affirmative evidence dispelling their erroneous "beliefs" alone demonstrates the grievous and misguided nature of their policy and the chilling effect they have on Plaintiffs' Fundamental Right.

Defendants' argument is akin to saying the first amendment only applies in the extreme situation of allowing citizens to yell fire in a crowded theater, but to otherwise remain silent until actual flames are seen. By defendants logic; speech, automobiles and alcohol should be banned immediately, as posing an unnecessary risk to public safety.

Plaintiff has never asserted a Constitutional Right to a CCW permit, but the California Legislature has chosen that as the only means of exercising such right, and defendants reliance on <u>Richards</u> and <u>Peruta</u> is misplaced because both cases have been stayed, and both cases were based upon the ability to open carry which the legislature took away on January 1, 2012, leaving CCW as the only means of carry.

At Page 9, lines 3-5 Torrance makes clear the fundamental misunderstanding at issue herein where they state:

> To hold that Plaintiff has a constitutional right to carry a loaded concealed handgun in public would be an unprecedented extension of Second Amendment law.

The problem with this statement is that Plaintiff has never sought such, Plaintiff only contends that the Defendants pre-condition of a clear and present

danger, before Plaintiff can exercise his fundamental right violates his Second Amendment right, and the California legislature only allows one mechanism for the exercise of his Right which defendant claims to have broad discretion to decide whether he is entitled to.

The reality is, 49 states now recognize the citizens to carry a functional handgun in a concealed manner, either by constitutional amendment, "Shall Issue" system or "Good Cause". Thirty-five states have "shall issue" permit laws that usually require states to issue permits to those who meet legal requirements. Ten others have "may issue" or discretionary permit laws. Vermont, Arizona, Alaska and Wyoming do not require a permit to carry a concealed weapon. In Sacramento County, California, the State Capital, the legislature recently banned the practice of openly carrying a firearm but left intact the CCW system. Notably, the Sacramento County Sheriff has a Shall Issue policy for CCW permits, i.e. state a desire for self-protection, get the proper training, pass a background and check and you will receive a permit. The only problem that has arisen in Sacramento or the more than 40 other counties in California that follow this practice is the wait time to get your new permit.

## II.    FACTUAL & LEGAL BACKGROUND

The parties have stipulated that Plaintiff was denied a permit because he did not meet the Good Cause Policy of either Department." (Paragraph 1, Joint Report of Counsel). The parties have also stipulated that "The sole legal issue in this case is whether Defendants violated Plaintiff's civil rights by refusing to issue Plaintiff a permit to carry a concealed weapon (CCW), and more specifically, whether the policies for issuing permits to carry a concealed weapon as set forth by the TPD and LASD respectively violate Plaintiff's constitutional rights under the Second Amendment of the United States Constitution." (Paragraph 3, Joint Report of Counsel).

## III. DEFENDANTS ADMISSIONS AND FACTS

There is no dispute that handguns are dangerous in the hands of felons, but that isn't what this case is about. Plaintiff has no objection to the Defendants material facts, and in fact, when combined with the admissions in the motions, the Defendant has made it abundantly clear that they are completely indifferent to the fundamental rights at issue herein.

Defendant LASD acknowledges that they have made no changes to their policy since 2005, thus acknowledging a failure to address Supreme Court decisions set forth in moving papers changing the legal framework applicable to their policies. (LASD motion at page 6, line 24). Torrance has a policy that said "we don't issue" until after this lawsuit was filed and they created a policy copying that of the LASD. This indifference is clearly demonstrated by the Defendants stated belief that they are empowered with "extremely broad discretion" to determine who gets to exercise a Fundamental Right. (LASD motion at Page 4, lines 21-21). (TPD motion at Page 3, Line 28.)

Defendants state that their policy is justified by the need to protect against gun violence (LASD UF 11) and the presence of guns on the street creates problems for law enforcement (LASD motion at Page 7, lines 19-21) but then state most of the violent acts in the County involving guns are by gang members (LASD UF 12). Defendants suggest that their policy is designed to suppress crime (LASD motion at page 13, lines 22-23) but never explain how limiting CCW's suppresses crime. As such, the argument that limiting CCW permits will reduce violence is never explained by any fact, argument or evidence.

The only nexus argument in the motions is between felons and guns, whereas what must be established is the nexus between CCW holders and public safety, but not even a scintilla of evidence is offered to show how restricting CCW permits reduces crime or aids public safety. In prior testimony, the County has

admitted that gang members do not seek CCW permits and would never be granted permits. As such, while Defendants identifies vague fears, Defendants offers no connection to CCW holders, and in fact admit that the problem is gang members, not law abiding citizens who seek permission and training.

### IV. DEFENDANTS FLAWED LEGAL ARGUMENTS

Perhaps the most bizarre point of the entire motion is the premise that the Second Amendment is somehow limited to the home or does not protect a Right to bear arms outside the home, and Defendants LASD even state this with emphasis at Page 9, line 20 arguing that Heller somehow was limited to being "in the home", but no citation is ever provided for this belief other than the fact that the statute at issue related to the home, but the Supreme court made clear that its' opinion recognized a Fundamental Right, not a Fundamental Right "in the home".

Moreover, all of the remaining citations in Plaintiffs motion apply outside the home, and even this district has recognized that the Fundamental Rights bestowed by the Second Amendment are not limited to the home. (See Judge Andersons ruling on Motion to Dismiss in Hacopian v. City of Upland- 2:11-cv-06155-PA -SP applying finding the Second Amendment was a viable 1983 claim for conduct occurring outside the home).

Lastly, Defendants rely heavily on Richards v. County of Yolo, 2011 U.S. Dist. LEXlS 51906 and Peruta v. San Diego County, 2010, 758 F.Supp.2d 1106 but both cases were decided on the ability of the plaintiff to open carry, a right that no longer exists due to the passage of AB 144 by the California legislature, but regardless, neither case is citable as both cases have been stayed pending an *en banc* review in the current Nordyke matter. Nordyke v. King, No. 07-15763, 2011 WL 5928130 (9th Cir. Nov. 28, 2011) (granting rehearing en banc).

## V. DEFENDANTS HAVE NO NEXUS CONNECTING THEIR POLICY WITH ANY RATIONAL BASIS

Defendants do not offer any evidence that in any way links their policy to any State interest. Defendants speak generally of crime, but never make any nexus to their CCW policy. The reason for this is simple, the policy is politically driven and not tied to reality or Constitutional requirements. A CCW Permit issued pursuant to California Penal Code 12050 is the **only** mechanism in California by which a Citizen can exercise their right to bear arms outside of the home.

> In *Heller,* the Supreme Court held the Second Amendment protects an individual right "to possess **and carry** weapons in case of confrontation," unconnected with service in a militia…. the court held the Second Amendment right recognized in *Heller* is "fully applicable to the States."…A plurality of the *McDonald* court concluded the Second Amendment right applies to the states because it is "fundamental" to the American "scheme of ordered liberty"
> People v. Delacy (2011) 192 Cal.App.4th 1481. (emphasis added)

Torrance devotes a great amount of their motion to the suggestion that the Second amendment doesn't apply to a CCW Permit, but as stated above, it does protect the fundamental right to "carry" and there is only one way to "carry in California- concealed. Defendants carry the burden of establishing the nexus between their need and their infringement upon a Fundamental Right. Under Cantwell v. Connecticut (1940) 310 U.S. 296, and progeny, States and localities may not condition a license necessary to engage in constitutionally protected conduct on the grant of a license officials have *discretion to withhold*. Further, a host of prior restraint cases establish that "the peaceful enjoyment of freedoms *which the Constitution guarantees*" may not be made "contingent upon the uncontrolled will of an official." Staub v. Baxley (1958) 355 U.S. 313, 322 (emphasis added). Though, Defendants maintain their belief that they have "extremely broad discretion" to choose who gets their Rights.

The Ninth Circuit recently found, in a prior restraint case decided on a First Amendment claim that:

> Our analysis is guided by certain well-established principles of First Amendment law. In public places such as streets and sidewalks, "the State [may] enforce a content-based exclusion" on speech if the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983). For content-neutral regulations, the State may limit "the time, place, and manner of expression" if the regulations are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*
> We conclude that the Ordinance fails to satisfy the narrow tailoring element of the Supreme Court's "time, place, and manner" test. The Ordinance is not narrowly tailored because it regulates significantly more speech than is necessary to achieve the City's purpose of improving traffic safety and traffic flow at two major Redondo Beach intersections, and the City could have achieved these goals through less restrictive measures, such as the enforcement of existing traffic laws and regulations. Because the Ordinance does not constitute a reasonable regulation of the time, place, or manner of speaking, it is facially unconstitutional.
> <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u> (9th Cir., Sept. 16, 2011, 06-55750) 2011 WL 4336667.

## VI. <u>ISSUING PERMITS POSES NO RISK TO PUBLIC SAFETY AND IN REALITY HAS A POSITIVE EFFECT OF REDUCING CRIME AND INJURY</u>

Plaintiff is submitting the declaration of Officer Lawrence Mudgett to refute any suggestion of a nexus between defendants policy and their stated intent. This is a detailed declaration indicating he has reviewed available reports and statistics which confirm that with the rise in CCW issuance, there has been a drop in overall crime. The declaration also states that it is the generally held opinion outside of Los Angeles that issuing CCW's has not created the circumstances defendants contend they seek to protect against:

- The Lott-Mustard Report - John Lott and David Mustard, in connection with the University of Chicago Law School, examining crime statistics from 1977 to 1992 for all U.S. counties, concluded that the thirty-one states allowing their residents to carry concealed, had significant reductions in violent crime. Lott writes, "Our most conservative estimates show that by adopting shall-issue laws, states reduced murders by 8.5%, rapes by 5%, aggravated assaults by 7% and robbery by 3%. If those states that did not permit concealed handguns in 1992 had permitted them back then, citizens might have been spared approximately 1,570 murders, 4,177 rapes, 60,000 aggravated assaults and 12,000 robberies. To put it even more simply criminals, we found, respond rationally to deterrence threats... While support for strict gun-control laws usually has been strongest in large cities, where crime rates are highest, that's precisely where right-to-carry laws have produced the largest drops in violent crimes."
(Source: "More Guns, Less Violent Crime", Professor John R. Lott, Jr., The Wall Street Journal, August 28, 1996, (The Rule of Law column).

- "Crimes are stopped with guns about five times as frequently as crimes are committed with guns." John Lott "Gun Laws Can Be Dangerous, Too" Wall Street Journal, May 12, 1999  http://www.tsra.com/Lott22.htm

- "In Florida, where 315,000 permits have been issued, there are only five known instances of violent gun crime by a person with a permit. This makes a permit-holding Floridian the cream of the crop of law-abiding citizens, 840 times less likely to commit a violent firearm crime than a randomly selected Floridian without a permit." (David Kopel – "More Permits Mean Less Crime..." Los Angeles Times, Feb. 19, 1996, Monday, p. B-5)

- "Dade County, Florida, kept meticulous records for six years, and of 21,000 permit holders, there was no known incident of a permit holder injuring an innocent person.  In addition, since Virginia passed a right-to-carry law more than 50,000 permits have been issued, but not one permit holder has been convicted of a crime and violent crime has dropped." H. Sterling Burnett, No Smoking Guns http://www.ncpa.org/oped/sterling/mar899.html

## VII. DEFENDANTS POLICIES DO NOT PASS CONSTITUIONAL MUSTER

The United States Supreme Court has clearly stated, with regard to the Second Amendment, that: "Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation." District of Columbia v. Heller (2008) 128 S. Ct. 2783, 2798. (emphasis added)   The state may have an interest in reducing gun violence and accidents, but it cannot presume that the exercise of a constitutional right will cause the sort of harm it is allowed to curtail. Defendants cannot point to the impact of their practice – the deprivation of constitutional rights – as their interest. Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd. (1991) 502 U.S. 105, 120. If anything, logically, requiring additional training will reduce gun violence and accidents involving firearms.

Until retiring late last year following an arrest for drunk driving, the Undersheriff in Los Angeles County charged with issuing CCW permits for 30 years was Larry Waldie:

> Q.   Okay.  Can you point to any study or correlation between increased issuance of CCW permit  and gun violence?
> A   No.
>
> Waldie deposition at page 25 line 4-12.

To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." District of Columbia v. Heller (2008) 128 S. Ct. 2783, 2793 . "[T]he core right identified in Heller [is] the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." United States v. Chester (2010) 628 F.3d 673.

"But uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right." Hague v. Committee for Indus. Org. (1937) 307 U.S. 496, 516. Accordingly, the Ninth Circuit rejects alleged public health and safety concerns as a substitute for objective standards and due process. Desert Outdoor Advertising v. City of Moreno Valley (1996) 103 F.3d 814, 819.

## VIII. CONCLUSION

Our decision in Heller points unmistakably to the answer. Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in Heller, we held that individual self-defense is "the central component" of the Second Amendment right. McDonald v. City of Chicago (2010) 130 S. Ct. 3020, at 3037.

At the risk of repetition, and of stating the obvious, nowhere in any cited decision recognizing or discussing the Fundamental Right recognized by the Second Amendment is there any authority for the proposition that the right is limited to "in the home" as suggested by the County. This Court is respectfully requested to find that defendants pre-condition of documentation of a Clear and Present Danger before granting permission to exercise a Fundamental Right does not pass Constitutional Scrutiny and Violates Plaintiffs Rights under the Second Amendment.   A gun is not a crime, it is a constitutionally protected right, and the exercise thereof by law abiding citizens who seek training and licensing present no risk to public safety.

January 9, 2012                     ___/s/_____
                                    Jonathan W. Birdt, Esq.