ANDREA SHERIDAN ORDIN, County Counsel
ROGER H. GRANBO, Assistant County Counsel
JENNIFER A.D. LEHMAN, Principal Deputy County Counsel
(SBN 191477) • *jlehman@counsel.lacounty.gov*
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 974-1908 · Fax: (213) 626-2105

Attorneys for Defendant
LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT THOMSON,<br><br>    Plaintiff,<br><br>    v.<br><br>TORRANCE POLICE DEPARTMENT and THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT,<br><br>    Defendants. | CASE NO. CV 11-06154 SJO (JCx)<br><br>**DEFENDANT LOS ANGELES COUNTY SHERIFF'S DEPARTMENT'S RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW; EVIDENCE IN SUPPORT THEREOF**<br><br>[Filed concurrently with LASD Opposition to Plaintiff's Motion for Summary Judgment; Notice of Lodging LASD Response to Plaintiff's Separate Statement]<br><br>**MSJ Date:**  **February 27, 2012**<br>Time:  10:00 a.m.<br>Ctrm:  1<br><br>Action Filed:  July 26, 2011<br>**Trial Date:**  **None set** |

HOA.853183.1

Defendant Los Angeles County Sheriff's Department (LASD) submits this Response and additional facts and evidence to Plaintiff Robert Thomson's Separate Statement of Uncontroverted Facts & Conclusions of Law in support of its Motion for Summary Judgment/Partial Summary Judgment pursuant to Local Rule 56-1.

| **Moving Party Robert Thomson's Uncontroverted Material Facts and Alleged Supporting Evidence:** | **Opposing Party's LASD's Response and Evidence:** |
| --- | --- |
| 1.     The California Legislative scheme requires a CCW Permit to enable Plaintiff to possess a functional firearm for self-defense purposes outside of the home<br>**Supporting Evidence:**   Penal Code 26350 (Open Carry), 12031 (Loaded & 12025 | 1.     Undisputed for purposes of this motion. |
| 2.     Plaintiff applied with the Torrance Police Department (TPD) and Los Angeles County Sheriff's Department (LASD) for a permit to carry a concealed weapon pursuant to Cal. Pen. Code Section 12050.  Plaintiff was denied a permit because he did not meet the good Cause Policy of either Department. | 2.     Undisputed. |

HOA.853183.1

| Moving Party Robert Thomson's Uncontroverted Material Facts and Alleged Supporting Evidence: | Opposing Party's LASD's Response and Evidence: |
|---|---|
| **Supporting Evidence:**  Stipulated facts from Joint Report of Counsel | |
| 3.    Defendants require documentation of a Clear and Present Danger to the applicant before they will issue a CCW Permit. **Supporting Evidence:** Defendants Initial Disclosures | 3.    Undisputed.  (See LASD Fact No. 7 below). |

### DEFENDANT LOS ANGELES COUNTY SHERIFF DEPARTMENT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

| LASD's Uncontroverted Facts | LASD's Supporting Evidence: |
|---|---|
| 1.    Paul Tanaka is the Undersheriff for Los Angeles County. As part of his responsibilities as Undersheriff he has been designated to act as the Sheriff's sole authorized representative for reviewing applications for concealed weapons licenses (CCW) for the County of Los Angeles.  In that role, he and members of his staff, evaluate | 1.    Exh. A, Tanaka Decl. ¶¶ 1-2. |

HOA.853183.1

| LASD's Uncontroverted Facts | LASD's Supporting Evidence: |
|---|---|
| CCW applications.  While members of his staff make recommendations regarding applications, he is the final decision-maker. | |
| 2.      As part of his evaluation of CCW applications, he will review the entire application packet and any and all supporting documentation. | 2.      Exh. A, Tanaka Decl. ¶ 2. |
| 3.      In Los Angeles County, there are four distinct categories of CCW licenses:  Employment, Standard, Judges, and Reserve Police Officers.  The Employment CCW license is issued only to a person who spends a substantial period of time in his or her principal place of employment or business in Los Angeles County.  The Standard CCW license is issued to residents of Los Angeles County or to residents of a particular city within Los Angeles County.  The Judge CCW license is issued to California judges, full-time commissioners, and to federal judges and magistrates of the federal courts.  The Reserve Police Officer | 3.      Exh. A, Tanaka Decl. ¶ 3. |

HOA.853183.1

| LASD's Uncontroverted Facts | LASD's Supporting Evidence: |
|---|---|
| CCW license may be issued to reserve police officers appointed pursuant to California Penal Code § 830.6. | |
| 4.     If an applicant resides in an incorporated city not policed by the LASD, the applicant must apply to the chief of police of their city of residence for a concealed weapons license and have such application acted upon. Within 60 days after a denial of such application, such city resident may file a separate application with the LASD, attaching a copy of the application denied by the chief of police.  The LASD will exercise independent discretion in granting or denying licenses to such person but may review, consider, and give weight to the grounds upon which such denial was made. | 4.     Exh. A, Tanaka Decl. ¶ 4. |
| 5.     California Penal Code sections 12050-12054 set forth the general criteria that CCW applicants must meet. Applicants must be of good moral character, be a resident of, or spend substantial time in the County they apply in, take a firearms course, and | 5.     Exh. A, Tanaka Decl. ¶ 5. |

HOA.853183.1

CV 11-06154 SJO (JCx)

| LASD's Uncontroverted Facts | LASD's Supporting Evidence: |
|---|---|
| demonstrate good cause for the license. | |
| 6.     The issuance of licenses enabling a private citizen to carry a CCW is of great concern to the LASD.  The LASD's overriding policy is that no CCW license should be granted merely for the personal convenience of the applicant.  No position or job application in itself shall constitute good cause for the issuance, or for the denial, of a CCW license. | 6.     Exh. A, Tanaka Decl. ¶ 6. |
| 7.     The LASD defines "good cause" under California Penal Code section 12050 as requiring convincing evidence of a clear and present danger to life or of great bodily harm to the applicant, his spouse or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by the applicant's carrying of a concealed firearm. | 7.     Exh. A, Tanaka Decl. ¶ 6, see also Exh. 1 to Tanaka Decl. (p.22) |
| 8.     Each CCW application is individually reviewed for cause.  The | 8.     Exh. A, Tanaka Decl. ¶ 6. |

| **LASD's Uncontroverted Facts** | **LASD's Supporting Evidence:** |
|---|---|
| LASD's definition of good cause has been in existence since at least 2005.  It is the Undersheriff's understanding that this definition of good cause, or one similar to it, is utilized by many other counties within California, including San Diego. | |
| 9.      In evaluating whether an applicant has presented good cause, an applicant's stated reason of self-defense is not enough. | 9.      Exh. A, Tanaka Decl. ¶ 7. |
| 10.     The applicant must demonstrate a credible threat of violence which would justify the need to possess a concealed weapon.  If an applicant claims that he or she has been threatened, the LASD looks for documentation of that threat, such as police reports or other evidence. | 10.     Exh. A, Tanaka Decl. ¶ 7. |
| 11.     One of the purposes for the LASD's policy is to protect against gun violence to the community at large, as well as to protect officers conducting law enforcement operations on the streets. | 11.     Exh. A, Tanaka Decl. ¶ 8; see also Exh. B, Zimring Decl., ¶¶ 1-28. |
| 12.     Gun violence is a problem throughout the State of California and | 12.     Exh. A, Tanaka Decl. ¶ 8; see also Exh, B, Zimring Decl., ¶¶ 3-10. |

HOA.853183.1

CV 11-06154 SJO (JCx)

| | LASD's Uncontroverted Facts | LASD's Supporting Evidence: |
|---|---|---|
| 1 | | |
| 2 | Los Angeles County is no exception. | |
| 3 | The vast majority of homicides in Los | |
| 4 | Angeles County are committed with the | |
| 5 | use of guns.  Handguns are of particular | |
| 6 | concern because they are much more | |
| 7 | likely to be used than shotguns and | |
| 8 | rifles.  Because handguns are small, | |
| 9 | easy to conceal, and deadly at short | |
| 10 | range, they are of paramount concern | |
| 11 | and danger.  Further, most of the violent | |
| 12 | acts committed in this County involving | |
| 13 | the use of guns are by gang members. | |
| 14 | 13.    The presence of more guns on the | 13.    Exh. A, Tanaka Decl. ¶ 9; Exh,. B, |
| 15 | streets of Los Angeles County creates | Zimring Decl., ¶¶ 3-28. |
| 16 | many problems for law enforcement | |
| 17 | officers.  Officers are often charged with | |
| 18 | monitoring public gatherings as well as | |
| 19 | with breaking up public nuisances. | |
| 20 | Officers must act quickly whenever a | |
| 21 | disturbance occurs.  Often times, this | |
| 22 | involves isolating one or two problem | |
| 23 | individuals.  However, if multiple | |
| 24 | persons within a crowd are carrying | |
| 25 | concealed weapons, this creates an | |
| 26 | increased likelihood that guns will be | |
| 27 | brandished or used.  Thus, the increased | |
| 28 | | |

HOA.853183.1

| LASD's Uncontroverted Facts | LASD's Supporting Evidence: |
|---|---|
| presence of guns creates not only increased safety problems for officers but also for members of the community at large. | |
| 14.   It is the LASD's position that increasing the numbers of concealed weapons in the community increases the threat of gun violence to the community at large, to those who use the streets and go to public accommodations, and to law enforcement officers patrolling the streets.  Further, the increased presence of concealed handguns make law enforcement operations more difficult thus taking away valuable resources which would be better used conducting law enforcement operations. | 14.   Exh. A, Tanaka Decl. ¶ 10; Exh. B, Zimring Decl., ¶¶ 3-28. |
| 15.   Los Angeles County's "good cause" requirement is intended to drastically restrict the number of persons who are secretly armed in the County. | 15.   Exh. A, Tanaka Decl. ¶ 10; see also, e.g., Exh. B, Zimring Decl., ¶¶ 3-28. |
| 16.   In 2011, there was an average of approximately 400 concealed weapons permits that were issued by the LASD. The Undersheriff is informed and | 16.   Exh. A, Tanaka Decl. ¶ 11. |

HOA.853183.1

| LASD's Uncontroverted Facts | LASD's Supporting Evidence: |
|---|---|
| believe that the County's Chief Executive Office has estimated that the population of Los Angeles County as of January 2010 was 10,441,080 people | |
| 17.    On or about April 7, 2011, Plaintiff submitted a CCW application to the LASD. | 17.    Exh. A, Tanaka Decl., ¶ 12, (and exh. 2 to Tanaka Decl., pp. 27-41) |
| 18.    In his application, Plaintiff stated as justification: "I am a licensed California Bail Agent.  I have been licensed for over three years.  I am alone when I meet with co-signers and defendants at their homes in violent high crime areas within Los Angeles County such as Compton, Inglewood, Watts, and South Los Angeles as well as city and county jails to fill out paperwork and receive payment for I am called to post bail at all hours of the day and night.  Often when I bail out a person I am in neighborhoods where other suspects are a danger to me.  I don't' know the backgrounds of clients who may be disgruntled and have a grudge against me.  While in the process of my Bail Agent duties, I sometimes | 18.    Exh. A, Tanaka Decl., ¶ 12, (and exh. 2 to Tanaka Decl., p.39) |

HOA.853183.1

| | LASD's Uncontroverted Facts | LASD's Supporting Evidence: |
|---|---|---|
| 1 | | |
| 2 | have in my possession over $10,000 in | |
| 3 | cash. | |
| 4 | I fear great bodily injury or death | |
| 5 | from an armed assailant who has the | |
| 6 | intent to steal my case of harm me.  I | |
| 7 | am a man of small stature, and work | |
| 8 | very late hours of the night.  The | |
| 9 | criminal element that I deal with | |
| 10 | presents a danger to my safety that | |
| 11 | cannot be mitigated by law enforcement | |
| 12 | resources or other means available to | |
| 13 | me.  I don't have any | |
| 14 | 19.    The LASD reviewed Plaintiff's | 19.    Exh. A., Tanaka Decl., ¶¶ 12-13; |
| 15 | application and determined that he | Exh. 3 to Tanaka Decl. |
| 16 | failed to show good cause as required | |
| 17 | by LASD policy, and as defined above. | |
| 18 | (LASD UF 17)  Specifically, Plaintiff | |
| 19 | failed to show convincing evidence of a | |
| 20 | clear and present danger to life or of | |
| 21 | great bodily harm to the applicant, his | |
| 22 | spouse or dependent child, which cannot | |
| 23 | be adequately dealt with by existing law | |
| 24 | enforcement resources and which | |
| 25 | danger cannot be reasonably avoided by | |
| 26 | alternative measures, and which danger | |
| 27 | would be significantly mitigated by the | |
| 28 | | |

HOA.853183.1

CV 11-06154 SJO (JCx)

| LASD's Uncontroverted Facts | LASD's Supporting Evidence: |
|---|---|
| applicant's carrying of a concealed firearm. | |
| 20.     Julie Basco of the California Department of Justice supervised an analysis of all 122,948 adult felony arrests in Los Angeles County for 2010 and divided these persons by whether they had a pre-2010 felony conviction. A total of 43,440 subjects had a prior felony that would keep them from being eligible in a "shall issue" mandate or constitutional rule.  Sixty-five percent of Los Angeles County felons do not have a prior felony conviction when arrested. These statistics indicate that almost 2/3rds of the known current felons would not be screened out by a prior felony from CCW permits without further barriers. | 20.     Exh. B, Zimring Decl. ¶ 23, Exh. C, Basco Decl., ¶ 2-3. |
| 21.     The LASD's good cause policy was recently found to be constitutional under the Second Amendment against a similar challenge. | 21.     Exh. D.  Pursuant to FRE 201, the LASD requests that the Court take judicial notice of the ruling in *Jonathan Birdt v. Charlie Beck*, USDC, Case No. CV 10-08377 JAK |

HOA.853183.1

CV 11-06154 SJO (JCx)

**CONCLUSIONS OF LAW**

1.     California Penal Code § 12050(a)(1)(A) authorizes a county sheriff to issue a license to carry a concealed pistol, revolver, or other firearm capable of being concealed upon the person (hereinafter "CCW permit") upon the existence of good cause, and provided that the applicant meets other criteria provided for in the Penal Code.  Section § 12050 gives extremely broad discretion to the sheriff concerning the issuance of concealed weapons licenses, and explicitly grants discretion to the issuing officer to issue or not issue a license to applicants meeting the minimum statutory requirements.  *Gifford v. City of Los Angeles*, 88 Cal.App.4th 801, 805 (2001).

2.     In *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 2788, 2822 (2008) and *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026, 3044 (2010), the United States Supreme Court held that the Second Amendment protects an individual's right to possess firearms in the home for self-defense.

3.     The right to keep and bear arms is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.  *Heller*, 128 S.Ct. at 2816.

4.     Penal Code sections 12025(a) and 12031(a) have been upheld in California against a Second Amendment challenge after *Heller*.  *People v. Flores*, 169 Cal. App. 4th 568, 575-576 (2008); *People v. Yarbrough*, 169 Cal. App. 4th 303, 312-314 (2008).

5.     Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized "threat to public order," and is "prohibited as a means of preventing physical harm to persons other than the offender.' *Yarbrough,* 169 Cal.App.4th at 314, citing *People v. Hale*, 43 Cal.App.3d 353, 356 (1974).

6.     A person who carries a concealed firearm on his person or in a vehicle, which permits the individual immediate access to the firearm but impedes others

HOA.853183.1

1  from detecting its presence, poses an 'imminent threat to public safety. *Id.* at 313-
2  314.

3      7.    Intermediate scrutiny requires that the challenged statute or regulation
4  "be substantially related to an important governmental objective." *Clark v. Jeter*,
5  486 U.S. 456, 461 (1988).

6      8.    Maintaining public safety and preventing crime are clearly important (if
7  not paramount) government interests and the regulation of concealed firearms is a
8  critical factor in accomplishing that interest. *See, e.g.*, *United States v. Salerno*, 481
9  U.S. 739, 750 (1987); *Schall v. Martin*, 467 U.S. 253, 264 (1984); *Kelley v.*
10  *Johnson*, 425 U.S. 238, 247 (1976).

11  DATED: January 𝒥𝓁, 2012            Respectfully submitted,

12                                     ANDREA SHERIDAN ORDIN
13                                     County Counsel

14

15                                     By _____
16                                        JENNIFER A.D. LEHMAN
                                          Principal Deputy County Counsel
17
                                       Attorneys for Defendant
18                                     LOS ANGELES COUNTY SHERIFF'S
19                                     DEPARTMENT

20

21

22

23

24

25

26

27

28

HOA.853183.1

# EXHIBIT A

1 | ANDREA SHERIDAN ORDIN, County Counsel
ROGER H. GRANBO, Assistant County Counsel
2 | JENNIFER A.D. LEHMAN, Principal Deputy County Counsel
(SBN 191477) • jlehman@counsel.lacounty.gov
3 | 648 Kenneth Hahn Hall of Administration
500 West Temple Street
4 | Los Angeles, California 90012-2713
Telephone: (213) 974-1908 · Fax: (213) 626-2105
5 |
Attorneys for Defendant
6 | LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

7

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10

11 | ROBERT THOMSON,                          CASE NO. CV 11-06154 SJO (JCx)

12 |          Plaintiff,
                                             **DECLARATION OF**
13 |     v.                                  **UNDERSHERIFF PAUL TANAKA**

14 | TORRANCE POLICE DEPARTMENT
and THE LOS ANGELES COUNTY
15 | SHERIFF'S DEPARTMENT,

16 |          Defendants.

17

18 | I, PAUL TANAKA, declare as follows:

19 |     1.    I am the Undersheriff for Los Angeles County.  I have served as the

20 | Undersheriff since June 2011, and have been employed by the Los Angeles County

21 | Sheriff's Department (LASD) for over 29 years.  As the Undersheriff, I am the

22 | second in command of the LASD and the Sheriff's chief assistant.  In the Sheriff's

23 | absence, I also assume his duties, in addition to my executive responsibilities

24 | addressing LASD operational, budgetary and personnel matters.

25 |     2.    As part of my responsibilities as Undersheriff, I have been designated

26 | to act as the Sheriff's sole authorized representative for reviewing applications for

27 | carry concealed weapons (CCW) licenses for the County of Los Angeles.  In that

28

HOA.845808.1

1  role, I and members of my staff, evaluate CCW applications. While members of my

2  staff make recommendations regarding applications, I am the final decision-maker.

3  As part of my evaluation of CCW applications, I will review the entire application

4  packet and any and all supporting documentation.

5      3.    In Los Angeles County, there are four distinct categories of CCW

6  licenses: Employment, Standard, Judges, and Reserve Police Officers. The

7  Employment CCW license is issued only to a person who spends a substantial

8  period of time in his or her principal place of employment or business in Los

9  Angeles County. The Standard CCW license is issued to residents of Los Angeles

10  County or to residents of a particular city within Los Angeles County. The Judge

11  CCW license is issued to California judges, full-time commissioners, and to federal

12  judges and magistrates of the federal courts. The Reserve Police Officer CCW

13  license may be issued to reserve police officers appointed pursuant to California

14  Penal Code § 830.6.

15      4.    If an applicant resides in an incorporated city not policed by the LASD,

16  the applicant must apply to the chief of police of their city of residence for a

17  concealed weapons license and have such application acted upon. Within 60 days

18  after a denial of such application, such city resident may file a separate application

19  with the LASD, attaching a copy of the application denied by the chief of police.

20  We will exercise independent discretion in granting or denying licenses to such

21  person but may review, consider, and give weight to the grounds upon which such

22  denial was made. A copy of the LASD Concealed Weapons License Policy is

23  attached hereto as Exhibit 1. This policy is also available on the LASD website at

24  www.lasd.org.

25      5.    California Penal Code sections 12050-12054 set forth the general

26  criteria that CCW applicants must meet. Applicants must be of good moral

27  character, be a resident of, or spend substantial time in the County they apply in,

28  take a firearms course, and demonstrate good cause for the license.

HOA.845808.1

6.     The issuance of licenses enabling a private citizen to carry a CCW is of great concern to the LASD.  The LASD's overriding policy is that no CCW license should be granted merely for the personal convenience of the applicant.  No position or job application in itself shall constitute good cause for the issuance, or for the denial, of a CCW license.  The LASD defines "good cause" under California Penal Code section 12050 as requiring convincing evidence of a "clear and present danger to life or of great bodily harm to the applicant, his spouse or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by the applicant's carrying of a concealed firearm." Each application is individually reviewed for cause.  I am informed and believe that the LASD's definition of good cause has been in existence since at least 2005.  It is also my understanding that this definition of good cause, or one similar to it, is utilized by many other counties within California, including San Diego.

7.     In evaluating whether a CCW applicant has presented "convincing evidence of a clear and present danger to life or of great bodily harm to the applicant, his spouse or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by applicant's carrying of a concealed firearm," an applicant's stated reason of self-defense is not enough.  The applicant must demonstrate a credible threat of violence which would justify the need to possess a concealed weapon.  If an applicant claims that he or she has been threatened, we look for documentation of that threat, such as police reports or other evidence.

8.     One of the purposes for the LASD's policy is to protect against gun violence to the community at large, as well as to protect officers conducting law enforcement operations on the streets.  Gun violence is a problem throughout the State of California and Los Angeles County is no exception.  The vast majority of homicides in Los Angeles County are committed with the use of guns.  Handguns

HOA.845808.1

1  are of particular concern because in my experience, they are much more likely to be
2  used than shotguns and rifles.  Because handguns are small, easy to conceal, and
3  deadly at short range, they are of paramount concern and danger.  Further, most of
4  the violent acts committed in this County involving the use of guns are by gang
5  members.

6        9.    In my experience as a law enforcement officer, the presence of more
7  guns on the streets of Los Angeles County creates many problems for law
8  enforcement officers.  Officers are often charged with monitoring public gatherings
9  as well as with breaking up public nuisances.  Officers must act quickly whenever a
10  disturbance occurs.  Often times, this involves isolating one or two problem
11  individuals.  However, if multiple persons within a crowd are carrying concealed
12  weapons, this creates an increased likelihood that guns will be brandished or used.
13  Thus, the increased presence of guns creates not only increased safety problems for
14  officers but also for members of the community at large.

15        10.    It is the LASD's position that increasing the numbers of concealed
16  weapons in the community increases the threat of gun violence to the community at
17  large, to those who use the streets and go to public accommodations, and to law
18  enforcement officers patrolling the streets.  Further, the increased presence of
19  concealed handguns make law enforcement operations more difficult thus taking
20  away valuable resources which would be better used conducting law enforcement
21  operations.  Los Angeles County's "good cause" requirement is intended to
22  drastically restrict the number of persons who are secretly armed in the County.

23        11.    In 2011, there was an average of approximately 400 existing concealed
24  weapons permits that were issued by the LASD.  I am informed and believe that the
25  County's Chief Executive Office has estimated that the population of Los Angeles
26  County as of January 2010 was 10,441,080 people.

27        12.    Attached hereto as Exhibit 2 is a copy of the April 7, 2011 CCW
28  application we received from Robert Thomson (redacted to conceal certain personal

HOA.845808.1

-4-

CV 11-06154 SJO (JCx)

00018

1  information).  Mr. Thomson's permit application was reviewed, analyzed, and
2  processed in the exact same manner in which every application is processed.  After
3  reviewing Mr. Thomson's application and supporting documentation, I determined
4  that he did not demonstrate "good cause" for the issuance of a permit as required by
5  the LASD policy.  Specifically, convincing evidence was not established of a clear
6  and present danger to life or of great bodily harm to the applicant, his spouse or
7  dependent child, which could not be adequately dealt with by existing law
8  enforcement resources and which danger cannot be reasonably avoided by
9  alternative measures, and which danger would be significantly mitigated by the
10 applicant's carrying of a concealed firearm.

11     13.    Attached hereto as Exhibit 3 is a copy of the June 28, 2011 letter we
12 sent to Mr. Thomson denying his application.

13     I declare under penalty of perjury under the laws of the United States of
14 America that the foregoing is true and correct.

15     Executed in Monterey Park, California on December 15, 2011

16

17

18     PAUL TANAKA

19

20

21

22

23

24

25

26

27

28

HOA.845808.1

TOTAL P. 00019

# EXHIBIT 1
# POLICY

# Los Angeles County Sheriff's Department

## Concealed Weapons Licensing Policy

The issuance of licenses enabling a private citizen to carry a concealed weapon (CCW) is of great concern to the Los Angeles County Sheriff's Department. The Department's overriding policy is that no concealed weapons license should be granted merely for the personal convenience of the applicant. No position or job classification in itself shall constitute good cause for the issuance, or for the denial, of a CCW license. Each application shall be individually reviewed for cause, and the applicant will be notified by writing within 90 days of the application, or within 30 days after receipt of the applicant's criminal background check from the Department of Justice, that the CCW license was either approved or denied.

In accordance with California Penal Code § 12050 et. seq., and subject to Department policy and procedures, any Los Angeles County resident may obtain a CCW application for authorization to carry a concealed weapon. Applications may be obtained from any sheriff's patrol station or directly from the Office of the Undersheriff. Completed applications may be submitted to any of these units for processing.

## Types of Licensing and Expiration Periods for CCWs

There are four distinct categories of CCW licenses: Employment, Standard, Judges, and Reserve Police Officers. The. Employment_CCW license is issued only by the sheriff of a county to a person who spends a substantial period of time in his or her principal place of employment or business in the county of issuance. The license is valid only in the county issued and for any period not to exceed 90 days. The Standard CCW license is issued to residents of the county or a particular city within the county. The license is valid for any period not to exceed 2 years. The Judge CCW license may be issued to California judges, full-time commissioners, and to federal judges and magistrates of the federal courts. The license is valid for any period not to exceed 3 years. The Reserve Police Officer CCW license may be issued to reserve police officers appointed pursuant to California Penal Code § 830.6. The license is valid for any period not to exceed 4 years, except that it becomes invalid upon the conclusion of the person's appointment as a reserve police officer.

## Training Requirements for a CCW License

Regardless of the category, all new license applicants for CCW's must now pass a specified course of training which is acceptable to the licensing authority, the Los Angeles County Sheriff's Department (See attached sheet, "Suggested Training Vendors"). New CCW license applicants must pass a specified course of training acceptable to the licensing authority. The course shall not exceed 16 hours, and the course shall include instruction on firearm safety, the law regarding the permissible use of a firearm and weapon proficiency. The licensing authority may also require

the applicant to attend a community college course certified by the Commission on Peace Officer Standards and Training (POST), up to a maximum of 24 hours, but only if required uniformly of all applicants without exception. For CCW license renewal applicants, the course of training may be any course acceptable to the licensing authority, shall be no less than 4 hours, and shall include instruction on firearms safety, the law regarding the permissible use of a firearm and weapon proficiency.

## Qualifications for a CCW License

To qualify for a CCW, each applicant must demonstrate (1) proof of good moral character, (2) that good cause exists, and (3) that the applicant is a resident of the count or a city within the county, or, that the applicant spends a substantial period of time in the applicant's place of employment or business in the county or a city within the county. In addition, the applicant must complete the training requirements as listed above.

According to Los Angeles County Sheriff's Department policy (5-09/380.10) and the California Supreme Court (CBS, Inc. v. Block, (1986) 42 Cal.3d 646), good cause shall exist only if there is convincing evidence of a clear and present danger to life, or of great bodily harm to the applicant, his spouse, or dependent child, which cannot be adequately dealt with by existing law enforcement resources, and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by the applicant's carrying of a concealed firearm.

The character requirement will be fulfilled by, but not limited to, a criminal history check through the Bureau of Criminal Identification and Investigation. The good cause requirement will only be fulfilled by thoroughly justifying the applicant's need to the Sheriff or his designee on the application form. The residence requirement will be fulfilled upon presentation of an approved, recognized identification card and at least one recently canceled item of United States mail.

If the applicant resides in an incorporated city, which is not policed by our Department, he or she must first apply to the Chief of Police of their city of residence for a CCW license and have the application acted upon. Within 60 days after a denial of the application, the city resident may file a separate application with the Los Angeles County Sheriff's Department, attaching a copy of the application denied by the Chief of Police. The Sheriff will exercise independent discretion in granting or denying licenses to these applicants. Further, the Sheriff may review, consider, and give weight to the grounds upon which the previous denial was made.

-2-

## CCW License Subject to Restrictions

When a license is issued it will be subject to the following general restrictions.

While exercising the privilege granted under the terms of this license, licensees shall not:

1. Consume any alcoholic beverage. Represent to any person that they
2. are peace officers, unless they are in fact
   peace officers as defined by law.
3. Abuse this privilege by an unjustified display of a deadly weapon.
4. Violate any law of this State or Country.
5. Be under the influence of any medication or narcotic drug. Impede
6. law enforcement officers in the conduct or performance of their duty
   or activities.
7. Refuse to display their permits or to surrender their concealable firearm to any peace officer for inspection upon demand.

In addition, the Los Angeles County Sheriff's Department may place special limitations further limiting the time, the place, and the circumstances under which the license is valid. When each license is issued, general restrictions and any special limitations will be noted on the reverse side of the card.

Remember, it is a Privilege, not a right to carry a concealed weapon.

## Application for CCW License Form

Upon reviewing the attached policy and meeting all requirements, please complete the Standard Application form in its entirety and forward to Sheriff Headquarters, 4700 Ramona Boulevard, Monterey Park, California, 91754-2169, Attention: CCW Coordinator. A non-refundable fee of $10.00 must accompany this application. Those who successfully pass the initial screening will be charged a required follow-up processing fee.

Revised 9/99

00023

## Suggested Training Vendors

**Angeles Range 12651 Little Tujunga,
Lakeview Terrace Phone: (818)
362-3650 or (800) 499-4486 Instructor:
Don Emmer**

**L.A.X. Shooting Range 927
W. Manchester, Inglewood
Phone: (310) 568-1515
Instructor: Danny Hudson**

**Sharpshooter 1827 W. 208
Street, Torrance Phone:
(310) 618-9971 Instructor:
Fred Darling**

**Centinel Services
18348 Eddy, Northridge
Phone: (818) 238-9860
Instructor: Cecil Williams**

**Centinel Services 1060 N.
Lake Street, Burbank
Phone: (818) 954-981 0
Instructor: John Rives**

**The Firing Line 17921 Jamestown Lane,
Huntington Beach Phone: (714)
841-2100 Instructor: Fred Donohue**

**Professional Security Training School
44633 Sierra Highway Lancaster, CA
93534 Phone: (661) 945-0600
Instructor: Cecil Williams**

**5040 Cornell Road
Agoura Hills, CA 91301
(818) 707-9100**

THE CONTENT AND LENGTH OF THE COURSES OFFERED BY THE TRAINERS LISTED ABOVE ARE
ACCEPTABLE TO THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT ("LASD") IN
ACCORDANCE WITH PENAL CODE SECTION 12050(a).

### DISCLAIMER

THE COUNTY OF LOS ANGELES AND THE LASD MAKE NO OTHER REPRESENTATIONS OR
WARRANTIES ABOUT THE TRAINERS LISTED ABOVE OR THE FACILITIES OR EQUIPMENT THEY USE
TO CONDUCT TRAINING.

- NONE OF THESE TRAINERS ARE EMPLOYEES OR AGENTS OF THE COUNTY OF LOS
  ANGELES OR LASD.

- NONE OF THESE TRAINERS WAS TRAINED IN THE USE OF FIREARMS BY THE COUNTY
  OF LOS ANGELES OR LASD.

- NONE OF THE FACILITIES AND EQUIPMENT USED BY THESE TRAINERS ARE OWNED,
  CONTROLLED OR INSPECTED BY THE COUNTY OF LOS ANGELES OR THE LASD.

NEITHER THE COUNTY OF LOS ANGELES NOR LASD CERTIFY OR CONTROL THE SAFETY OF THE
TRAINING CONDUCTED BY ANY OF THESE TRAINERS.

YOU ASSUME FULLY THE RISK OF ANY LOSS, INJURY OR DAMAGE ATTRIBUTABLE TO (1) ANY ACT OR
OMISSION OF ANY OF THESE TRAINERS OR ANY OF THEIR AGENTS OR EMPLOYEES OR (2) THE
CONDITION ANY PREMISES OR EQUIPMENT USED BY ANY OF THESE TRAINERS. THE COUNTY OF
LOS ANGELES AND LASD DISCLAIM ANY RESPONSIBILITY FOR ANY SUCH LOSS, INJURY OR DAMAGE.

LASD RECOMMENDS THAT BEFORE YOU BEGIN TRAINING, YOU FULLY INVESTIGATE THE
TRAINER'S QUALIFICATIONS, TRAINING, SAFETY RECORD AND CONDITION OF PREMISES AND
EQUIPMENT.



## 5-09/380.10 APPLICATION REQUESTS

Any person may obtain the Department's Concealed Weapon License Application (form SH-AD-602 revised 2/95) from any station or the Undersheriff. Persons requesting such application shall be shown a copy of the application process.

Each applicant must demonstrate proof of residence and good character. In addition, good cause for the purposes of Penal Code section 12050 shall exist only if both of the following elements prevail:

- Convincing evidence of a clear and present danger to life or of great bodily harm to the applicant, his spouse or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by the applicant's carrying of a concealed firearm,
- A valid certificate from an Advanced Officer Training Institution, approved by the California State Bureau of Collection and Investigative Services, attesting to applicant's satisfactory completion of at least 24 hours of training,
  - Alternate proof of firearms proficiency may be submitted for review and possible acceptance in lieu of this certification.

If the applicant resides in an incorporated city not policed by this Department, they must apply to the chief of police of their city of residence for a Concealed Weapon License and have such application acted upon. Within 60 days after a denial of such application, such city resident may file a separate application with the Sheriff, attaching a copy of the application denied by the chief of police. The Sheriff will exercise independent discretion in granting or denying licenses to such persons but may review, consider and give weight to the grounds upon which such denial was made.

**04/01/96 MPP**

# EXHIBIT 2

## APPLICATION

00026

# California Department of Justice



# STANDARD APPLICATION FOR LICENSE TO CARRY A CONCEALED WEAPON (CCW)



RECEIVED

APR 1 1 2011

UNDER SHERIFF'S OFFICE
CCW COORDINATOR

BCIA 4012 (6/99)

State of California, Department of Justice
## Standard Application for CCW License

Official Use Only -Type of Permit
Requested ( ) Standard    ( ) Judge
( ) Reserve Officer ( ) 90 Day

## Public Disclosure Admonition

I understand that I am obligated to be complete and truthful in providing information on this application. I understand that all of the information disclosed by me in this application may be subject to public disclosure.

Applicant Signature

4 - 7 - 2011
Date

Witness Signature / Badge Number

Date

## Section 1 - Applicant Personal Information

Name: Last **Thomson**  First **Robert**  Middle **James**

If Applicable,
Maiden Name or Other Name(s) Used: **Robby, Bob**

City and County of Residence: **Torrance, Los Angeles**  Country of Citizenship: **U.S.A.**

Date of Birth: **REDACTED**  Place of Birth: **Harbor City,** City **Los Angeles,** County **CA** state

Height: **5'6"**  Weight: **185**  Color Eyes: **Blue**  Color Hair: **Brown**

## Section 2 - Applicant Clearance Questions

1. Do you now have, or have you ever had a license to carry a concealed weapon (CCW)?
   No _____ Yes **✓** (If yes, please indicate below. Use additional pages if necessary.)

Issuing Agency **Utah** Issue Date **10-6-2008** CCW# **C256808**

2. Have you ever applied for and been denied a license to carry a concealed weapon?
   No _____ Yes **✓** (If yes, give agency name, date and reason for denial.)

**April 1, 2009  Torrance  Failed to prove 1 or more**
**April 5th, 2011  Torrance  legal requirements**

-3-

00028

State of California, Department of Justice
## Standard Application for CCW License

**Section 2 - Applicant Clearance Questions -   (continued)**

3.  Have you ever held and subsequently renounced your United States citizenship?
    No __✓__ Yes _____ (If yes, explain):

4.  If you served with the Armed Forces, were you ever convicted of any charges or was your discharge other than honorable? No __✓__ Yes _____ (If yes, explain):

5.  Are you now, or have you been, a party to a lawsuit in the last rive years?
    No _____ Yes __✓__ (If yes, explain):
    Small claims court regarding my spa.
    (resolved 2008)

6.  Are you now, or have you been, under a restraining order(s) from any court?
    No __✓__ Yes _____ (If yes, explain):

7.  Are you on probation or parole from any state for conviction of any offense including traffic? No __✓__ Yes _____ (If yes, explain):

-4-

00029

State of California, Department of Justice
## Standard Application for CCW License

### Section 2 . Applicant Clearance Questions - (continued)

8. List all traffic violations (moving violations only) and motor vehicle accidents you have had in the last five years. (Use additional pages if necessary.)

Date _____ Violation / Accident _____ Agency / Citation # _____

| Date | Violation / Accident | Agency / Citation # |
|------|---------------------|---------------------|
| 7-6-2006 | 21650 V.C. | Signal Hill PD 5187066 |
| 6-29-2006 | 22349 (A) V.C. | CHP 42922 BJ |
| 4-28-2010 | 27315 (D)(1) V.C. | Gardena G21519O |

9. Have you ever been convicted for any criminal offense (civilian or military) in the U.S. or any other country?

No ___✓___ Yes _____  (If yes, explain including date, agency, charges, and disposition.)

10. Have you withheld any fact that might affect the decision to approve this license?

No ___✓___ Yes _____  (If yes, explain):

### Section 3 . Descriptions of Weapons:

List below the weapons you desire to carry if granted a CCW. You may carry concealed only the weapon(s) which you list and describe herein, and only for the purpose indicated. Any misuse will cause an automatic revocation and possible arrest. (Use additional pages if necessary.)

| | Make | Model | Caliber | Serial No. |
|---|------|-------|---------|-----------|
| 1. | Glock | 22 | .40 | DKL431 45 |
| 2. | Glock | 27 | .40 | HG2 826 |
| 3. | | | | |

-5-

00030

State of California, Department of Justice
# Standard Application for CCW License

## Section 4 - CCW License Conditions and Restrictions

The licensee is responsible for all liability for, injury to, or death of any person, or damage to any property which may result through any act or omission of either the licensee or the agency that issued the license. In the event any claim, suit, or action is brought against the agency that issued the license, its chief officer or any of its employees, by reason of, or in connection with any such act or omission, the licensee shall defend, indemnify, and hold harmless the agency that issued the license, its chief officer or any of its employees from such claim, suit, or action.

The licensee authorizes the licensing agency to investigate, as they deem necessary, the licensee's record and character to ascertain any and all information which may concern his/her qualifications and justification to be issued a license to carry a concealed weapon and release said agency of any and all liability arising out of such investigation.

While exercising the privileges granted to the licensee under the terms of this license, the licensee shall not, when carrying a concealed weapon:

- Consume any alcoholic beverage.
- Be in a place having a primary purpose of dispensing alcoholic beverages for on-site consumption.
- Be under the influence of any medication or drug, whether prescribed or not.
- Refuse to show the license or surrender the concealed weapon to any peace officer upon demand.
- Impede any peace officer in the performance of his/her duties.
- Present himself/herself as a peace officer to any person unless he/she is, in fact, a peace officer as defined by California law.
- Unjustifiably display a concealed weapon.
- Carry a concealed weapon not listed on the permit
- Carry a concealed weapon at times or circumstances other than those specified in the permit.

Pursuant to U.S. Government Code - Title 49, Chapter 26, Section 1472 (1) and Federal Aviation Regulation 121.583, a license to carry a concealed weapon does not authorize a person to carry a firearm, tear gas, or any dangerous weapon aboard commercial airlines. Further, a person must declare that he/she is carrying such firearm, tear gas, or dangerous weapon BEFORE entering the boarding area of an air terminal where the security checks are made. Such violation can result in arrest by law enforcement.

Any violation of these restrictions or conditions may invalidate the CCW license and may void any further use of the license until reinstated by the licensing authority. Any arrest for a felony or serious misdemeanor, including driving under the influence of alcohol and/or drugs, is cause for invalidating the license.

-6-

00031

State of California, Department of Justice

## Standard Application for CCW License

### Section 5 - Applicable California Penal Code Sections

The following Penal Code sections are of special importance to the holder of a CCW license regarding the use, carrying, and storage of firearms:

Penal Code Section 12051 - Applications for CCW Licenses; False Statements

(b) Any person who files an application required by subdivision (a) knowing that statements contained therein are false is guilty of a misdemeanor.
(c) Any person who knowingly makes a false statement on the application regarding any of the following shall be guilty of a felony:
  (1) The denial or revocation of a license, or the denial of an amendment to a license, issued pursuant to Section 12050.
  (2) A criminal conviction.
  (3) A finding of not guilty by reason of insanity.
  (4) The use of a controlled substance.
  (5) A dishonorable discharge from military service.
  (6) A commitment to a mental institution.
  (7) A renunciation of United States citizenship.

Penal Code Section 192 - Manslaughter
Manslaughter is the unlawful killing of a human being without malice.
(a) Voluntary - upon a sudden quarrel or heat of passion.
(b) Involuntary - in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle.

Penal Code Section 197 - Justifiable Homicide; Any Person
Homicide is justifiable when committed by any person in any of the following cases:
  1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or,
  2. When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the of offering violence to any person therein; or,
  3. When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed; or,
  4. When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace.

-7-

State of California, Department of Justice
# Standard Application for CCW License

## Section 5 - Applicable California Penal Code Sections -   (continued)

**Penal Code Section 198 - Justifiable Homicide; Sufficiency of Fear**
**(Limitation of Self-defense of Property Rule)**
A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.

**Penal Code Section 199 - Justifiable and Excusable Homicide; Discharge of Defendant**
The homicide appearing to be justifiable or excusable, the person indicted must, upon his trial, be fully acquitted and discharged.

**Penal Code Section 12035 - Storage of Firearms Accessible to Children**
(a) As used in this section, the following definitions shall apply:
    (1) "Locking device" means a device that is designed to prevent the firearm from functioning and when applied to the firearm, renders the firearm inoperable.
    (2) "Child" means a person under the age of 16 years. (3) "Off-premises" means premises other than the premises where the firearm was stored.
    (4) "Locked container" has the same meaning as set forth in subdivision (d) of Section 12026.2.
(b)(1) Except as provided in subdivision (c), a person commits the crime of "criminal storage of a firearm of the first degree" if he or she keeps any loaded firearm within any premise which is under his or her custody or control and he or she knows or reasonably should know that a child is likely to gain access to the firearm without the permission of the child parent or legal guardian and the child obtains access to the firearm and thereby causes death or great bodily injury to himself, herself, or any other person.
    (2) Except as provided in subdivision (c), a person commits the crime of "criminal storage of a firearm of the second degree" if he or she keeps any loaded firearm within any premise which is under his or her custody or control and he or she knows or reasonably should know that a child is likely to gain access to the firearm without the permission of the child's parent or legal guardian and the child obtains access to the firearm and thereby causes injury, other than great bodily injury, to himself, herself, or any other person, or carries the firearm either to a public place or in violation of Section 417.
(c) Subdivision (b) shall not apply whenever any of the following occurs:
    (1) The child obtains the firearm as a result of an illegal entry to any premises by any person.
    (2) The firearm is kept in a locked container or in a location that a reasonable person would believe to be secure.
    (3) The firearm is carried on the person or within such a close proximity thereto so that the individual can readily retrieve and use the firearm as if carried on the person.
    (4) The firearm is locked with a locking device that has rendered the firearm inoperable.
    (5) The person is a peace officer or a member of the armed forces or national guard and the child obtains the firearm during, or incidental to, the performance of the person's duties.
    (6) The child obtains, or obtains and discharges, the firearm in a lawful act of self-defense or defense of another person, or persons.
    (7) The person who keeps a loaded firearm on any premise which is under his or her custody or control has no reasonable expectation, based on objective facts and circumstances, that a child is likely to be present on the premise.

-8-

**State of California, Department of Justice**
## Standard Application for CCW License

**Section 5 -   Applicable California Penal Code Sections -   (continued)**

**Penal Code Section 12036 - Firearms Accessed by Children and Carried Off-premises**

(a) As used in this section, the following definitions shall apply:

    (1) "Locking device" means a device that is designed to prevent the firearm from functioning and when applied to the firearm, renders the firearm inoperable.

    (2) "Child" means a person under the age of 16 years. (3) "Off-premises" means premises other than the premises where the firearm was stored.

    (4) "Locked container" has the same meaning as set forth in subdivision (d) of Section 12026.2.

(b) A person who keeps a pistol, revolver, or other firearm capable of being concealed upon the person, loaded or unloaded, within any premise that is under his or her custody or control and he or she knows or reasonably should know that a child is likely to gain access to that firearm without the permission of the child's parent or legal guardian and the child obtains access to that firearm and thereafter carries that firearm off-premises, shall be punished by imprisonment in a county jail not exceeding one year, by a fine not exceeding one thousand dollars ($ 1,000), or by both that imprisonment and fine.

(c) A pistol, revolver, or other firearm capable of being concealed upon the person that a child gains access to and carries off-premises in violation of this Section shall be deemed "used in the commission of any misdemeanor as provided in this code or any felony" for the purpose of subdivision (b) of Section 12028 regarding the authority to confiscate firearms and other deadly weapons as a nuisance.

(d) This Section shall not apply if any one of the following circumstances exists:

    (1) The child obtains the pistol, revolver, or other firearm capable of being concealed upon the person as a result of an illegal entry into any premises by any person.

    (2) The pistol, revolver, or other firearm capable of being concealed upon the person is kept in a locked container or in a location that a reasonable person would believe to be secure.

    (3) The pistol, revolver, or other firearm capable of being concealed upon the person is locked with a locking device that has rendered the firearm inoperable.

    (4) The pistol, revolver, or other firearm capable of being concealed upon the person is carried on the person within such a close range that the individual can readily retrieve and use the firearm as if carried on the person.

    (5) The person is a peace officer or a member of the armed forces or national guard and the child obtains the pistol, revolver, or other firearm capable of being concealed upon the person during, or incidental to, the performance of the person's duties.

    (6) The child obtains, or obtains and discharges, the pistol, revolver, or other firearm capable of being concealed upon the person in a lawful act of self-defense or defense of another person or persons.

    (7) The person who keeps a pistol, revolver, or other firearm capable of being concealed upon the person has no reasonable expectation, based on objective facts and circumstances, that a child is likely to be present on the premises.

-9-

00034

State of California, Department of Justice

## Standard Application for CCW License

### Section 6 - Agreement to Restrictions  and to Hold Harmless

I accept and assume all responsibility and liability for, injury to, or death of any person, or damage to any property which may result through any act or omission of either the licensee or the agency that issued the license. In the event any claim, suit or action is brought against the agency that issued the license, its chief officer or any of its employees, by reason of, or in connection with any such act or omission, the licensee shall defend, indemnify, and hold harmless the agency that issued the license, its chief officer or any of its employees from such claim, suit, or action.

I understand that the acceptance of my application by the licensing authority does not guarantee the issuance of a license and that fees and costs are not refundable if denied. I further understand that if my application is approved and I am issued a license to carry a concealed weapon, that the license is subject to restrictions placed upon it and that misuse of the license will cause an automatic revocation and possible arrest and that the license may also be suspended or revoked at the discretion of the licensing authority at any time. I am aware that any use of a firearm may bring criminal action or civil liability against me.

I have read, understand, and agree to the CCW license liability clauses, conditions, and restrictions stated in this Application and Agreement to Restrictions and to Hold Harmless.

I have read and understand the applicable Penal Code sections regarding False Statements on a CCW Application, Manslaughter, Killing in Defense of Self or Property, Limitation on Self-defense and Defense of Property, and Child Access and Firearm Storage, stated in this application.

I have read and understand Attachment 1 - California Prohibiting Categories for a CCW License, Attachment 2 - California Prohibiting Misdemeanors, and Attachment 3 - Federal Prohibiting Categories for Possessing Firearms. I further acknowledge that these Prohibiting Categories can be amended or expanded by state or federal legislative or regulatory bodies and that any such amendment or expansion may affect my eligibility to hold a CCW.

| | |
|---|---|
| _____ | 4-7-2011 |
| Applicant Signature | Date |
| | |
| _____ | _____ |
| Witness Signature / Badge Number | Date |

-10-

00035

State of California, Department of Justice
## Standard Application for CCW License

### Section 7 - Investigator's Interview Notes

Applicant Name: **Thomson, Robert James**
Last — First — Middle

Date of Birth: _____   Age: **40**

Social Security No.: **REDACTED**

California DLAD No.: _____

Driver's License Restrictions: **None**

Residence Address:
**REDACTED**   **Torrance CA**
Number — Street — Apt. — City — State — Zip

Mailing Address (if different):
**Same as above**
Number — Street — Apt — City — State — Zip

Home / Personal Phone Numbers: **REDACTED**

Spouse's Name and Address: **Cristina Thomson**
**REDACTED   Torrance CA**

Applicant Occupation: **Bail Bonds Agent**

Business / Employer Name: **Caught Up Bail Bonds – owner**

Business Phone Number: **(310) 320-2245 (310) 320-BAIL**

Business Address:
**2309 Torrance Blvd #205 Torrance CA 9050**
Number — Street — Apt — City — State — Zip

1. List all previous home addresses for the past five years.

**San Pedro CA 90731**

-11-

00036

State of California, Department of Justice
## Standard Application for CCW License

**Section 7 - Investigator's Interview Notes -   (continued)**

2. Have you ever been in a mental institution, treated for mental illness, or been found not-guilty by reason of insanity ? No ___✓___ Yes _____ (If yes, explain):

_____

_____

3. Are you now, or have you ever been, addicted to a controlled substance or alcohol, or have you ever utilized an illegal controlled substance, or have you ever reported to a detoxification or drug treatment program? No __✓__ Yes _____ (If yes, explain):

_____

_____

4. Have you ever been involved in an incident involving firearms?
   No __✓__ Yes_____(If yes, explain):

_____

_____

_____

5. Have you been involved in a domestic violence incident?
   No __✓__ Yes_____(If yes, explain):

_____

_____

6. List any arrests or formal charges, with or without disposition, for any criminal offenses within the U.S. or any other country (civilian or military).

   _Not Applicable_____

_____

_____

-12-

00037

State of California, Department of Justice
# Standard Application for CCW License

## Section 7 - Investigator's Interview Notes - (continued)

If the CCW license is desired for self-protection, the protection of others, or for the protection of large sums of money or valuable property, you are required to explain and provide good cause for issuance of the license. For example, has your life or property been threatened or jeopardized? Explain incidents and include dates, times, locations, and names of police agencies to which these incidents were reported.

Details of Reason for Applicant Desiring a CCW License (use additional sheets if needed).

_See Good Cause Statement._

-13-

00038

## GOOD CAUSE STATEMENT

I am a licensed California Bail Agent. I have been licensed for over three years. I am alone when I meet with co-signers and defendants at their homes in violent high crime areas within Los Angeles County such as Compton, Inglewood, Watts, and South Los Angeles as well as city and county jails to fill out paperwork and receive payment for I am called to post bail at all hours of the day and night. Often when I bail out a person I am in neighborhoods where other suspects are a danger to me. I don't know the backgrounds of clients who may be disgruntled and have a grudge against me. While in the process of my Bail Agent duties I sometimes have in my possession over $10,000 in cash.

I fear great bodily injury or death from an armed assailant who has the intent to steal my cash or harm me. I am a man of small stature, and work very late hours of the night. The criminal element that I deal with presents a danger to my safety that cannot be mitigated by law enforcement resources or other means available to me. I don't have any other means of defending myself. The areas I work in have a higher violent crime rate than the rest of the state. I have attached the 2007 crime rate statistics from Melissadata.com which is the most recent for Compton, Lynwood, Inglewood, and Los Angeles, cities in which I frequently post bail.

This creates an exigency that shows that I need a CCW more than some regular Joe off the street. I want to have it to protect myself and my family. I work out of my house as my office so I meet clients at their home or an establishment. (Fast food, star bucks, home.

Beginning in January of 2000.all applicants for a bail agents license in California had to complete a course prescribed in California penal code section 1299 if they were going to apprehend their own clients that failed to appear in court or those defendants of other bail agents agencies.

One requirement under P.C.1299 is that the bail agent or bail fugitive recovery person must complete a course of powers of arrest approved by the Bureau of Security and Investigative Services, because of this requirement many Bail Agents or Bail Fugitive Recovery Persons also take the security guard exposed firearm training to receive an exposed firearm permit from the BSIS. They then believe that they can now carry a firearm exposed while attempting or making an arrest of a bail fugitive.

Penal code 12031(k) states "Nothing in this section is intended to preclude the carrying a loaded firearm by any person while engaged in the act of making or attempting to make a lawful arrest" as a bail agent or bail recovery person, they may carry the loaded firearm only during the arrest itself, not before or after the arrest, need to be transported unloaded in and locked container. From the attorney general's office Leslie McGovern firearms division.

State of California, Department of Justice
## Standard Application for CCW License

### Section 8 - Certification and Release of Information

I hereby give permission to the agency to which this application is made to conduct a background investigation of me and to contact any person or agency who may add to or aid in this investigation. I further authorize persons, firms, agencies and institutions listed on this application to release or confirm information about me and statements I have made as contained in this application.

Notwithstanding any other provision of law and pursuant to the Public Records Act (Government Code section 6250 et seq.), I understand that information contained in this application may be a matter of public record and shall be made available upon request or court order.

I hereby certify under penalties of perjury and Penal Code section 1205 1 (b) and (c), that the answers I have given are true and correct to the best of my knowledge and belief, and that I understand and agree to the provisions, conditions, and restrictions herein or otherwise imposed.

_____
**Applicant Signature**

4 - 7 - 2011
**Date**

_____
**Witness Signature / Badge Number**

_____
**Date**

-14-

00040

76M474C (REV 12/98)

COUNTY OF LOS ANGELES
**DEPARTMENT OF SHERIFF**

**01-** 1162059

1027 Ck. Cash

Received from

Los Angeles, Calif., 5/10 20 11

$ 10

Thimsen, Robert

_____ Dollars

For Cell App fee

In Case No. _____

vs. _____

LEROY D. BACA, SHERIFF

BY C. Lee

00041

# EXHIBIT 3
## DENIAL LETTER



**County of Los Angeles**

Sheriff's Department Headquarters

4700 Ramona Boulevard

Monterey Park, California 91754-2169



LEROY D. BACA, SHERIFF

June 28, 2011

Mr. Robert J. Thomson
2309 Torrance Boulevard, #205
Torrance, California  90501

Dear Mr. Thomson:

Department Executives have reviewed your application for a concealed weapon license.  The circumstances, as outlined in the application, do not satisfy the requirements for the existence of good cause and we must, pursuant to our policy, deny your request.

Our stated policy as to what constitutes good cause for the issuance of a permit is stated below for your information:

> ".....specifically state under the section entitled "Qualifications for a CCW License" those circumstances which present convincing evidence of a clear and present danger to life, or of great bodily harm to the applicant, his/her spouse, or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by applicant's carrying of a concealed firearm."

Typically, the verbiage "convincing evidence of a clear and present danger...." refers to a current situation which involves a specific person(s) who has threatened an individual and who has displayed a pattern of behavior which would suggest that the threat(s) could be carried out.  Situations which would suggest only a potential danger to one's safety, (e.g. carrying large amounts of money to the bank, profession/job, working late hours in a high crime rate area, etc.) are not consistent with the criteria for issuance of a concealed weapon license.

If your circumstances change, please feel free to submit a new application.  Please do not hesitate to call Lieutenant Christopher Nee at (323) 526-5118 if you have any questions.

Sincerely,

LEROY D. BACA, SHERIFF

PAUL K. TANAKA
UNDERSHERIFF

*A Tradition of Service*

00043

# EXHIBIT B

## DECLARATION OF FRANKLIN E. ZIMRING

I, Franklin E. Zimring, declare as follows:

1.     My current academic appointment is William G. Simon Professor of Law, Wolfen Distinguished Scholar and Chair of the Criminal Justice Research Program at the University of California, Berkeley.  I have been studying the relationship between firearms and violence, strategies of firearms control, and patterns of gun commerce and civilian gun usage since 1967.  I have served as director of research of the task force on firearms of the National Commission on the Causes and Prevention of Violence in 1968-1969 and as a firearms and federal criminal law expert for the National Commission on Reform of Federal Criminal Laws.  I have published several empirical studies of firearms and violence and on gun control, and I have co-authored three books with firearms issues at their center, in 1969, 1986 and 1997.  I have served as an expert both on the relationship between firearms and violence and on the design and evaluation of firearms control.  I am providing expert opinions on both of these topics in this declaration. I was elected a Fellow of the American Academy of Criminology in 1993 and to the American Academy of Arts and Sciences in 1990.  A full curriculum vitae is Appendix A of this declaration.

2.     This declaration will summarize the empirical evidence and my expert opinions concerning four issues arising out of this litigation.

(1)  The relationship between firearms and violence and the governmental interest in reducing the rate of gun use in crime.

(2)  The particular governmental concerns with handguns and other concealable weapons because of their disproportionate involvement in life-threatening crimes of violence, particularly in streets and other public places.

(3)  The special threat posed by concealed handguns as weapons used by criminals in streets and other public spaces.  Persons using the streets

1   cannot avoid and police patrolling the streets cannot detect persons who
2   carry concealed handguns and later will find victims who are at risk when
3   concealed guns are displayed in robberies or assaults and not infrequently
4   discharged.  The governmental interest in limiting the number of persons
5   licensed to carry weapons hidden on their persons in public places is
6   substantially related to reducing the volume and deadliness of street
7   robberies and assaults.

8   　　　　(4)  A robust right to own a handgun in the privacy of one's own
9   home imposes whatever risks the gun poses on the owner and his family and
10  those who choose to visit those premises as long as the gun stays home.  But
11  unlimited freedom given to a person to carry a hidden handgun on the
12  streets subjects everybody else on the street to whatever risks that gun may
13  pose, and the others on the public fare have neither notice of the risk nor
14  power to control it.  This "externality" of unrestricted street carrying of
15  concealed weapons is probably the root cause of the longstanding and
16  broadly based history of restricting use of concealed weapons in public
17  places.

18  Firearms and the Death Rate from Violence.

19  　　　　3.　　　The overlap between firearms and crime in the United States is a
20  partial but important one.  Of all so-called "index" crimes reported to the police
21  nationwide (willful homicide, forcible rape, robbery, burglary, aggravated assault,
22  larceny over $50, motor vehicle theft, and arson), guns are known to be involved
23  in only about 4%.  But gun use is concentrated in violent crime, where about 20%
24  of all offenses involve guns.  And when only criminal acts that kill are counted,
25  guns account for almost 70% of all cases.  Why are gun cases seven out of every
26  ten lethal crimes, if firearms are used in only one out of five violent criminal acts?
27  Commonsense suggests that the greater dangerousness of guns when compared to
28  other frequently used instruments of attack such as knives and blunt instruments,

1  plays a major role in increasing the death rate from crimes, but there is an
2  alternative hypothesis, that robbers and assaulters who truly want to kill will
3  choose guns more often, and therefore that the greater death rate simply reflects
4  the more lethal intentions of those who use guns.  Which theory is better supported
5  by studying patterns of violent assault?

6      4.    A series of studies that were conducted under my supervision
7  addressed this issue from 1967 to 1988.  The first study compared knife and gun
8  attacks in Chicago over four police periods in 1967.  I found that when one only
9  compared gun and knife assaults to the same part of the body and controlled for
10 the number of wounds inflicted, the gun attacks were five times as likely to kill.[1]
11 Yet knives were the second most deadly instruments used in violent assault.  A
12 second study found that guns that fired smaller bullets were much less likely to kill
13 than guns firing larger bullets, again controlling for both the number of and the
14 location of the most life-threatening wound.  The central finding was that
15 instrumentality effects – the influences of weapon dangerousness independent of
16 measurable variations in the attacker's intent was an important influence in the
17 death rate from assault.[2]

18     5.    A second set of studies generated the same general results for the
19 weapons used in robberies.  Since the robber usually doesn't mean to inflict harm
20 if his demands are met, the death rate from all forms of robbery is much lower than

21

22   [1] Zimring, Franklin E. "Is Gun Control Likely to Reduce Violent Killings?"
*University of Chicago Law Review* 35:721 (1968).
23

24   [2] Zimring, Franklin E. "The Medium is the Message: Firearms Caliber as a
25 Determinant of the Death Rate from Assault," *Journal of Legal Studies* 1:97 (1972).
26 See Philip J. Cook, "The Technology of Personal Violence,' *Crime and Justice* 14:1
(1991).
27

28

1   from aggravated assault, but robberies with firearms are much more likely to
2   produce a victim's death than robberies using knives or personal force.[3]  The
3   availability of guns may or may not influence the rate of robberies, but the
4   proportion of robberies that involve guns will have a major impact on the number
5   of victims who die in robberies, and lethal robberies are a major element in the
6   life-threatening violence that sets U.S. cities apart from the major metropolitan
7   areas of other developed nations.

8        6.     The governmental interest in restricting the use of guns in violent
9   crime is in reducing the number of deaths and life-threatening injuries that are
10  produced when guns rather than less deadly weapons became instruments of
11  robbery and assault.  This interest is clear, appropriate and important for both the
12  State of California and the County and City of Los Angeles.

13       <u>The Special Risks of Handguns.</u>

14       7.     All forms of firearms are very dangerous to life if they are used in
15  assaults and robberies, but the handgun is the major hazard, particularly in big
16  cities, because handguns are much more likely to be used in criminal violence than
17  shotguns and rifles.  Handguns are slightly more than one-third of all firearms
18  owned by civilians in the United States, but they are used in more than 75% of all
19  gun killings and in even larger portions of robberies.  The handgun is small, easy
20  to carry and conceal, and deadly at short range.  Handguns are the priority concern
21  of law enforcement everywhere.[4]

22

23

---

24   [3] Zimring, Franklin E. and James Zuehl. "Victim Injury and Death in Urban
     Robbery: A Chicago Study," *Journal of Legal Studies* 15:1 (1986).

25   [4] Zimring, Franklin E. and Gordon Hawkins. Crime Is Not the Problem:
26   Lethal Violence in America, New York: Oxford University Press (1997), Chapters
27   1, 3 and 7.  See also Zimring, Franklin E. and Gordon Hawkins, The Citizen's Guide
     to Gun Control, New York: McMillan (1986), at Chapter 5, p. 38.

28

8.    The special dangers of handgun use in violence have produced a wide variety of different legal strategies to minimize the rate of handgun misuse.  Many nations attempt to restrict both the number of such firearms owned by citizens and reasons why citizens might be permitted to own them.  But California, like most U.S. states, allows competent adults to own handguns if they have no major record of criminal conviction.

9.    Because California does not restrict eligibility of most citizens to own handguns or the volume of guns owned, the state's first line of defense against the use of such weapons in street crime is a series of restrictions on the time, place and manner of handgun use.  California law prohibits the carrying of concealed deadly weapons in public without a special permit.  The state law delegates the authority to establish standards and make individual decisions in Los Angeles to county and city law enforcement and government.  The goal here is to distinguish uses of handguns that do not pose a special threat to the public (such as storage and use in the owner's home) from uses that pose greater threats to public safety (such as the carrying of concealed weapons in streets and public places).  The special danger of a hidden handgun is that it can be used against persons in public robbery and assault as well as transported to other indoor commercial and residential locations to be used in attacks.  The concealment of a handgun means that other citizens and police don't know it is in their shared space until it is brandished.  Concealed handguns are a special problem for police because an armed police officer has no warning that persons carrying concealed handguns are doing so.  A police officer will be vulnerable to an element of surprise that will not be present if a person is openly carrying a firearm.

10.    Of course not all of those carrying concealed handguns intend to use them as instruments of public harm.  But the existence of a loaded weapon is a hidden danger.  California's emphasis on controlling this risky use of guns rather than restricting ownership itself is exactly opposite to the policy formerly pursued

by Washington, D.C. and disapproved in the *Heller* decision in 2008. The distinction between restricting ownership and restricting dangerous uses is fundamental in the design of firearms control. And no public law regulation of firearms is as old or as pervasive as restrictions on public space use of firearms.

> "The earliest and most numerous state and local laws relate to the carrying or use of firearms. In the 1600s, Massachusetts prohibited the carrying of defensive firearms in public places. Kentucky in 1813, Indiana in 1819, Arkansas and Georgia in 1837 passed laws prohibiting the carrying of concealed weapons. Many states and most cities today have laws attempting to regulate what has been called the place and manner in which firearms may be carried or used."[5]

Almost all places make special rules for concealed handguns in public places.

> "Most often, state law prohibits the carrying of concealable firearms without a special permit and the discharge of guns within city limits...Forty-nine states now impose some sort of restrictions on carrying a concealed gun."[6]

### The Public Danger of Concealed Firearms.

11.    The previous section of this declaration documented the statistical dominance of handguns in life-threatening violence but did not explain it. Why are handguns, a minority of all firearms, responsible for three-quarters of all firearms deaths? Why are handguns the overwhelmingly predominant firearm used in armed robbery?

12.    This is a matter of simple criminal logistics. Most firearms assaults and almost all firearms robberies take place outside the offender's home, so that

---

[5] Newton, George and Franklin E. Zimring, *Firearms and Violence in American Life*, staff report submitted to the National Commission on Causes and Prevention of Violence, Washington D.C.: Government Printing Office (1969) at p. 87 (citations in original omitted).

[6] Zimring, Franklin E. and Gordon Hawkins, *The Citizen's Guide to Gun Control* (1986) at p. 123. A more recent compendium lists 47 states with special permits, see www.lcav.org.

1  using a firearm in crime requires transporting it to a non-home location.  But
2  carrying a loaded shotgun to a commercial location for a robbery or to somebody
3  else's home or on the street while looking for a target is a warning to potential
4  victims and a red flag to passersby and to any law enforcement personnel that the
5  armed pedestrian is not on an ordinary errand.  Other pedestrians and motorists can
6  avoid the visibly armed person and police can ask questions and subject the visibly
7  armed person to identity checks and surveillance.

8      13.    But the person with a concealed handgun in his pocket generates no
9  special notice until the weapon appears at his criminal destination.  The robber or
10  assaulter looks no different from any other user of common public spaces.  And this
11  ability to escape special scrutiny is the advantage that makes the concealed handgun
12  the dominant weapon of choice for gun criminals and a special danger to
13  government efforts to keep public spaces safe and secure.

14      14.    The necessity of carrying guns to crime sites without detection is one
15  reason why the National Violence Commission research reported that 86% of all the
16  firearms used in all assaults were handguns and an astonishing 96% of all firearms
17  robberies were committed with handguns in the ten large cities the task force
18  surveyed.[7]  What that robbery percentage means is that the problem of gun robbery
19  in American cities is almost exclusively a problem of concealable handguns.

20      15.    The stringent requirements that California and Los Angeles County and
21  cities within the county impose on persons wishing to have permits to carry loaded
22  and concealed guns have two strategic objectives.  The first and most important is to
23  restrict drastically the number of persons secretly armed on the streets of Los
24  Angeles County.

25      16.    Figure 1 shows the current control of the volume of California

26  _____

27  [7] Newton, George and Franklin E. Zimring (1969), *Firearms and Violence in American Life*, at Figure 8-1, p. 49.

28

HOA.846807.17

00050

concealed weapons (CCW) permits and the huge stakes of shifting to the standards

asserted as rights by the plaintiff in this litigation. The current system of CCW

licensing allows citizens in Los Angeles to apply for CCW licenses either to the

county sheriff or to their local police. For this reason, only countywide rates of

licensing can be determined without detail on the city of residence for all who obtain

county licenses. Figure 1 provides countywide population and CCW data.

Figure 1. Population and Licenses to Carry in Los Angeles County.



Sources: population (U.S.Census Bureau, State and County Quickfacts, Los Angeles
County, California, available at
http://quickfacts.census.gov/qfd/states/06/06037.html); permits (California
Department of Justice, CCW Counts by County, 2000 through 2007, available at
http://ag.ca.gov/firearms/forms/pdf/ccwissuances2007.pdf)

17.    The rate per thousand adults of CCW permits is .16, indicating that

fewer than one of every 5,000 adults holds a permit. By contrast, a system where all

persons without felony convictions, convictions for domestic violence crime or

involuntary mental health commitments would make more than 90% of Los Angeles

adults eligible for permits. That would be just under seven million potential

carriers.

18.    Making the carrying of hidden deadly weapons into a very rare

HOA.846807.1 8

00051

1    privilege enables citizens not to worry that they must choose between carrying a gun

2    themselves or being unarmed in public spaces where many strangers are secretly

3    armed.  Restricting the publicly entitled carriers of concealed handguns to a tiny

4    number also reinforces the practical monopoly of armed force by the police.  And

5    the police are one of the primary groups protected by small rates of carrying

6    concealed guns since more than 90% of killings of police are with guns.[8]

7          19.     The special vulnerability of police to weapons concealed on a person is

8    the element of surprise in the event of an attack.  An openly carried firearm is a

9    special danger to an officer, but it is a known danger.  The police officer can be

10   prepared to draw or use his weapon when a weapon is on display.  But the person

11   carrying a concealed handgun is a hidden danger to an officer.  High rates of

12   carrying concealed weapons put the police on the horns of a dangerous dilemma—

13   either they (1) make no assumptions about persons being armed (in which case they

14   are surprised and at a disadvantage when a concealed weapon is drawn) or (2)

15   assume everybody is carrying a loaded gun in which case they will be much quicker

16   to draw and fire their own guns even if no weapons are in fact held by the person

17   being approached.  So once a high rate of CCW takes place, the relationship

18   between armed police and citizens without any visible evidence of carrying guns

19   will get more dangerous for the police, for the citizen, or for both.

20         20.     The second strategic aim of a permit-to-carry requirement is to screen

21   those persons who do have special needs for concealed guns to make sure they will

22   not misuse the guns they carry.  This kind of risk screening explains the good

23   character, minimum age and lack of criminal record requirements.  But the central

24   reason to require a good reason for needing a gun is to reduce the number of secretly

25   armed citizens on the streets and sidewalks of one of the biggest urban areas in the

26   _____

27         [8] U.S. Department of Justice, Federal Bureau of Investigation, *Law
Enforcement Officers Killed and Assaulted* (2008), Table 27.

28

United States.

21.     There is one factual dispute of central importance in the distinction between small and large volumes of CCW permits—the degree to which criminal conduct is concentrated among formally identified felons.  It is sometimes claimed that simply excluding former felons would prevent persons with high risks of future crime from being eligible to carry hidden handguns.  This claim is false.  A majority of criminal homicides and other serious crimes are committed by individuals who have not been convicted of a felony.  The first published study on this question found that in Chicago, 57% of those adults arrested for homicide did not have a felony record.[9]

22.     It has more recently been reported that for all of New York State only 33% of all persons arrested for felonies have a felony conviction at the time of arrest.  Thus, about two-thirds of current felons would not be prohibited from eligibility under "shall issue" criteria (meaning criteria wherein if a person has no prior felony conviction, domestic violence conviction, or recent psychiatric commitment, said person would automatically be entitled to a CCW permit).[10]

23.     What percentage of the persons committing serious crimes in Los Angeles would be disqualified by reason of a felony conviction from a permissive "right to carry" license standard?  Julie Basco of the California Department of Justice supervised an analysis of all 122,948 adult felony arrests in Los Angeles County for 2010 and divided these persons by whether they had a pre-2010 felony conviction.  A total of 43,440 subjects had a prior felony that would keep them

---

[9] P.J. Cook, J. Ludwig and A. Braqa, "Criminal Records of Homicide Offenders," *Journal of the American Medical Association* 294(5), August 3, 2005.

[10] Reported in expert's declaration of Philip J. Cook in Kachalsky v. Cacase, Civil Action 10-cv-5413, Southern District of New York (2011).

HOA.846807.1 10

00053

1  from being eligible in a "shall issue" mandate or constitutional rule.  Sixty-five

2  percent of Los Angeles County felons do not have a prior felony conviction when

3  arrested.  These statistics indicate that Almost 2/3rds of the known current felons

4  would not be screened out by a prior felony from CCW permits without further

5  barriers.    We cannot divide the Department of Justice 35% into city and other-

6  county segments, but we are confident that 65% of Los Angeles County's felony

7  suspects are not prior felons: The same general breakdown appears in the

8  statewide New York findings.  Los Angeles is part of a general pattern.

9        24.    The State of California and the County of Los Angeles believe that it

10  would threaten the public health and safety to have hundreds of thousands of people

11  in the county carrying loaded handguns that the people who share the streets and

12  stores and parks of Los Angeles cannot see.

13        25.    Is this public choice consistent with *D.C. v. Heller's* conferral of a right

14  to handgun ownership under the Second Amendment?  Los Angeles has never tried

15  to restrict home possession, so it obviously believes that public places call for

16  different presumptive policies, and history is on Los Angeles' side.  Special

17  restrictions on carrying concealed weapons are venerable and almost universal.

18  Even the plaintiff in this suit does not question the legitimacy of a special license for

19  carrying weapons.  The central question is whether publicly concealed weapons can

20  be restricted even if possession in the home is protected by *Heller*.

21        The External Dangers of Concealed Weapons in Public Spaces.

22        26.    The right of home possession announced in the *Heller* case does not

23  require citizens to purchase and own handguns in their houses but rather confers on

24  individuals the right to decide for themselves if the benefits of gun possession in the

25  home outweigh the risks.  So the Second Amendment liberty announced in *Heller*

26  puts the homeowner in a position of power to determine what risks to take.  As long

27  as the guns owned in the home stay there, Mr. Smith's gun is no risk to his

28  neighbors.  But the presence of loaded and concealed guns in public spaces is an act

HOA.846807.1 11

where Mr. Smith's decision will generate risks to others who use the streets, and go to public accommodations. And if the guns are concealed, the people who are exposed to these risks won't have notice or any ability to avoid the armed presence they confront.

27.    This "externality" means that the implications of concealed carrying are spread over the community of users of public space and the only method of deciding policy is a collective determination of whether concealed weapon carrying should be allowed and under what circumstances.

28.    So government must be involved in public space regulation in a way that is not necessary in the privacy of individual homes. This is why concealed weapons laws are the oldest form of legal regulation of gun use and the most common. There is a public choice that must be made to reduce the number of persons carrying concealed weapons by limiting licenses. But without a general rule on the standard for licenses, there is no way that individual preferences for or against high rates of permits can be translated into a regulatory framework.

I declare under penalty of perjury that the forgoing is true and correct. Executed at _Berkeley_, this 14th of December 2011.

FRANKLIN E. ZIMRING

# FRANKLIN E. ZIMRING

20 October 2011

**PERSONAL**    Born 1942, Los Angeles, California; married; two adult children.

**EDUCATION**    Los Angeles Public Schools; B.A. with Distinction, Wayne State University (1963); J.D. *cum laude*, University of Chicago (1967).

**PRESENT POSITION**    **WILLIAM G. SIMON PROFESSOR OF LAW; WOLFEN DISTINGUISHED SCHOLAR** and **CHAIR**, Criminal Justice Research Program, Institute for Legal Research (formerly the Earl Warren Legal Institute), Boalt Hall School of Law, University of California, Berkeley.

**OTHER WORK**    **Principal Investigator,** Center on Culture, Immigration and Youth Violence Prevention (2005-).

**DIRECTOR**, Earl Warren Legal Institute (1983-2002).

**FACULTY OF LAW**, University of Chicago (1967-85): **KARL N. LLEWELLYN PROFESSOR OF JURISPRUDENCE** (1982-85) and **DIRECTOR**, Center for Studies in Criminal Justice (1975-85).

**MEMBER,** MacArthur Foundation Research Program on Adolescent Development and Juvenile Justice (1997-2007).

**FELLOW,** Center for Advanced Studies in the Behavioral Sciences, Stanford, California (1979-80).

**RAPPORTEUR,** Task Force on Sentencing Policy for Young Offenders, Twentieth Century Fund (1978).

**VISITING PROFESSOR OF LAW**, University of California, Irvine (2004), University of South Africa (1993), University of California, Berkeley (1983-85), Yale University (1973), and University of Pennsylvania (1972).

**DIRECTOR OF RESEARCH,** Task Force on Firearms, National Commission on the Causes and Prevention of Violence (1968-69).

**CONSULTANT:** American Bar Foundation, Police Foundation, National Commission on Reform of Federal Criminal Laws, Institute for Defense Analysis, Department of Justice, Rand Corporation, Abt Associates, Federal Parole Commission, Federal Bureau of Prisons, Federal Bureau of Investigation, General Accounting Office, Canadian Institute for Advanced Studies, States of Alaska, California, Nebraska, Illinois, Virginia, and Washington, Cities of Chicago, New York and San Francisco.

**ADVISORY POSTS**    CURRENT: Campaign for Youth Justice (2007-); California Attorney General's Office (2001-); National Policy Committee, American Society of Criminology (1989-91 and 1993-); Board of Directors, Illinois Youth Services Association (Honorary) (1977-); Advisory Committee, National Pre-Trial Services Association (1975-).

PAST: Asian Pacific Violence Prevention Center, National Council on Crime and Delinquency (2001-2005); Advisory Committee, Sentencing Project, American Law Institute (2001-2003); Criminal Justice Policy Group, Advisory Board, National Campaign Against Youth Violence (2000-2002); Expert Panel Member, U.S. Department of Transportation, National Highway Traffic Safety Administration Panel on Crash Risk of Alcohol-Involved Driving (1994-2002); Expert Panel Member, U.S. Department of Education Panel on Safe, Disciplined,  and Drug-Free Schools (1998-2001); National Research Council Panel on Juvenile Crime:  Prevention, Intervention, and Control (1998-2001); Advisory Board, Center on Crime, Communities, and Culture, Open Society Institute (1998-2000); Affiliated Expert, Center for Gun Policy and Research, Johns Hopkins University (1995-98); Gun Violence Advisory Group, American College of Physicians (1995-98); Advisory Committee, Violent and Serious

Juvenile Offender Project, National Council on Crime and Delinquency (1994-1997); Panel on NIH Research on Anti-Social, Aggressive, and Violence-Related Behaviors and their Consequences (1997-); Task Force on Future Directions for the National Archive of Criminal Justice Data, Bureau of Justice Statistics, Department of Justice (1995); Panel on Antisocial, Aggressive, and Violence-Related Behaviors and Their Consequences, National Institute of Health (1993-94); Panel on Understanding and Control of Violent Behavior, National Research Council, National Academy of Sciences (1989-91); Research Advisory Committee, California Attorney General (1983-1990); Law Enforcement Committee, California Governor's Policy Council on Drug and Alcohol Abuse (1989-91); National Research Council, Working Group Crime and Violence (1985-88); Internal Revenue Service, Advisory Group Taxpayer Compliance Research (1983-87); Board of Directors, Eisenhower Foundation for the Prevention of Violence (1981-84); U.S. Secret Service Advisory Committee on Protection of the President (1981-82); Assembly of Behavioral and Social Sciences, National Academy of Sciences (1977-80); Executive Committee, Illinois Academy of Criminology (1968-71, 1977-78); Advisory Committee, Assessment Center for Alternatives to Juvenile Courts (1977-78) (chairman); Advisory Committee, Law and Social Science Program, National Science Foundation (1976-77); Advisory Committee, Vera Institute of Justice, Court Employment Project Evaluation (1976-77) (chairman); Panel on Deterrence and Incapacitation, National Academy of Sciences (1975-77); Legal Committee, American Civil Liberties Union, Illinois Branch (1967-70).

**EDITORIAL BOARDS**

CURRENT:  Punishment and Society (1998-); Crime and Justice:  An Annual Review of Research (1979-90, 1998-); Western Criminology Review (1997-); Buffalo Criminal Law Review (1996-); Homicide Studies (1996-); The Prison Journal (1992-); Journal of Research in Crime and Delinquency (1976-84, 1990-); Federal Sentencing Reporter (1988-); Studies in Crime and Justice (1980-); Journal of Criminal Justice (1978-).

PAST:  Law and Society Review (1988-1998); British Journal of Criminology (1988-1996);  Journal of Quantitative Criminology (1984-1989); Ethics, (1985-87); Encyclopedia of Crime and Justice (1979-83); Evaluation Quarterly (1976-84); Law and Behavior (1976-85).

**HONORS**

Edwin H. Sutherland Award, American Society of Criminology (2007); August Vollmer Award, American Society of Criminology (2006); Notable Book of the Year, *The Economist* (2003); Society of Research on Adolescence, Biannual Book Award (2002); Pass Award, National Council on Crime and Delinquency (1999); Donald Cressey Award, National Council on Crime and Delinquency (1995); Choice, Outstanding Academic Book Citation (1995 and 1982); Paul Tappan Award, Western Society of Criminology (1994); Fellow, American Society of Criminology (1993); Distinguished Alumni Award, Wayne State University (1989); Bustin Prize for Legal Research, University of Chicago (1981); Cooley Lecturer, University of Michigan Law School (1980); National Distinguished Alumnus Award, Delta-Sigma-Rho (1977); Ten Law Professors Who Shape the Future, *Time Magazine* (1977); Civilian Award of Merit for 1975, Chicago Crime Commission; Gavel Award Certificate of Merit, American Bar Association (1973).

**MEMBER**

American Academy of Arts and Sciences (1990-); California Bar Association (1968-); Order of the Coif (1967-); Phi Beta Kappa (1964-).

## BOOKS AND MONOGRAPHS

*The City That Became Safe: What New York Teaches About Urban Crime and Its Control,* New York: Oxford University Press (October 2011).

(with David T. Johnson) *The Next Frontier: National Development, Political Change, and the Death Penalty in Asia,* New York: Oxford University Press (January 2009).

(with Bernard E. Harcourt) *Criminal Law and the Regulation of Vice,* American Casebook Series, St. Paul: Thompson/West Publishers (2007).

*The Great American Crime Decline,* New York: Oxford University Press (2006).

*American Juvenile Justice,* New York: Oxford University Press (2005); (Korean translation) Prime Books (November 2009); (Chinese translation) Chinese People's Public Security University Press (2010).

*An American Travesty: Legal Responses to Adolescent Sexual Offending,* Chicago: University of Chicago Press (2004); paperback edition (2009).

*The Contradictions of American Capital Punishment*, New York: Oxford University Press (2003); paperback edition (2004); (Chinese translation) Shanghai Joint Publishing (2008); (Italian translation) Società editrice il Mulino, Bologna (2009).

(with Margaret Rosenheim, David Tanenhaus, and Bernardine Dohrn, eds.) *A Century of Juvenile Justice*, Chicago: University of Chicago Press (2002); (Chinese translation) Beijing: The Commercial Press (2008).

(with Gordon Hawkins and Sam Kamin) *Punishment and Democracy: Three Strikes and You're Out in California*, New York: Oxford University Press (2001).

(with Jeffrey Fagan, ed.) *The Changing Borders of Juvenile Justice: Transfer from Juvenile to Criminal Court*, Chicago: University of Chicago Press (2000).

(with Sam Kamin and Gordon Hawkins) *Crime and Punishment in California: The Impact of Three Strikes and You're Out*, Berkeley: Institute of Governmental Studies (1999).

*American Youth Violence*, New York: Oxford University Press (1998); paperback edition (2000).

(with Gordon Hawkins) *Crime Is Not the Problem: Lethal Violence in America*, New York: Oxford University Press (1997); paperback edition (1999).

(with Gordon Hawkins) *Incapacitation: Penal Confinement and the Restraint of Crime*, New York: Oxford University Press (1995); paperback edition (1997).

(with Gordon Hawkins) *Prison Population and Criminal Justice Policy in California*, Berkeley: Institute of Governmental Studies (1992).

(with Gordon Hawkins) *The Search for Rational Drug Control*, New York: Cambridge University Press (1992); paperback edition (1995).

(with Gordon Hawkins) *The Scale of Imprisonment*, Chicago: University of Chicago Press (1991); paperback edition (1993).

(with Gordon Hawkins) *Pornography in a Free Society*, New York: Cambridge University Press (1988); paperback edition (1991).

(with Michael Laurence and John Snortum, eds.) *Social Control of the Drinking Driver*, Chicago: University of Chicago Press (1988).

(with Gordon Hawkins) *The Citizen's Guide to Gun Control*, New York: Macmillan Publishing Company (1987); paperback edition (1992).

(with Gordon Hawkins) *Capital Punishment and the American Agenda*, New York: Cambridge University Press (1987); paperback edition (1989).

(with Mark Siegler, Steven Toulman, Kenneth Schaffner, eds.) *Medical Innovation and Bad Outcomes: Legal, Social, and Ethical Responses*, Ann Arbor, MI: Health Administration Press (1987).

(with Gordon Hawkins, ed.) *The Pursuit of Criminal Justice: Essays From the Chicago Center*, Chicago: University of Chicago Press (1984); Midway reprint edition (1986).

(with Michael Tonry, ed.) *Reform and Punishment: Essays on Criminal Sentencing*, Chicago: University of Chicago Press (1983).

*The Changing Legal World of Adolescence*, New York: The Free Press (1982); paperback edition (1985).

(with Richard Frase) *The Criminal Justice System: Materials on the Administration and Reform of the Criminal Law*, Boston: Little, Brown and Company (1980).

*Confronting Youth Crime: Report of the Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders*, New York: Holmes and Meier (1978).

(with Gordon Hawkins) *Deterrence: The Legal Threat in Crime Control*, Chicago: University of Chicago Press (1973); Phoenix edition (1976).

*Perspectives on Deterrence*, Washington, D.C.: National Institute of Mental Health (1971).

(with George P. Newton) *Firearms and Violence in American Life*, Task Force Report to the National Commission on the Causes and Prevention of Violence, Washington, D.C.: U.S. Government Printing Office (1969).

## SCHOLARLY ARTICLES

How New York Beat Crime, *Scientific American,* August 2011, p. 75.

Executions without Legitimacy? Why the ALI Action Matters, Response to Jordan and Steiker, "No More Tinkering: The ALI and the Death Penalty Provisions of the Model Penal Code." Texas Law Review See Also 88:257 (2011); available at: <http://www.texaslrev.com/seealso/vol/88/responses/zimring>.

(with Rosemary Gartner and Anthony Doob) The Past as Prologue? Decarceration in California then and Now, *Criminology and Public Policy* 10:291-325 (2011).

The Scale of Imprisonment in the United States: 20th Century Patterns and 21st Century Prospects, *The Journal of Criminal Law & Criminology* 100:1225-1245 (2010).

The Power Politics of Juvenile Court Transfer: A Mildly Revisionist History of the 1990s, *Louisiana Law Review* 71:1-15 (2010).

(with Jeffrey Fagan and David T. Johnson) Executions, Deterrence, and Homicide: A Tale of Two Cities, *Journal of Empirical Legal Studies* 7:1-29 (March 2010).

Delinquency, Opportunity and the Second Generation Immigrant Puzzle, in Frost, et al, eds., *Contemporary Issues in Criminal Justice Policy: Policy Proposals from the American Society of Criminology Conference,* Wasdworth/Cenage Learning (2010) 247-249.

Juvenile Crime, in Shweder, et al, eds., *The Child: An Encyclopedic Companion*, University of Chicago Press (2009) 217-219.

Debating a Federal Sentencing Commission circa 1978, *Federal Sentencing Reporter* 21:271 (April 2009).

(with Alex Piquero, Wesley Jennings and Stephanie Hays) Investigating the Continuity of Sex Offending: Evidence from the Second Philadelphia Birth Cohort, *Justice Quarterly* 26:59 (March 2009).

(with Chrysanthi S. Leon) A Cite Checker's Guide to Sexual Dangerousness, *Berkeley Journal of Criminal Law* 13:65 (Spring 2008).

Public Sentiment, Political Action, and Governmental Crime Policy–On the Origins and Significance of Mixed Feelings, *Criminology and Public Policy* 7:467 (August 2008).

Criminology and Its Discontents: The American Society of Criminology 2007 Sutherland Address, *Criminology* 46:255 (May 2008)

Violence and Drugs: Divide, Then Conquer? *Berkeley Review of Latin American Studies* pp. 40-41 (Spring 2008).

Handgun Control, The Second Amendment and Judicial Legislation in the D.C. Circuit: A Note on *Parker v. District of Columbia, New Criminal Law Review* 2:312 (2008).

(with David Johnson) Law, Society and Capital Punishment in Asia, *Punishment & Society* 10:103 (2008); also published in *Criminal Law Review* 19:109, (translated into Chinese by Richard Chiang for Peking University Press)  (2006).

(with Gordon Hawkins) Crime Is Not the Problem: Lethal Violence in America, in Mary E. Vogel, ed., *Crime, Inequality and the State,* Routledge (2007).

Protect Individual Punishment Decisions from Mandatory Penalties, *Criminology and Public Policy* 6:881 (November 2007).

(with Alex Piquero and Wesley Jennings) Sexual Delinquency in Racine: Does Early Sex Offending Predict Later Sex Offending in Youth and Young Adulthood? *Criminology and Public Policy* 6:507 (August 2007).

Vollmer Award Address: The Necessity and Value of Transnational Comparative Study--Some Preaching from a Recent Convert, *Criminology and Public Policy* 5:615 (November 2006).

(with David Johnson) Taking Capital Punishment Seriously, *Asian Criminology* 1:89 (2006).

(with Cheryl Marie Webster and Anthony N. Doob) Proposition 8 and Crime Rates in California: The Case of the Disappearing Deterrent, *Criminology and Public Policy* 5:1501 (August 2006).

(with Jeffrey Fagan and Amanda Geller) Capital Punishment and Capital Murder:  Market Share and the Deterrent Effects of the Death Penalty, *Texas Law Review* 84:1803 (June 2006).

(with David Johnson) Public Opinion and the Governance of Punishment in Democratic Political Systems, *The Annals of The American Academy of Political and Social Science* 605:266 (May 2006).

(with David Johnson) On the Comparative Study of Corruption, *British Journal of Criminology* 45:793 (2005); also in the *Pacific McGeorge Global Business and Development Law Journal* 20:243 (2007) and in K. Padmaja, ed., *Corruption: Socio Legal Dimensions,* The ICFAI University Press (2008).

Penal Policy and Penal Legislation in Recent American Experience, *Stanford Law Review* 58:323 (2005).

Path Dependence, Culture and State-Level Execution Policy: A Reply to David Garland, *Punishment and Society* 7:377 (2005).

Minimizing Harm from Minority Disproportion, in Darnell F. Hawkins and Kimberly Kempf-Leonard, eds., *Our Children, Their Children: Confronting Racial and Ethnic Differences in American Juvenile Justice,* University of Chicago Press (2005).

Política Criminal y Legislación Penal en la Experiencia Estadounidense Reciente [Criminal Policy and Penal Legislation in the Recent American Experience], in José Luis Díez Ripollés, Ana María Prieto del Pino and Susana Soto Navarro, eds., *La Política Legislative Penal en Occidente: Una Perspectiva Comparada* [Legislative Penal Policy in the West: A Comparative Perspective], Tirant lo Blanch (2005).

In Memoriam: Norval Morris (1923-2004), *The University of Chicago Law Review* 72:459 (2005).

The Unexamined Death Penalty: Capital Punishment and Reform of the Model Penal Code, *Columbia Law Review* 105:1396 (2005).

Symbol and Substance in the Massachusetts Commission Report, *Indiana Law Journal* 80:115 (2005).

(with Michael Vitiello, Clark Kelso, Erwin Chemerinsky, Kevin Reitz, and Jonathan Turley) A Proposal for a Wholesale Reform of California's Sentencing Practice and Policy, *Loyola of Los Angeles Law Review* 38:903 (2004).

The Discrete Character of High-Lethality Youth Violence, *Youth Violence: Scientific Approaches to Prevention, Annals of the New York Academy of Sciences* 1036:290 (2004).

The Weakest Link: Human Rights and the Criminal Offender in Modern Democratic Government, in Gerben Bruinsma, Henk Elffers, and Jan de Keijser, eds., *Punishment, Places, and Perpetrators: Developments in Criminology and Criminal Justice Research,* Wilan Publishing (2004).

Firearms, Violence, and the Potential Impact of Firearms Control, *The Journal of Law, Medicine, and Ethics* 32:34 (2004).

(with Gordon Hawkins) Democracy and the Limits of Punishment: A Preface to Prisoners' Rights, in Michael Tonry, ed., *The Future of Imprisonment,* Oxford University Press (2004).

Continuity and Change in the American Gun Debate in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence*, Washington, DC: Brookings Institution Press (2003); also as Chapter 1 in Bernard E. Harcourt, ed., *Guns, Crime, and Punishment in America*, New York: New York University Press (2003).

The Peculiar Present of American Capital Punishment in Stephen P. Garvey, ed., *Beyond Repair? America's Death Penalty*, Durham, NC: Duke University Press (2003).

(with Sam Kamin) Facts, Fallacies, and California's Three Strikes, *Duquesne Law Review* 40:605 (2002).

(with Gordon Hawkins) Capital Punishment, in *Oxford Companion to American Law*, New York: Oxford University Press (2002).

The New Politics of Criminal Justice:  Of "Three Strikes," Truth-in-Sentencing, and Megan's Laws, *National Institute of Justice Research Report, Perspectives on Crime and Justice: 1999-2000 Lecture Series, Washington, DC*, Volume 4 (March 2001).

Crime, Criminal Justice, and Criminology for a Smaller Planet: Some Notes on the 21st Century (Noriyoshi Takemura, translator), *Toin Law Review* 8:75 (2001)

Crime, Criminal Justice, and Criminology for a Smaller Planet: Some Notes on the 21st Century, *The Australian and New Zealand Journal of Criminology* 34:213 (2001).

Imprisonment Rates and the New Politics of Criminal Punishment, *Punishment and Society* 3:161 (2001); also as Chapter 10 in David Garland, ed., *Mass Imprisonment: Social Causes and Consequences*, London: Sage Publications (2001).

The Common Thread: Diversion in Juvenile Justice, *California Law Review* 88:2477 (2000); also as Chapter 5 in (with Margaret Rosenheim, David Tanenhaus, and Bernardine Dohrn, eds.) *A Century of Juvenile Justice*, Chicago: University of Chicago Press (2002).

(with Jeffrey Fagan) The Search for Causes in an Era of Declining Crime Rates: Some Lessons from the Study of New York City Homicide, *Crime and Delinquency* 46:446  (2000).

Incarceration Patterns, in *Mass Incarceration:  Perspectives on U.S. Imprisonment, University of Chicago Law School Roundtable, A Journal of Interdisciplinary Legal Studies*, Volume 7 (2000).

Penal Proportionality and the Young Offender: Notes on Immaturity, Capacity, and Diminished Responsibility, in Thomas Grisso and Robert G. Schwartz, eds., *Youth on Trial*, Chicago: University of Chicago Press (2000).

The Punitive Necessity of Waiver, Chapter 6 in Fagan and Zimring, eds., *The Changing Borders of Juvenile Justice*, Chicago: University of Chicago Press (2000).

(with Jeffrey Fagan) Transfer Policy and Law Reform, Chapter 12 in Fagan and Zimring, eds., *The Changing Borders of Juvenile Justice*, Chicago: University of Chicago Press (2000).

American Youth Violence:  Implications for National Juvenile Justice Policy, *Update on Law-Related Education* (American Bar Association publication) 23:6 (1999).

The Hardest of the Hard Cases: Adolescent Homicide in Juvenile and Criminal Courts, *Virginia Journal of Social Policy and the Law*, 6:437 (1999).

The 1990s Assault on Juvenile Justice: Notes from an Ideological Battleground, *Federal Sentencing Reporter* 11:260 (1999).

(with Jeffrey Fagan and June Kim) Declining Homicide in New York City: A Tale of Two Trends, *Journal of Criminal Law and Criminology* 88:1277 (1998); also (with Jeffrey Fagan) as Le Cause Della Diminuzione Dei Reati: Alcune Riflessioni Sull'Analisi Degli Omicidi a New York, in Marzio Barbagli, ed., *Perché È Diminuita La Criminalità Negli Stati Uniti?* Società Editrice Il Mulino (2000).

The Executioner's Dissonant Song:  On Capital Punishment and American Legal Values, Chapter 6 in Austin Sarat, ed., *Killing State:  Capital Punishment in Law, Politics, and Culture*, Oxford University Press (1999); also in *Institute for Philosophy and Public Policy Report* 19:1 (1999).

(with Gordon Hawkins) Public Attitudes Toward Crime:  Is American Violence A Crime Problem? in Edward Rubin, ed., *Minimizing Harm:  A New Crime Policy for Modern America*, Westview Press (1999).

Toward a Jurisprudence of Youth Violence, in Michael Tonry and Mark Moore, eds., *Youth Violence. Crime and Justice:  A Review of Research*, University of Chicago Press (1998).

The Youth Violence Epidemic:  Myth or Reality?, *Wake Forest Law Review* 33:727 (1998).

(with Gordon Hawkins) Crime Is Not the Problem:  A Reply, *University of Colorado Law Review* 69:1177 (1998).

(with Gordon Hawkins) Lethal Violence and the Overreach of American Imprisonment, *National Institute of Justice Research Report, Presentations from the 1996 Annual Research and Evaluation Conference, Washington, DC*, July 1997.

Juvenile Violence in Policy Context, *Valparaiso University Law Review* 31:419 (1997).

The Doom of a Good Intention, *Politics and the Life Sciences* 16:44 (1997).

(with Gordon Hawkins) Concealed Handguns:  The Counterfeit Deterrent, *The Responsive Community*, Spring 1997, p. 46.

Kids, Guns, and Homicide:  Policy Notes on an Age-Specific Epidemic, *Law and Contemporary Problems* 59:25 (1996).

Populism, Democratic Government, and the Decline of Expert Authority:  Some Reflections on "Three Strikes" in California, *Pacific Law Journal* 28:243 (1996).

(with Gordon Hawkins) Is American Violence a Crime Problem?, *Duke Law Journal* 46:43 (1996); also in Edward Rubin, ed., *Minimizing Harm as a Goal for Crime Policy in California*, California Policy Seminar Policy Research Program Report (1997).

The Wages of Ambivalence:  On the Context and Prospects of New York's Death Penalty, *Buffalo Law Review* 44:303 (1996).

(with Adolfo Ceretti and Luisa Broli) Crime Takes a Holiday in Milan, *Crime and Delinquency* 42:269 (1996).

The Genetics of Crime, *Politics and the Life Sciences* 15:105 (1996).

(with Gordon Hawkins) Toward a Principled Basis for Federal Criminal Legislation, *The Annals of the American Academy of Political and Social Science* 543:15 (1996).

Firearms Control in Federal Law in the United States:  Current Conditions and Further Choices, *UNAFEI Resource Materials Series*, No. 46 (Materials Produced during the 96th International Seminar Course on the "Promotion of International Cooperation in Criminal Justice Administration), p. 117 (1995).

Reflections on Firearms and the Criminal Law, *Journal of Criminal Law and Criminology* 86:1 (1995).

(with William Nelson) Cigarette Taxes as Cigarette Policy, *Tobacco Control* 4:S25 (1995).

(with Gordon Hawkins and Hank Ibser) Estimating the Effects of Increased Incarceration on Crime in California, *California Policy Seminar Brief*, Volume 7, July 1995.

(with Johannes van Vuren and Jan van Rooyen) Selectivity and Racial Bias in a Mandatory Death Sentence Dispensation:  A South African Case Study, *Comparative and International Law Journal of Southern Africa* 28:107 (1995); Misleading Statistics and the Death Penalty -- Two Authors Reply to Henry Lever, *Comparative and International Law Journal of Southern Africa* 30:364 (1997).

(with Gordon Hawkins) The Growth of Imprisonment in California, *British Journal of Criminology* 34:83 (1994).

Policy Research on Firearms and Violence, *Health Affairs* 12:109 (1993).

(with Gordon Hawkins) Crime, Justice, and the Savings and Loan Crisis, *Crime and Justice* 18:247 (1993).

(with Gordon Hawkins) Continuity and Focus in Criminal Justice Research, *Journal of Research in Crime and Delinquency* 20:525 (1993).

Comparing Cigarette Policy and Illicit Drug and Alcohol Control, in Robert Rabin and Stephen Sugarman, eds., *Smoking Policy: Law, Politics, and Culture*, Oxford University Press (1993).

On the Liberating Virtues of Irrelevance, *Law and Society Review* 27:9 (1993).

Drug Treatment as a Criminal Sanction, *University of Colorado Law Review* 64:809 (1993).

Prison Population and Criminal Justice Policy in California, *California Policy Seminar Brief*, Volume 4, August 1992.

Inheriting the Wind:  The Supreme Court and Capital Punishment in the 1990s, *Florida State University Law Review* 20:1 (1992).

The Jurisprudence of Teenage Pregnancy, in Margaret Rosenheim and Mark Testa, eds., *Early Parenthood and Coming of Age in the 1990s*, Rutgers University Press (1992).

The Multiple Middlegrounds Between Civil and Criminal Law, *Yale Law Journal* 101:1901 (1992).

(with Gordon Hawkins) What Kind of Drug War?, *Social Justice* 18:104 (1991).

Firearms, Violence, and Public Policy, *Scientific American*, November 1991, p. 48; also in Robert K. Miller, ed., *The Informed Argument*, Harcourt Brace (1995); K. Ackley, ed., *Perspective on Contemporary Issues*, Harcourt Brace (1996).

Ambivalence in State Capital Punishment Policy:  An Empirical Sounding, *New York University Review of Law and Social Change* 18:729 (1991).

(with Gordon Hawkins) The Wrong Question:  Critical Notes on the Decriminalization Debate, in Melvyn Krauss and Edward Lazear, eds., *Search for Alternatives:  Drug-Control Policy in the United States*, Hoover Institution Press (1991).

The Limits of Criminal Punishment:  Some Ethical Issues for the 1990s, in David Gordis, ed., *Crime, Punishment, and Deterrence:  An American-Jewish Exploration*, University of Judaism (1991).

The Treatment of Hard Cases in American Juvenile Justice:  In Defense of Discretionary Waiver, *Notre Dame Journal of Law, Ethics and Public Policy* 5:267 (1991).

Punishing the Drinking Driver:  Toward an Experimental Design, *Alcohol, Drugs, and Driving* 6:199 (1990).

(with Gordon Hawkins) On the Scale of Imprisonment:  Downes's *Contrasts in Tolerance*, *Journal of the American Bar Foundation* 14:527 (1989).

The Problem of Assault Firearms, *Crime and Delinquency* 35:538 (1989).

Methods for Measuring General Deterrence:  A Plea for the Field Experiment, in Martin Friedland, ed., *Sanctions and Rewards in the Legal System*, University of Toronto Press (1989).

(with Gordon Hawkins) The Path Toward the Abolition of Capital Punishment in the Industrial West, *Revue Internationale de Droit Penal* 58:669 (1988).

(with Gordon Hawkins) The New Mathematics of Imprisonment, *Crime and Delinquency* 34:425 (1988); Response to Zedlewski, *Crime and Delinquency* 35:316 (1989).

(with Gordon Hawkins) Murder, the Model Code, and the Multiple Agendas of Reform, *Rutgers Law Journal* 19:733 (1988).

Law, Society, and the Drinking Driver: Some Concluding Reflections, in Michael Laurence, John Snortum, and Franklin Zimring, eds., *Social Control of the Drinking Driver*, University of Chicago Press (1988).

Principles of Criminal Sentencing, Plain and Fancy, *Northwestern University Law Review* 82:73 (1987).

Legal Perspectives on Family Violence, *California Law Review* 75:521 (1987); also as Toward a Jurisprudence of Family Violence, in Lloyd Ohlin and Michael Tonry, eds., *Family Violence*, University of Chicago Press (1989).

(with Gordon Hawkins) Dangerousness and Criminal Justice, *Michigan Law Review* 85:481 (1987).

Some Social Bases for Compensation Schemes, in Mark Siegler, Steven Toulman, Franklin Zimring, and Kenneth Schaffner, eds., *Medical Innovation and Bad Outcomes: Legal, Social, and Ethical Responses*, Health Administration Press (1987).

(with Gordon Hawkins) A Punishment in Search of a Crime: Standards for Capital Punishment in the Law of Criminal Homicide, *Maryland Law Review* 46:1001 (1986).

Gun Control, *Bulletin of New York Academy of Medicine* 62:5 (1986).

(with James Zuehl) Victim Injury and Death in Urban Robbery: A Chicago Study, *Journal of Legal Studies* 15:1 (1986).

(with Gordon Hawkins) Cycles of Reform in Youth Corrections: The Story of Borstal, in Peter Greenwood, ed., *The Juvenile Rehabilitation Reader*, Rand Corporation (1985).

(with Gordon Hawkins) Western European Perspectives on the Treatment of Young Offenders, in Peter Greenwood, ed., *The Juvenile Rehabilitation Reader*, Rand Corporation (1985).

(with Gordon Hawkins) Capital Punishment and the Eighth Amendment: Furman and Gregg in Retrospect, *UC Davis Law Review* 18:927 (1985).

Violence and Firearms Policy, in Lynn Curtis, ed., *American Violence and Public Policy*, Yale University Press (1985).

(with Rayman Solomon) The Principle of the Thing: Goss v. Lopez, Student Rights, and Litigation in the Public Interest of Children, in Robert Mnookin, ed., *In the Interest of Children: Advocacy, Law Reform, and Public Policy*, Part VI, W.H. Freeman (1985).

Youth Homicide in New York: A Preliminary Analysis, *Journal of Legal Studies* 13:81 (1984).

Sentencing Reform in the States, in Franklin Zimring and Michael Tonry, eds., *Reform and Punishment: Essays on Criminal Sentencing*, University of Chicago Press (1983).

(with Satyanshu K. Mukherjee and Barrik Van Winkle) Intimate Violence: A Study of Intersexual Homicide in Chicago, *University of Chicago Law Review* 50:910 (1983).

Kids, Groups, and Crime: Some Implications of a Well-Known Secret, *Journal of Criminal Law and Criminology* 72:867 (1981).

Handguns in the Twenty-First Century:  Alternative Policy Futures, *The Annals of the American Academy of Political and Social Sciences* 455:1 (1981).

Secret Service "Dangerousness" Research, in Jane Takeuchi, Frederic Solomon, and W. Walter Menniger, eds., *Behavioral Science and the Secret Service:  Toward the Prevention of Assassination*, National Academic Press (1981).

Notes Toward a Jurisprudence of Waiver, in John Hall, Donna Hamparian, John Pettibone, and Joseph White, eds., *Issues in Juvenile Justice Information and Training*, Academy of Contemporary Problems (1981).

Privilege, Maturity, and Responsibility:  Notes on the Emerging Jurisprudence of Adolescence, in Lamar Empey, ed., *The Future of Childhood and Juvenile Justice*, University Press of Virginia (1980).

American Youth Violence:  Issues and Trends, in Norval Morris and Michael Tonry, eds., *Crime and Justice:  A Review of Research*, University of Chicago Press (1979).

(with Gordon Hawkins) Ideology and Euphoria in Crime Control, *Toledo Law Review* 10:370 (1979).

Pursuing Juvenile Justice:  Comments on Some Recent Reform Proposals, *University of Detroit Journal of Urban Law* 55:631 (1978).

Policy Experiments in General Deterrence, 1970-1975, in Alfred Blumstein, Jacqueline Cohen, and Daniel Nagin, eds., *Deterrence and Incapacitation:  Estimating the Effects of Criminal Sanctions on Crime Rates*, National Academy of Science (1978).

Bad Checks in Nebraska:  A Study of Complex Threats, in Greenburg, ed., *Punishment and Corrections*, Sage Publications (1977).

The Serious Juvenile Offender:  Notes on an Unknown Quantity, in *The Serious Juvenile Offender: Proceedings of a National Symposium Held in Minneapolis, Minnesota on September 19 and 20, 1977*, U.S. Government Printing Office (1978).

Determinants of the Death Rate from Robbery:  A Detroit Time Study, *Journal of Legal Studies* 6:317 (1977).

Making the Punishment Fit the Crime:  A Consumer's Guide to Sentencing Reform, *Hastings Center Reports*, December 1976; also in University of Chicago Law School, *Occasional Papers*, No. 12 (1977); Hyman Gross and Andrew von Hirsch, eds., *Sentencing*, Oxford University Press (1981); Culbertson and Tezak, eds., *Order Under Law*, Waveland Press (1981).

(with Joel Eigen and Sheila O'Malley) Punishing Homicide in Philadelphia:  Perspectives on the Death Penalty, *University of Chicago Law Review* 43:227 (1976); also in Hugo Bedau and Chester Pierce, eds., *Capital Punishment in the United States*, AMS Press (1976); *Civil Rights*, Staff Report of the Sub-Committee on Constitutional Rights of the Committee on the Judiciary, U.S. Senate (1976).

Street Crime and New Guns:  Some Implications for Firearms Control, *Journal of Criminal Justice* 4:95 (1976).

Field Experiments in General Deterrence:  Preferring the Tortoise to the Hare, *Evaluation Magazine*, Volume 3, Russell Sage Publications (1976).

Firearms and Federal Law:  The Gun Control Act of 1968, *Journal of Legal Studies* 4:133 (1975); also in *Evaluation Annual*, Volume 1, Russell Sage Publications (1977); *Improving the Criminal Justice System in the United States*, 94th Congress, 2d Session, Library of Congress Document No. 94-171, at 273.

Measuring the Impact of Pretrial Diversion from the Criminal Justice System, *University of Chicago Law Review* 41:224 (1974); also in *Crime and Justice Annual -- 1974*, Aldine (1975); Povl Boesen and Stanley Grupp, eds., *Community Based Corrections: Theory, Practice and Research*, Davis Publishing Company (1976).

Threat of Punishment as an Instrument of Crime Control, *Proceedings of the American Philosophical Society* 118:231 (1974).

(with Richard Block) Homicide in Chicago, 1965-70, *Journal of Research in Crime and Delinquency* 10:1 (1973); also in Lee Rainwater, ed., *Deviance and Liberty*, Aldine (1974).

Of Doctors, Deterrence, and the Dark Figure of Crime: A Note on Abortion in Hawaii, *University of Chicago Law Review* 39:699 (1972).

The Medium is the Message: Firearms Caliber as a Determinant of the Death Rate from Assault, *Journal of Legal Studies* 1:97 (1972).

(with Gordon Hawkins) The Legal Threat as an Instrument of Social Change, *Journal of Social Issues* 27:33 (1971); also in Ronald Akers and Richard Hawkins, eds., *Law and Control in Society*, Prentice-Hall (1974); June Louin Tapp and Felice Levine, eds., *Law, Justice, and the Individual in Society*, Holt, Rinehart (1977).

Firearms and Federal Criminal Law, *Working Papers of the National Commission on the Reform of Federal Criminal Laws*, Volume II, U.S. Government Printing Office (1970).

(with Norval Morris) Deterrence and Corrections, *Annals of the American Academy of Political Social Sciences* (1969).

(with Gordon Hawkins) Deterrence and Marginal Groups, *Journal of Research in Crime and Delinquency* 5:100 (1968).

Games with Guns and Statistics, *Wisconsin Law Review* 1968:1113 (1968).

Is Gun Control Likely to Reduce Violent Killings?, *University of Chicago Law Review* 35:721 (1968).

(with Edward H. Hunvald) Missouri Implied Consent Statutes, *Missouri Law Review* 33:323 (1968).

"Free Press-Fair Trial" Revisited: Defendant-Centered Remedies as a Publicity Policy, *University of Chicago Law Review* 33:512 (1966).

## GENERAL

Preface to the Chinese edition of *American Juvenile Justice*, Chinese People's Public Security University (2010).

Juvenile Justice: Legal, Policy & Political Issues (expert participant), *Focus on Law Studies*, American Bar Association, Division for Public Education, Vol. XXV, No. 2, Spring 2010, p. 4.

Miraklet I New York, *Magasinet Neo*, No. 2, March/April 2010, p. 38.

Pulling the Plug on Capital Punishment, *The National Law Journal*, Vol. 32, No. 14, December 7, 2009, p. 42.

Foreword to Jane Sprott and Anthony Doob, *Justice for Girls? Stability and Change in the Youth Justice Systems of the United States and Canada*, University of Chicago Press (2009).

(with Jeffrey Fagan) Myths of Get-Tough Law, *St. Petersburg Times,* October 30, 2009; also available online at http://www.tampabay.com/opinion/columns/myths-of-get-tough-law/1048326#.

Preface to the Korean edition, *American Juvenile Justice,* Oxford University Press (2009).

Book review of *The Death Penalty: A Worldwide Perspective* (Roger Hood and Carolyn Hoyle, Oxford University Press, 2008), *Punishment and Society,* Vol. 11, No. 2, April 2009, p. 280.

(with David T. Johnson) Last Days of the Hangman, *New Scientist,* March 14, 2009, p. 22; also available online at http://www.newscientist.com/article/mg20126995.100-capital-punishment-its-all-politics.html.

(with David T. Johnson) The Death Penalty's Future, *The Los Angeles Daily Journal,* January 16, 2009, p. 9.

Preface to the Chinese edition, *The Contradictions of American Capital Punishment,* Shanghai Joint Publishing, pp. 4-7 (2008).

Preface to the Chinese edition, *A Century of Juvenile Justice,* Beijing: The Commercial Press (2008).

Prison Policy Reform, *Issues in Science and Technology,* Vol. 25, No. 1, Fall 2008, p. 11.

A Sick System, *Los Angeles Times,* October 25, 2008, p. A23.

Guns: Liberty or Order? *The National Law Journal,* Vol. 30, No. 30, April 7, 2008, p. 23.

What Lies Behind the Case of Lethal Injection? *The Sacramento Bee,* Sunday, December 16, 2007, p. E1; reprinted in *The Police News* (Gulf Coast edition), Vol. V, No. 1, January 2008, p. 14.

A Tale of Two Despots, *The National Law Journal,* Vol. 29, No. 49, August 6, 2007, p. 23.

Little Changes, Big Results, *The New York Times,* April 8, 2007, p. 9.

Foreword to Peter Greenwood, *Changing Lives: Delinquency Prevention as Crime Control Policy,* University of Chicago Press (2005).

Capital Punishment: An American Dilemma, in "Shalt Thou Kill? An In-Depth Look at Capital Punishment," *Christian Networks Journal,* Fall 2005, p. 17.

Terri Schiavo and the Dilemma of "Life or Death" Litigation, *San Francisco Daily Journal,* June 15, 2005, p. 6.; *Los Angeles Daily Journal,* June 15, 2005, p. 6.

A Death Knell for the Death Penalty? *Newsday,* March 4, 2005, p. A47.

Review of Kathleen Auerhahn, *Selective Incapacitation and Public Policy: Evaluating California's Imprisonment Crisis,* *Contemporary Sociology* 34:62 (2005).

Foreword to Thomas Grisso, *Double Jeopardy: Adolescent Offenders with Mental Disorders,* University of Chicago Press (2004).

Three-Ring Capital-Punishment Circus, *Los Angeles Daily Journal,* February 20, 2004, p. 6.

Confessions of a Former Smoker, in Jane E. Aaron, *The Compact Reader: Short Essays by Method and Time* (Seventh Edition), Boston: Bedford/St. Martin's (2003);also as Hot Boxes for Ex-Smokers, *Newsweek,* My Turn, April 20, 1987, p. 12.

Train an Impartial Eye on Police Behavior, *Los Angeles Times,* July 12, 2002, p. A17.

(with Gordon Hawkins) The Ethics of Criminal Justice: Aspects of Human Dignity, *International Encyclopedia of the Social and Behavioral Sciences,* Volume 5, p. 2949 (2002).

Review of David Garland, *The Culture of Control: Crime and Social Order in Contemporary Society*, *Criminal Justice* 1:465 (2001).

McVeigh's Execution Will Heal Neither Survivors Nor Public, *Los Angeles Times*, May 11, 2001, p. B17.

The Walking Plea of Wen Ho Lee, *San Francisco Chronicle*, October 2, 2000, p. A21

Contributor to M. Dwayne Smith, *A New Era of Homicide Studies?  Visions of a Research Agenda for the Next Decade*, *Homicide Studies* 4:1 (2000).

It's Violence by All, Not Just Teen Violence, *Los Angeles Times*, August 8, 2000, p. B9.

Bring Courage Back into Fashion, *Los Angeles Times,* January 16, 2000, p. M5.

Capital Punishment, *Microsoft's Encarta Encyclopedia* (CD-ROM) (1999).

Gun Control, *Microsoft's Encarta Encyclopedia* (CD-ROM) (1999).

Criminal Investigation Is Just a Human Art, *Los Angeles Times*, August 1, 1999, p. M5.

Curb Imperial Power of Prosecutors, *Los Angeles Times*, April 20, 1999, p. A15.

Mystery Terms, *Boston Review*, New Democracy Forum, April/May 1999, p. 17.

Marking Time on Death Row, *The 1999 World Book Year Book*, World Book, Inc. (1999).

What is the Aim of Criminal Law?  *Los Angeles Times*, January 14, 1999, p. A15.

The Buck Stops with Prison Managers:  Perspective on the Corcoran Report, *Los Angeles Times*, November 28, 1998, p. M5.

(with Gordon Hawkins) Review of Jacob Sullum, *For Your Own Good: The Anti-Smoking Crusade and the Tyranny of Public Health, The Responsive Community* 8:75 (1998).

A Gulag Mentality in the Prisons, *Los Angeles Times*, July 15, 1998, p. B9.

Thank You for Not Sneezing, *Los Angeles Times*, February 1, 1998, p. M5.

The Truth About Repeat Sex Offenders, *Los Angeles Times*, May 5, 1997, p. B5.

Review of Ugljesa Zvekic and Anna Alvazzi del Frate, eds., *Criminal Victimization in the Developing World*, *Contemporary Sociology* 25:663 (1996).

Paranoia on the Playground, *Los Angeles Times*, November 11, 1996, p. B5.

Crying Wolf over Teen Demons, *Los Angeles Times*, August 19, 1996, p. B5.

Gun Control, *Microsoft's Encarta Encyclopedia* (CD-ROM) (1996).

Crime Is Not the Problem, *Iowa Advocate*, Spring/Summer 1996, p. 34.

Deadly Force:  South Africa's Brave and Necessary Gamble with Its Death Penalty, *Chicago Tribune*, July 6, 1995, p. 19.

Will Success Spoil James Q. Wilson?, *Journal of Criminal Law and Criminology* 85:828 (1995).

Introduction to David Indermaur, *Violent Property Crime*, The Federation Press (1995).

For Gun Control, Give Big Cities Local Control, *Los Angeles Times*, May 17, 1995, p. B7.

Death Penalty, *jungeWelt*, April 1, 1995, p. 2.

Don't Bet on Executions Here Any Time Soon, *Newsday*, February 21, 1995, p. A27; also as Executions in New York?  Don't Bet on It, *New York Law Journal*, February 27, 1995.

Clouding the Issue:  Tobacco Industry Tries to Choke Off a Lawsuit, *Los Angeles Daily Journal*, December 12, 1994, p. 4.

The Voodoo Economics of California Crime, *Overcrowded Times*, October 1994, p. 3.

(with Gordon Hawkins) Policy on Crime, in Leonard Levy and Louis Fisher, eds., *Encyclopedia of the American Presidency*, Simon and Schuster (1994).

Tough Crime Laws Are False Promises, *Insight on the News* 10:21 (1994); also in *Federal Sentencing Reporter* 6:61 (1994).

"Three Strikes" Law Is Political Fool's Gold, *The Christian Science Monitor*, April 11, 1994, p. 23.

New Senate, Same Old Crime Debate, *The American Lawyer*, March 1994, p. 25.

To Punish Genocide with Death Is Overkill, *Los Angeles Times*, December 2, 1993, p. B7.

Introduction to Harry Kalven, Jr. and Hans Zeisel, *The American Jury*, Gryphon Editions (1993).

A Country Where There Is No Status Quo, *Los Angeles Times*, June 30, 1993, p. B7.

Hanged If We Do, Or We Don't, *Johannesburg Star*, April 5, 1993.

The Color of Murder, *Legal Times*, February 22, 1993, p. 34.

Intercept Migrating Guns, *Christian Science Monitor*, September 10, 1992, p. 18.

Are State Prisons Undercrowded?, *Federal Sentencing Reporter* 4:347 (1992).

Politics Dictate Wilson's Verdict, *Los Angeles Times*, April 12, 1992, p. M5.

Tribute to Sheldon Messinger, *California Law Review* 80:307 (1992).

(with Gordon Hawkins) Review of Samuel Gross and Robert Mauro, *Death and Discrimination:  Racial Disparities in Capital Sentencing*, *Constitutional Commentary* 9:135 (1992).

(with Gordon Hawkins) Why the S&L Gang Isn't in Jail, *Los Angeles Times*, February 3, 1992, p. B5.

(with Michael Laurence) Capital Punishment, in Leonard Levy, ed., Supplement to the *Encyclopedia of the American Constitution*, Macmillan (1991).

More Jail Cells, Fewer Classrooms, *Los Angeles Times*, May 31, 1991, p. B5.

The Speaking Engagement as One-Night Stand, *California Monthly*, April 1991, p. 17.

The Great American Lockup, *Washington Post*, February 28, 1991, p. A19.

Strategies for Arms Control:  Trace Illegal Firearms, *New York Times*, January 4, 1991, p. A13.

Foreword to Stephen Sugarman and Herma Hill Kay, eds., *Divorce Reform at the Crossroads*, Yale University Press (1990).

Greenmail Goes Transnational, *Los Angeles Times*, March 23, 1990, p. B7; also as Can East Germany Leverage Its Way to Wealth?, *Newsday*, April 9, 1990, p. 43.

A Solitary Symbol in a Deadly Tug of War, *Los Angeles Times*, January 29, 1990, p. B5.

Review of Donald Downs, *The New Politics of Pornography*, *New York Times Book Review*, January 28, 1990, p. 18.

(with Gordon Hawkins) Bennett's Sham Epidemic, *New York Times*, January 25, 1990, p. A23.

Hardly the Trial of the Century, *Michigan Law Review* 87:1307 (1989).

Foreword to James Jacobs, *Drunk Driving:  An American Dilemma*, University of Chicago Press (1989).

Review of Jack Katz, *Seductions of Crime*, *New York Times Book Review*, November 20, 1988, p. 50.

Drug Death Penalty:  A Federal Tantrum, *New York Times*, September 16, 1988, p. 19; also as A Temper Tantrum Masquerading as an Act of Government, *Los Angeles Daily Journal*, September 20, 1988.

Pint-Sized Debate on Child Executions:  More Jurisprudence from the Briar Patch, *Legal Times*, July 18, 1988, p. 14; also as Can the Bad Die Young?, *The Connecticut Law Tribune*, July 18, 1988, p. 10; Justices Waffle on Death Penalty, *Fulton County Daily Report*, July 19, 1988, p. 2; Decision on Executing Youths Highlights Death Penalty Dilemma, *Manhattan Lawyer*, July 19, 1988, p. 12; The Court's Death Sentence Schizophrenia, *The Texas Lawyer*, July 25, 1988, p. 29; A Stumble at the Finish Line, *The Recorder*, July 28, 1988, p. 4.

If We Have Reached a Landmark in Our Execution Policy, It Is Still One of Confusion, *Los Angeles Times*, March 18, 1988, Part II, p. 7.

NRA's Latest Advice Can Get You Killed, *Los Angeles Times*, December 6, 1987, Part V, p. 5.

Review of James Wright and Peter Rossi, *Armed and Considered Dangerous:  A Survey of Felons and Their Firearms*, *American Journal of Sociology* 93:224 (1987).

Why the Goetz Verdict Was Not a Landmark Precedent, *New York Times*, June 21, 1987, p. 25.

Is Court Too Split To Sanction Death?, *Los Angeles Times*, April 27, 1987, Part II, p. 5.

A Frequent Flier Explains the Thrill, *New York Times*, April 20, 1987, p. 19; also as Rewarding the Pinball for Its Tos and Fros, *International Herald Tribune*, April 23, 1987, p. 5; Confessions of a Frequent Flier, *Chemtech*, June 1988, p. 386.

Beyond Solomon:  The "Tragic Choice" Cases, *Los Angeles Times*, March 16, 1987, Part II, p. 5.

EF Hutton Goes South, *Michigan Law Review* 85:397 (1987).

Is Retribution Only for a Few?, *Los Angeles Times*, December 4, 1986, Part II, p. 7.

Facing the Threat of a Crippled UC, *Los Angeles Times*, September 3, 1986, Part II, p. 5.

The Death Penalty:  Ten Dark Years, *New York Times*, June 19, 1986, p. 27.

Gun Lobby's Victory Can Help Handgun Control, *Los Angeles Times*, April 28, 1986, Part II, p. 5.

Justice Teeters on the Fine Points, *Los Angeles Times*, January 29, 1986, Part II, p. 5.

Review of Henry Pontell, *A Capacity to Punish*, *American Journal of Sociology* 91:724 (1985).

Two New Books on Guns, *Michigan Law Review* 83:954 (1985).

Lessons for the Urban Jungle, *Los Angeles Times*, March 15, 1985, Part II, p. 5.

Smoking and Public Policy, *Chicago Tribune*, Perspective Section, January 18, 1985, p. 27.

Research Agendas, Information Policies and Program Outcomes, in Alan Westin, ed., *Information Policy and Crime Control Strategies: Proceedings of a Bureau of Justice Statistics/Search Conference*, U.S. Government Printing Office (1984).

Is Crime Going Out of Style?, *Los Angeles Times*, July 12, 1984; also as Is American Crime Up or Down?, *Newsday*, August 30, 1984, p. 89.

The Dan White Case:  Justice Is a Victim, *Los Angeles Times*, January 6, 1984, Part II, p. 5.

The Death Penalty's Iron Law, *New York Times*, October 12, 1983, p. 27; also in *Los Angeles Times*, September 21, 1983, Part II, p. 7.

Where Do the New Scholars Learn New Scholarship?, *Journal of Legal Education* 33:453 (1983).

(with Gordon Hawkins) Crime Commissions, in Sanford Kadish, ed., *Encyclopedia of Crime and Justice*, Volume 1, The Free Press, Macmillan (1983).

(with James Lindgren) Regulation of Guns, in Sanford Kadish, ed., *Encyclopedia of Crime and Justice*, Volume 2, The Free Press, Macmillan (1983).

Foreword to John Kaplan, *The Hardest Drug:  Heroin and Social Policy*, University of Chicago Press (1983).

Review of Arnold Trebach, *The Heroin Solution*, and John Kaplan, *The Hardest Drug:  Heroin and Social Policy*, *The Times Literary Supplement*, June 10, 1983, p. 610.

Choosing the Right Camp for the Children, *Institutions Etc.* 6:21 (1983).

Idealizing the "Angels" on Death Row, *Los Angeles Times*, February 24, 1983, Part II, p. 7.

Uncle Sam's Wars on Crime, *The New Republic* 186:38 (1982).

Poland's "Real" Problem, *Chicago Tribune*, September 28, 1982, Perspective Section, p. 25.

Will the 21st Century Be Safer?, *Chicago Tribune*, April 13, 1982, Section 1, p. 22.

Crime:  The 120-Day Solution, *Chicago Tribune*, September 28, 1981, Perspective Section, p. 25.

Review of Peter Prescott, *The Child Savers:  Juvenile Justice Observed*, *New York Times Book Review*, June 14, 1981, p. 24.

(with Gordon Hawkins) Review of Walter Berns, *For Capital Punishment:   Crime and the Morality of the Death Penalty*, *American Journal of Sociology* 86:1171 (1981).

Portnoy's Real Complaint, *Moment* 6:58 (1980).

Taking a Tour of America's Prisons, *Chicago Tribune*, September 14, 1980, Perspective Section, p. 4.

Foreword to Philip Cook and Daniel Nagin, *Does the Weapon Matter?*, Institute for Law and Social Research (1979).

Comment, Current Developments in Judicial Administration, *Federal Rules Decisions* 80:147 (1979).

Crime in the Streets, *Chicago Sun Times Bookweek*, November 27, 1978, p. 14.

Review of The Institute of Judicial Administration and the American Bar Association, *Juvenile Justice Standards Project, Harvard Law Review* 91:1934 (1978).

Review of Charles Silberman, *Criminal Justice, Criminal Violence, Chicago Tribune*, November 5, 1978, Section 7, p. 1.

Review of John Allen, *Crime in the Streets:  Assault with a Deadly Weapon*, Chicago Sun Times, November 27, 1977.

Foreword to Richard Block, *Violent Crime:  Environment, Interaction, and Death*, Heath, Lexington (1977).

Comment, *Hastings Center Report*, p. 44 (1977).

Review of Mark Lane and Dick Gregory, *Code Name Zorro, Chicago Sun Times*, May 1, 1977.

Illegally Seized Evidence:  Exclude It?, *Los Angeles Times*, April 20, 1976.

Review of Pretrial Intervention, in Abt Associates, *Pretrial Services:  An Evaluation of Policy Related Research*, p. 152 (1975).

A Tale of Two Cities, *Wall Street Journal*, December 20, 1974, p. 12; also in *Hearings of Senate Subcommittee to Investigate Juvenile Delinquency, Oversight of 1968 Gun Control Act*, Volume 1, p. 11 (1975).

Eight Myths About Gun Control in the United States, *Christian Science Monitor*, July 24, 1972.

Getting Serious About Guns, *The Nation* 214:457 (1972).

Some Facts About Homicide, *The Nation* 214:303 (1972).

Firearms Control:  Hard Choices, *Trial*, p. 53 (1972).


WRITING REPRINTED IN:

Funk, Day, Coleman and McMahan, *The Simon and Schuster Short Prose Reader* (2009).

Lee, *Empowered College Reading* (2008).

Feng-Checkett and Checkett, *The Write Start* (2nd edition, 2005).

Anker, *Real Writing with Readings* (2004).

Aaron, *The Complete Reader* (2003).

Nicholas and Nicholl, *Models for Effective Writing* (2000).

Miller, *The Informed Argument* (4th edition, 1995).

Eschholtz and Rosa, *Themes for Writers* (1994).

Winterrowd and Winterrowd, *The Critical Reader, Thinker and Writer* (1992).

REPORTS TO GOVERNMENTAL AGENCIES

(with Peter W. Greenwood) *One More Chance: The Pursuit of Promising Intervention Strategies for Chronic Juvenile Offenders*, Rand Corporation (1985).

(with Peter W. Greenwood and Allan Abrahamse) *Factors Affecting Sentence Severity for Young Adult Offenders*, Rand Corporation (1984).

(with Peter W. Greenwood and Marvin Lavin) *The Transition From Juvenile to Adult Court*, Rand Corporation (1984).

(with Peter W. Greenwood, Albert J. Lipson, and Allan Abrahamse) *Youth Crime and Juvenile Justice: A Report to the California Legislature*, Rand Corporation (1983).

(with Peter W. Greenwood and Joan Petersilia) *Age, Crime, and Sanctions: The Transition From Juvenile To Criminal Court*, Rand Corporation (1980).

*Dealing with Youth Crime: National Needs and Federal Priorities*, a policy paper prepared for the Federal Coordinating Council on Juvenile Justice and Delinquency Prevention (1975) (mimeo).

*The Court Employment Project: A Report to the City of New York* (1974) (mimeo).

# EXHIBIT C

# DECLARATION OF JULIE BASCO

I, Julie Basco, declare as follows:

1.     My current position is the Bureau Chief of the Bureau of Criminal Information and Analysis in the Department of Justice.

2.     The Department of Justice has produced a statistical run from the Automated Criminal History System to determine the number of criminal identification and index (CII) number/subjects with a felony arrest from January 1, 2010 - December 31, 2010. From this run, 122,948 number/subjects were adults at the time of arrest and had a Los Angeles County Originating Agency Identifier (ORI).

3.     Of these 122,948 number/subjects, 43,440 also had a felony conviction prior to January 1, 2010.

I declare under penalty of perjury that the forgoing is true and correct. Executed at Sacramento, this 28th of July 2011.

JULIE BASCO, declarant

1

00076

# EXHIBIT D

Case 2:10-cv-08377-JAK-JEM  Document 96  Filed 01/13/12  Page 1 of 10  Page ID
#:1215
Case 2:11-cv-08474-SJO-JC  Document 35-1  Filed 07/30/12  Page 81 of 90  Page ID
#:575

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

## JS-6

| | | | |
|---|---|---|---|
| Case No. | LA CV10-08377 JAK (JEMx) | Date | January 13, 2011 |
| Title | Jonathan Birdt v. Charlie Beck, et al. | | |

Present: The Honorable    JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:**    **ORDER RE PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Dkt. 20, 54, 56)**

## I.    Introduction

In California, a person may carry a concealed firearm only if first issued a license by the sheriff of the county in which the licensee resides. Such licenses are to be issued only upon a showing of "good cause." Cal. Penal Code § 12050. Plaintiff Jonathan Birdt applied for a concealed carry weapons ("CCW") license from the Los Angeles Police Department and the Los Angeles County Sheriff's Department. Each denied his application; this action followed.

Plaintiff has named the Los Angeles Police Department ("LAPD"), the Los Angeles County Sheriff's Department ("LACSD"), Los Angeles Chief of Police Charlie Beck, and Los Angeles County Sheriff Lee Baca as defendants in his claims brought pursuant to 42 U.S.C. §§ 1983 and 1988. Relying on *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), Plaintiff argues that, as applied to Plaintiff, the LAPD and LACSD policies under which his CCW license application was denied, violate the Second Amendment to the United States Constitution. Plaintiff also claims that LAPD and LACSD policies violate his rights under the Equal Protection Clause and interfere with his right to interstate travel.

Plaintiff and Defendants have filed cross-motions for summary judgment. The parties stipulated at oral argument on September 19, 2011 that there are no disputed issues of material fact.

## II.    Background

### A.    California's Concealed Weapons Law

California Penal Code section 12031 prohibits the open carrying of loaded firearms in public, and section 12025 prohibits the carrying of concealed firearms in public, subject to a licensing process. Section 12050(a)(1)(A) allows "[t]he sheriff of a county, upon proof that the person applying

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV10-08377 JAK (JEMx) | Date | January 13, 2011 |
| Title | Jonathan Birdt v. Charlie Beck, et al. | | |

is of good moral character, that good cause exists for the issuance, and that the person applying satisfies" other statutory requirements, to "issue to that person a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person." Without a license, a person cannot carry a concealed weapon. "Section 12050 gives extremely broad discretion to the sheriff concerning the issuance of concealed weapons licenses and explicitly grants discretion to the issuing officer to issue or not issue a license to applicants meeting the minimum statutory requirements." *Gifford v. City of Los Angeles*, 88 Cal. App. 4th 801, 805 (2001).

The LAPD and the LACSD each has formulated definitions of "good cause" to evaluate permit applications.

The LAPD defines "good cause" in these terms:

[G]ood cause exists if there is convincing evidence of a clear and present danger to life or of great bodily injury to the applicant, his (or her) spouse, or dependent child, which cannot be adequately dealt with by existing law enforcement resources, and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by the applicant's carrying of a concealed firearm . . .

Good cause is deemed to exist, and a license will issue in the absence of strong countervailing factors, upon a showing of any of the following circumstances: (a) The applicant is able to establish that there is an immediate or continuing threat, express or implied, to the applicant's, or the applicant's family, safety and that no other reasonable means exist which would suffice to neutralize the threat.

Tompkins Decl., Exh. 1, Dkt. 56-4. The LAPD does not consider general fear for one's personal safety good cause. *Id.* at ¶ 4.

The LACSD's definition of "good cause" requires the following showing:

Convincing evidence of a clear and present danger to life or of great bodily harm to the applicant, his spouse or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by the applicant's carrying of a concealed firearm.

Waldie Decl., Exh. 1, Dkt. 55. The LACSD does not consider a general desire for self-defense good cause; the applicant must "demonstrate a credible threat of violence." Waldie Decl. ¶ 7, Dkt. 55.

### B. Plaintiff's Applications for a License

Plaintiff is a lawyer. He resides in Los Angeles County. Plaintiff applied to the LAPD and the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV10-08377 JAK (JEMx) | Date | January 13, 2011 |
| Title | Jonathan Birdt v. Charlie Beck, et al. | | |

LACSD for a CCW license in 2010. Each department denied his application. On his LAPD application, Plaintiff listed his reasons for seeking a CCW license. These included his work as a volunteer bench officer for the Los Angeles Superior Court, his frequent interstate travel with large sums of cash, his representation of clients in high-profile litigation involving violent crime, and unspecified threats against his employees. Tompkins Decl., Exh. 2, Dkt. 56-4. The LAPD rejected his application, concluding that Plaintiff did not establish "a clear and present danger to life or great bodily injury" that could not "be adequately dealt with by existing law enforcement resources, and which danger cannot be reasonably avoided by alternative measures." Tompkins Decl., Exh. 3, Dkt. 56-4. The Citizens Advisory Review Board that reviews denied applications also found that Plaintiff had failed to show good cause for licensure. Tompkins Decl., Exh. 4, Dkt. 56-4.

Plaintiff's LACSD application identified substantially similar reasons in support of licensure. The LACSD denied his application for the same reasons previously advanced by the LAPD. As the LACSD wrote in denying the license:

> Typically, the verbiage "convincing evidence of a clear and present danger . . ." refers to a current situation which involves a specific person(s) who has threatened an individual and who has displayed a pattern of behavior which would suggest that the threat(s) could be carried out. Situations which would suggest only a potential danger to one's safety, (e.g. carrying large amounts of money to the bank, profession/job, working late hours in a high crime rate area, etc.) are not consistent with the criteria for issuance of a concealed weapon license.

Waldie Decl., Exh. 3, Dkt. 55.

**III.     The Second Amendment Claims**

      **A.     Legal Standard**

          1.     The Second Amendment

The Second Amendment protects the "individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). In *Heller*, the Supreme Court held that a total prohibition on handguns within the home precluded citizens from using guns "for the core lawful purpose of self-defense and [was] hence unconstitutional." *Id.* at 630. In *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026 (2010), the Court held "that the Second Amendment right is fully applicable to the States." *McDonald* stated that *Heller*'s "central holding" was "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *Id.* at 3044.

*Heller* also explained that "the right secured by the Second Amendment is not unlimited." 554 U.S. at 626. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV10-08377 JAK (JEMx) | Date | January 13, 2011 |
| Title | Jonathan Birdt v. Charlie Beck, et al. | | |

and for whatever purpose." *Id.* The Court listed examples of "presumptively lawful regulatory measures" that would not infringe Second Amendment rights, including "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 570. The Court added that, "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.* This observation is significant, because under *Heller*, the scope of the Second Amendment's protection turns on "the historical background of the Second Amendment." *Id.* at 592.

   2.   Case Law with Respect to the Standard of Review

   Six of the Circuits have applied a standard of review resembling intermediate scrutiny to claims under the Second Amendment.

   In *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011), the Seventh Circuit subjected a Chicago gun-control ordinance to "rigorous" review, "if not quite 'strict scrutiny.'" The ordinance at issue in that case amounted to a total ban on gun ownership. It conditioned gun ownership -- even within the home -- on the gun owner having completed firing range training. The same ordinance, however, also banned firing ranges within the city. The Seventh Circuit found that this ban impacted too greatly the "core Second Amendment right to possess firearms for self-defense." *Id.* at 711. Where such a core right is not implicated, the Seventh Circuit has applied intermediate scrutiny. For example, in *United States v. Skoien*, that court applied intermediate scrutiny to a regulation prohibiting those convicted of domestic violence misdemeanor crimes from carrying firearms; in its view, such a regulation did not infringe the core right to self-defense. 614 F.3d 638, 641 (7th Cir. 2010).

   Similarly, in *United States v. Marzzarella*, 614 F.3d 85, 97 (3rd Cir. 2010), the Third Circuit applied intermediate scrutiny to a regulation of the sale of firearms because the "burden imposed by the law [did] not severely limit the possession of firearms." The court reasoned that the *Heller* handgun ban was "an example of a law at the far end of the spectrum of infringement on protected Second Amendment rights" because it prohibited all handgun possession. *Id.* The regulation at issue in *Marzzarella* did not prohibit all handgun possession; as a result, the court found that it was far from the restrictions that *Heller* found improper. *Id.*

   Other circuits have applied intermediate scrutiny to restrictions on the use of firearms. *See, e.g., United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011) (requiring "a substantial relationship between the restriction and an important governmental objective"); *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011) ("[w]hile we find the application of strict scrutiny important to protect the core right of the self-defense of a law-abiding citizen in his home . . . we conclude that a lesser showing is necessary with respect to laws that burden the right to keep and bear arms outside of the home.); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny); *Heller v. District of Columbia*, No. 10–7036, 2011 WL 4551558, at \*8 (D.C. Cir. Oct. 4,

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV10-08377 JAK (JEMx) | Date | January 13, 2011 |
|---|---|---|---|
| Title | Jonathan Birdt v. Charlie Beck, et al. | | |

2011) (same).

Although not binding on this Court , two District Courts in California have considered certain of the issues raised in this action. These decisions are instructive here. In *Richards v. County of Yolo*, the District Court for the Eastern District of California considered a challenge to Yolo County's concealed weapon policy implementing California Penal Code section 12050. No. 09-01235, 2011 WL 1885641 (E.D. Cal. May 16, 2011). The court held that "the Second Amendment does not create a fundamental right to carry a concealed weapon in public." *Id.*, 2011 WL 1885641, at *3. Given the various exceptions to the concealed weapons law, discussed below, the court found that there was adequate opportunity for the plaintiff to use a weapon in self-defense. Therefore, the county's policy did not substantially burden his Second Amendment rights. The court applied rational basis review to find the county policy constitutional.

In *Peruta v. County of San Diego*, the District Court for the Southern District of California considered claims -- like those of the Plaintiff in this action -- brought by a party whose application for a CCW license was denied for lack of good cause pursuant to section 12050. 758 F. Supp. 2d. 1106 (S.D. Cal. 2010). The court applied intermediate scrutiny in assessing the county's policy, noting that

> the Court is not aware of . . . a case in which a court has employed strict scrutiny to regulations that do not touch on the "core" Second Amendment right: possession in the home. If it exists, the right to carry a loaded handgun in public cannot be subject to a more rigorous level of judicial scrutiny than the 'core right' to possess firearms in the home for self-defense.

*Id.* at 1116.

### B.     Application

#### 1.     Intermediate Scrutiny Is Appropriate

California Penal Code section 12025, prohibiting the carrying of concealed weapons, California Penal Code section 12050, creating the concealed weapon licensure requirements, and the LACSD and LAPD policies do not infringe the "core" Second Amendment right of self-defense within the home. They do not prevent Plaintiff from using "arms in defense of hearth and home." *Heller*, 554 U.S at 635. They do not effect a total ban on gun ownership. Thus, they are not presumptively unconstitutional, as was the handgun ban in *Heller*. For these reasons, strict scrutiny is not appropriate. The Court need not decide whether intermediate scrutiny, or mere rational review, applies to Plaintiff's claims; the regulations at issue, as applied to Plaintiff, satisfy intermediate scrutiny.

#### 2.     The Regulations Satisfy Intermediate Scrutiny

"To withstand intermediate scrutiny, a statutory classification must be substantially related to

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV10-08377 JAK (JEMx) | Date | January 13, 2011 |
| Title | Jonathan Birdt v. Charlie Beck, et al. | | |

an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). The government bears the burden of showing the "substantial relation" to an "important government objective." *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 465 (2002).

          a)    "Important Government Objective"

It is clear that the protection of public health and safety are important government objectives, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996), as is crime prevention, *Foucha v. Louisiana*, 504 U.S. 71, 81 (1992). In considering California's concealed weapons regulations, the *Peruta* court noted:

> In particular, the government has an important interest in reducing the number of concealed weapons in public in order to reduce the risks to other members of the public who use the streets and go to public accommodations. The government also has an important interest in reducing the number of concealed handguns in public because of their disproportionate involvement in life-threatening crimes of violence, particularly in streets and other public places.

758 F. Supp. 2d at 1117.

This Court finds this reasoning persuasive. Thus, the concealed weapons regulations serve an important government objective.

          b)    "Substantial Relation"

California's concealed weapons regime is substantially related to the important government objective identified above. A licensing regime allows the state to protect the general public from widespread and unchecked public carrying of concealed and loaded firearms. Such widespread carrying of weapons poses the threat of criminal use of firearms by stealth and surprise. Limiting the number of concealed firearms in public places strengthens law enforcement and prevents the need for public places -- such as restaurants, malls, theaters and parks -- to be equipped with metal detectors, fencing, guards, and other forms of security, in order to protect patrons from unchecked concealed firearms. As the *Peruta* court noted, "[r]equiring documentation enables [the state] to effectively differentiate between individuals who have a bona fide need to carry a concealed handgun for self-defense and individuals who do not." 758 F. Supp. 2d at 1117.

It is also significant that the ban on carrying loaded weapons has numerous exceptions. These allow the carrying of weapons by police officers, private investigators, members of the military forces, target shooters, hunters, and others. Cal. Penal Code § 12031(b). The statute also specifically allows the keeping of loaded weapons at one's home. Cal. Penal Code § 12031(*l*). More importantly, a person may carry a loaded firearm in public when he

reasonably believes that the person or property of himself or herself or of another is in

---

CV-90 (10/08)               **CIVIL MINUTES - GENERAL**               Page 6 of 10

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV10-08377 JAK (JEMx) | Date | January 13, 2011 |
| Title | Jonathan Birdt v. Charlie Beck, et al. | | |

immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property. As used in this subdivision, "immediate" means the brief interval before and after the local law enforcement agency, when reasonably possible, has been notified of the danger and before the arrival of its assistance.

Cal. Penal Code § 12031(j)(1). The section also permits carrying a loaded firearm "while engaged in the act of making or attempting to make a lawful arrest." Cal. Penal Code § 12031(k). These exceptions ensure that California's concealed weapons law is tailored to the safety issues raised by gun violence and does not infringe unnecessarily on the right to use guns in self-defense.

Because of these exceptions, and because the regulatory regime for concealed weapons focuses on the carrying of such weapons in public, the statutory system imposes much more narrow limitations on firearm possession than the sweeping prohibition presented by the statute addressed in *Heller*. Thus, California's concealed weapon laws are substantially related to an important government objective, and survive intermediate scrutiny.

        c)      The Parties' Expert Declarations

The parties have provided competing expert declarations with respect to the threat of concealed weapons. Defendants have presented evidence that concealed weapons are a particularly serious threat to public safety. As one example, Defendants point out that the

> special danger of a hidden handgun is that it can be used against persons in public robbery and assault. The concealment of a handgun means that other citizens and police don't know it is in their shared space until it is brandished. Concealed handguns are a special problem for police because an armed police officer has no warning that persons carrying concealed handguns are doing so. A police officer will be vulnerable to an element of surprise that will not be present if a person is openly carrying a firearm.

Zimring Decl. ¶ 4, Dkt. 56-5. Defendants also have produced evidence that, during 2010, approximately 39% of those arrested by the LAPD on a charge of homicide had no prior felony convictions. Torrez Decl. ¶¶ 4-15, Dkt. 56-6. This data suggests that eliminating restrictions on permitting the carrying of concealed weapons, or a policy less stringent than that presently in place, could readily increase the number of future felons who may use such weapons while committing a crime. Thus, if the regulations were invalidated, rescinded, or severely restricted, those with no prior felony convictions could more readily obtain CCW licenses and go on to commit homicides. Zimring Decl. ¶ 5, Dkt. 56-5. By contrast, Plaintiff has provided competing expert testimony arguing that CCW permits reduce crime. Mudgett Decl. ¶ 7, Dkt. 69-1.

As noted, the parties have stipulated that there are no genuine issues of material fact presented by the instant motions. As such, these competing expert declarations should not be

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| | |
|---|---|
| Case No. | LA CV10-08377 JAK (JEMx) |
| Title | Jonathan Birdt v. Charlie Beck, et al. |

Date   January 13, 2011

deemed to create disputed questions of fact. Rather, they reflect differing opinions within the law enforcement community regarding the impact of limitations on the carrying of concealed weapons -- something that can be considered in the intermediate scrutiny analysis. Thus, Defendants' policy need not be a perfect empirical fit to the problem of gun violence; it must merely be "substantially related." "In contrast with strict scrutiny, intermediate scrutiny, by definition, allows the government to paint with a broader brush." *Peruta,* 758 F. Supp. 2d at 1117. Because the concealed weapons law focuses on the particular threat posed by concealed weapons, there is a substantial relationship between the state's means and its important objectives. It is also noteworthy that the variations in the declarations are a reflection of the responsibility that lies with the California Legislature to weigh the effectiveness of concealed weapons laws as a tool to combat crime and violence. As the Supreme Court has noted, when applying intermediate scrutiny in the First Amendment context:

> What our decisions require is a "fit" between the legislature's ends and the means chosen to accomplish those ends -- a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.

*Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 480 (1989). Thus, to prevail on their motion for summary judgment, Defendants need not prove that California's approach to concealed weapons is more empirically sound, that Plaintiff's expert is incorrect, or that California's approach is otherwise the "correct" one. Rather, Defendants need only show a sufficient "fit," which they have done. The Legislature's decision in balancing or addressing competing views will be upheld where, as here, it is substantially related to the important objectives described.

      3.    <u>The LASD and LACSD Policies</u>

          a)    The Policies Themselves Do Not Violate the Second Amendment

That the LASD and LACSD policies implementing California's concealed weapons laws define "good cause" as requiring the applicant to show a "clear and present danger to life or of great bodily injury" does not render them unconstitutional. To the contrary, that California allows those facing a clear and present danger to carry concealed weapons provides further support for the conclusion that the CCW regulations are substantially related to an important government objective. Not only can Plaintiff keep loaded guns in his house, but he can carry them in public when he is in immediate grave danger, and can obtain a concealed weapon permit when there is a clear and present danger. The focus of the Second Amendment right is "to possess and carry weapons in case of confrontation," *Heller,* 554 U.S. at 592, and these exceptions to California's gun control laws are in harmony with that right to self-defense. Because the Supreme Court suggested that long-standing prohibitions on carrying concealed weapons would be constitutional, *id.* at 626, a concealed weapons law that allows exceptions tailored to the need for self-defense is certainly constitutionally

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV10-08377 JAK (JEMx) | Date | January 13, 2011 |
| Title | Jonathan Birdt v. Charlie Beck, et al. | | |

sound.

> b) The LASD and LACSD Policies as Applied to Plaintiff

The LASD and LACSD policies have been applied to Plaintiff in a consistent manner. Plaintiff has been unable to point to any direct, physical threats against him or his family as a result of his work as an attorney, as a volunteer bench officer, or otherwise. *See* Lehman Decl., Exh. C, Dkt. 61-3. Plaintiff has produced no evidence that his application was not properly and fairly reviewed. Thus, Plaintiff lacked "good cause" to receive a CCW license under the LASD and LACSD policies.

**C. Conclusion**

Because the LASD and LACSD policies, as implementing the California concealed weapons regime and as applied to Plaintiff, satisfy intermediate scrutiny, they do not violate the Second Amendment. There has been no violation of Plaintiff's constitutional rights, and no resulting violation of 42 U.S.C. §§ 1983 and 1988.

**IV. Equal Protection**

Plaintiff argues that the LAPD and LACSD policies violate the Equal Protection Clause to the Fourteenth Amendment because those who have been subjected to a "clear and present danger to life or of great bodily injury" are generally victims of past crimes. Plaintiff argues that, as a result, the policies grant broader Second Amendment rights to crime victims by allowing them CCW licenses. Plaintiff argues that classifications based on whether one has been a crime victim violates the Equal Protection Clause.

This argument is unpersuasive. First, the policies do not classify applicants based on whether or not an applicant for a CCW license has been a victim of a crime. Instead, they classify applicants based on whether a person has a need for a concealed weapon due to the showing of a sufficient, immediate danger to the applicant. Second, even if the policies did classify based on whether the applicant was a crime victim, the policies would pass constitutional muster. Persons who have not been crime victims are not a suspect class under the Constitution. Rather, crime victims are those who rationally may be thought to legitimately fear some future criminal act. A law that classifies based on crime victim status must merely "rationally further a legitimate state interest." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Preventing crime is a legitimate state interest. It is entirely rational for the LAPD and LACSD to believe that those who have been victims of crime once may be victims again, and have a greater need for self-protection by carrying a concealed weapon. Accordingly, it is rational for the LAPD and LACSD to restrict CCW licenses to such applicants.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV10-08377 JAK (JEMx) | Date | January 13, 2011 |
| Title | Jonathan Birdt v. Charlie Beck, et al. | | |

### V. Interstate Travel

Plaintiff also claims that his right to interstate travel is burdened by the challenged regulations and by his resulting inability to obtain a CCW license. Thus, he claims that he has a permit to carry a concealed weapon in Nevada, but that when he enters California, he must move any weapons carried to a locked container in the trunk of this car, thereby "brandishing" his weapon in violation of the Nevada law authorizing his Nevada CCW license.

This argument is not sufficient to support this claim. "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 903 (1986). The right to interstate travel is tied to the Article IV Privileges and Immunities Clause. *See Zobel v. Williams*, 457 U.S. 55, 79 (1982). However, the Article IV Privileges and Immunities Clause protects only those activities "sufficiently basic to the livelihood of the Nation." *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64 (1988). The Supreme Court has found such a right implicated in a waiting period for the right to vote, *Dunn v. Blumstein*, 405 U.S. 330 (1972), a residency period to receive welfare benefits, *Shapiro v. Thompson*, 394 U.S. 618 (1969), and a residency period to receive medical benefits, *Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974).

The inconvenience of moving a weapon from the passenger compartment to the trunk of a car does not rise to the level of such activities "sufficiently basic to the livelihood of the Nation." The LAPD and LACSD policies do not deter travel, have impeding travel as their objective, or serve to penalize travel.

### VI. Conclusion

California's concealed weapons law, the LAPD and LACSD policies promulgated under that law, and those policies as applied to Plaintiff do not infringe upon Plaintiff's constitutional rights. Consequently, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendants' motion for summary judgment.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer    ak

_____

00086