1  **JONATHAN W. BIRDT – SBN 183908**          e-filed _____
   **Law Office of Jonathan W. Birdt**
2  18252 Bermuda Street
3  Porter Ranch, CA 91326
   Telephone:    (818) 400-4485
4  Facsimile:    (818) 428-1384
   jon@jonbirdt.com
5  Attorney for Plaintiff Robert Thomson

6

7

8               **UNITED STATES DISTRICT COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10

11

12 ROBERT THOMSON,                    )  **CASE NO.  2:11-cv-06154-SJO-JC**
                                      )
13              Plaintiff,            )  **SUPPLEMENTAL REPLY BRIEF RE**
                                      )  **PLAINTIFF'S MOTION FOR SUMMARY**
14 vs.                                )  **JUDGMENT**
                                      )
15 TORRANCE POLICE DEPARTMENT and )
16 THE LOS ANGELES COUNTY SHERIFFS )
   DEPARTMENT,                        )  DATE: February 27, 2012
17                                    )  TIME:  10:00 a.m.
                Defendants.           )  HON.:  Judge S. James Otero
18                                    )
19                                    )
                                      )
20                                    )
21 _____ )

22      The Court is respectfully requested to take notice of the ruling attached

23 hereto which presents issues substantially similar to those presently before the

24 Court.

25

26 March 5, 2012                    ___/s/_____

27                                  Jonathan W. Birdt, Esq.

28

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

RAYMOND WOOLLARD, et al.

       Plaintiffs

   v.

TERRENCE SHERIDAN, et al.

       Defendants

:
:
:
:
:
:

Civil Case No. L-10-2068

o0o

## **MEMORANDUM**

      This case calls upon the Court to determine whether the State of Maryland's handgun regulation statute violates the Second Amendment to the United States Constitution insofar as it requires an applicant to demonstrate "good and substantial reason" for the issuance of a handgun permit.  Plaintiffs Raymond Woollard and The Second Amendment Foundation[1] bring suit against Terrence Sheridan, Secretary of the Maryland State Police, and three members of the Maryland Handgun Permit Review Board.  The facts of the case are undisputed, and both sides have moved for summary judgment.  <u>See</u> Docket Nos. 21 and 25.[2]  The issues have been comprehensively briefed and the Court has heard oral argument.

---

[1]     The Second Amendment Foundation is a non-profit organization, the stated purposes of which include "promoting the exercise of the right to keep and bear arms; and education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control."  Am. Compl. 2.  For ease of reference, Plaintiffs will be collectively referred to as "Woollard" throughout.

[2]     The Court thanks counsel for their thorough and skillful briefs.  The Court also thanks <u>amici curiae</u>, the Brady Center to Prevent Gun Violence and the Legal Community Against Violence, for their useful submissions.

1

Because the "good and substantial reason" requirement is not reasonably adapted to a substantial government interest, the Court finds this portion of the Maryland law to be unconstitutional.  Woollard is entitled to summary judgment.

## I.      BACKGROUND

The state of Maryland prohibits the carrying of a handgun outside the home, openly or concealed, without a permit.  See MD. CODE ANN., CRIM. LAW § 4-203; MD. CODE ANN., PUB. SAFETY § 5-303.[3]  The Secretary of the State Police ("Secretary") is required to issue permits, but only to individuals who meet certain enumerated conditions.  An applicant must establish that he has not been convicted of a felony or a misdemeanor for which a term of imprisonment greater than one year was imposed, has not been convicted of a drug crime, is not an alcoholic or drug addict, and has not exhibited a propensity for violence or instability.  Of significance to this case, the Secretary must also make a determination that the applicant "has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger."  MD. CODE ANN., PUB. SAFETY § 5-306(a)(5)(ii).

In deciding whether the applicant has satisfied these criteria, the Handgun Permit Unit ("Permit Unit"), which reviews applications as the Secretary's designee, is required to take various factors into consideration.  These include "the reasons given by the applicant as to whether those reasons are good and substantial," "whether the applicant has any alternative

---

[3]      Maryland law does allow the transport of an unloaded handgun to and from places where it may legally be possessed without a permit, such as the owner's home, a repair shop, a target range, or a gun show.  See MD. CODE ANN., CRIM. LAW § 4-203(b).  With limited exceptions, Maryland also allows the unrestricted carrying of a "long gun," i.e., a rifle or shotgun, outside the home.

available to him for protection other than a handgun permit," and "whether the permit is necessary as a reasonable precaution for the applicant against apprehended danger."  MD. CODE REGS. 29.03.02.04.

An individual whose permit application has been denied may appeal the decision to the Handgun Permit Review Board (the "Board").  MD. CODE ANN., PUB. SAFETY, § 5-312.  The Board may sustain, reverse, or modify the Permit Unit's decision.  Id.

Plaintiff Raymond Woollard lives on a farm in a remote part of Baltimore County, Maryland.  On Christmas Eve, 2002, Woollard was at home with his wife, children, and grandchildren when an intruder shattered a window and broke into the house.  The intruder was Kris Lee Abbott, Woollard's son-in-law.  Abbott, who was high on drugs and intent on driving into Baltimore city to buy more, was looking for his wife's car keys.  Woollard grabbed a shotgun and trained it on Abbott, but Abbott wrested the shotgun away.  Woollard's son restored order by pointing a second gun at Abbott.  Woollard's wife called the police, who took two-and-a-half hours to arrive.

Abbott was convicted of first degree burglary and sentenced to three years' probation. He was later incarcerated after he violated his probation by assaulting a police officer and by committing another burglary.

In 2003, Woollard applied for, and was granted, a handgun carry permit.  He was allowed to renew the permit in 2006, shortly after Abbott was released from prison.[4]  In 2009, however, when Woollard again sought to renew his permit, he was informed that his request was incomplete.  He was directed to submit evidence "to support apprehended fear (i.e. –copies of

---

[4]     Permits expire "on the last day of the holder's birth month following two years after the date the permit is issued" and may be renewed for successive three-year terms.  MD. CODE ANN., PUB. SAFETY, § 5-309.

police reports for assaults, threats, harassments, stalking)." Letter from M. Cusimano, Handgun Permit Section Supervisor, to Robert Woollard (Feb. 2, 2009), Pls.' Mot. Summ. J. Ex. A, Docket No. 12-3. Because Woollard was unable to produce evidence of a current threat, his application was denied.

Woollard appealed this decision, first through the Handgun Permit Unit's informal review procedures and eventually to the Board. On November 12, 2009, in a decision by Defendants Gallagher, Goldstein, and Thomas, the Board affirmed the denial of Woollard's application, finding that Woollard "ha[d] not submitted any documentation to verify threats occurring beyond his residence, where he can already legally carry a handgun." The Board concluded that Woollard "ha[d] not demonstrated a good and substantial reason to wear, carry or transport a handgun as a reasonable precaution against apprehended danger in the State of Maryland." Pls.' Mot Summ. J. Ex. D, Docket No. 12-6.

On July 29, 2010, Woollard filed the instant suit, arguing that Maryland's handgun permitting scheme is facially violative of both the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment. He avers that, separate and apart from any concern he may have regarding Abbott, he wishes to wear and carry a handgun for general self-defense.


## II.    LEGAL STANDARD

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial

judges have "an affirmative obligation" to prevent factually unsupported claims and defenses

from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of

material fact, the Court must view the facts, and all reasonable inferences to be drawn from

them, in the light most favorable to the non-moving party. <u>Pulliam Inv. Co. v. Cameo Properties</u>,

810 F.2d 1282, 1286 (4th Cir. 1987). Hearsay statements or conclusory statements with no

evidentiary basis cannot support or defeat a motion for summary judgment. <u>See</u> <u>Greensboro</u>

<u>Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro</u>, 64 F.3d 962, 967 (4th Cir. 1995).

"When both parties file motions for summary judgment . . . [a] court applies the same

standard of review." <u>McCready v. Standard Ins. Co.</u>, 417 F. Supp. 2d 684, 695 (D. Md. 2006)

(citing <u>Taft Broad. Co. v. United States</u>, 929 F.2d 240, 248 (6th Cir. 1991)). Furthermore, "each

motion [will be considered by a court] separately on its own merits to determine whether either

of the parties deserves judgment as a matter of law." <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523

(4th Cir. 2003).


### III.   ANALYSIS

The Second Amendment provides: "A well regulated Militia, being necessary to the

security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

U.S. CONST. amend. II. These 27 words, so long untroubled by significant judicial scrutiny,

have become newly fertile ground for interpretation following the Supreme Court's 2008

decision in <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008). In brief, <u>Heller</u> presented the

question whether the Second Amendment confers an individual right to bear arms, or protects

only the right to possess and carry a firearm in connection with militia service. After a lengthy

examination of the historical record, the <u>Heller</u> majority held that the Constitution guarantees

"the individual right to possess and carry weapons in case of confrontation," but left the contours

of that right largely undefined.  Id. at 592.  Two years later, in McDonald v. City of Chicago, 130

S. Ct. 3020 (2010), the Supreme Court held that the Second Amendment's protections, whatever

their bounds, apply fully to the States through the Fourteenth Amendment.

This case requires the Court to answer two fundamental questions.  The first asks whether

the Second Amendment's protections extend beyond the home, "where the need for defense of

self, family, and property is most acute."  Heller, 554 U.S. at 628.  This question was left

unanswered in Heller, and has not been authoritatively addressed in the Fourth Circuit's post-

Heller decisions.  Second, if the right to bear arms does extend beyond the home, the Court must

decide whether Maryland's requirement that a permit applicant demonstrate "good and

substantial reason" to wear or carry a handgun passes constitutional muster.  In undertaking these

inquiries, the Court is guided by the Fourth Circuit's recent opinion in United States v.

Masciandaro, 638 F.3d 458 (4th Cir. 2011), which helpfully laid the foundation for resolution of

the case at bar.

### A.  Level of Scrutiny

The Supreme Court has traditionally chosen among three levels of scrutiny when

examining laws challenged on constitutional grounds.  The rational basis test presumes the law's

validity and asks only whether the law is rationally related to a legitimate state interest.  City of

Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).  Intermediate scrutiny requires

more; the government's interest must be "significant," "substantial," or "important," see, e.g.,

Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 662 (1994), and the "fit" between the challenged

regulation and the asserted objective must be reasonable, though not perfect.  See, e.g., Lorillard

Tobacco Co. v. Reilly, 533 U.S. 525, 556 (2001).  Finally, strict scrutiny requires the

6

government to show that the law "furthers a compelling interest and is narrowly tailored to achieve that interest." Citizens United v. FEC, 130 S. Ct. 876, 898 (2010) (citing FEC v. Wisconsin Right To Life, Inc., 551 U.S. 449, 464 (2007)).

The Heller majority declined to articulate the level of constitutional scrutiny that courts must apply when examining laws that are in tension with the Second Amendment. It determined that the regulation then under consideration would have failed "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." 554 U.S. at 628. The majority did, however, reject both rational basis review, see id. at 628 n.27, and the "freestanding 'interest-balancing' approach" advocated by Justice Breyer in dissent. Id. at 634–35; see also id. at 689–90 (Breyer, J., dissenting).

The case of United States v. Chester, 628 F.3d 673 (4th Cir. 2010), called upon the Fourth Circuit Court of Appeals to decide the level of scrutiny applicable in a challenge to 18 U.S.C. § 922(g)(9), which prohibits the possession of a firearm by any person convicted of a misdemeanor crime of domestic violence.[5] Because Chester's prior conviction put him outside the ambit of the "core right identified in Heller—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense," the court determined that intermediate scrutiny was more appropriate than strict scrutiny. Id. at 683 (emphasis original).

Soon thereafter, Masciandaro presented the Fourth Circuit with another case involving the assertion of Second Amendment rights outside the "core" territory staked out by Heller. Sean Masciandaro was convicted of possessing a loaded handgun in a motor vehicle within a

---

[5] Commonly referred to as the "felon in possession" statute, § 922(g) is best known for proscribing the possession of a firearm or ammunition by anyone convicted of a crime punishable by a term of imprisonment exceeding one year. Lesser-known subsections also forbid firearm possession to those who have been dishonorably discharged from the armed forces, illegal aliens, and domestic violence misdemeanants.

national park, a combination made unlawful at the time by a federal regulation, 36 C.F.R.

§ 2.4(b).  638 F.3d at 459.  On appeal, Masciandaro argued that because the Second Amendment

guaranteed him the right to possess and carry a weapon in case of confrontation, it shielded him

from prosecution for exercising that right in a national park.  The Fourth Circuit, in upholding

Masciandaro's conviction, rejected his argument that the regulation should be tested under strict

scrutiny.  It noted that while Masciandaro, unlike Chester, was a law-abiding citizen with a clean

criminal record, he possessed the handgun not in his home but in a public park.  Id. at 469–70.

Drawing from First Amendment jurisprudence, the appeals court reasoned as follows:

> [W]e might expect that courts will employ different types of
> scrutiny in assessing burdens on Second Amendment rights,
> depending on the character of the Second Amendment question
> presented.
>
> \* \* \* \*
>
> As we observe that any law regulating the content of speech is
> subject to strict scrutiny, we assume that any law that would
> burden the "fundamental," core right of self-defense in the home
> by a law-abiding citizen would be subject to strict scrutiny.  But, as
> we move outside the home, firearm rights have always been more
> limited, because public safety interests often outweigh individual
> interests in self-defense.

Id. at 470 (citation omitted).

The court concluded that "a lesser showing is necessary with respect to laws that burden

the right to keep and bear arms outside of the home," and determined that intermediate scrutiny

was appropriate to Masciandaro's challenge.  Id. at 471.  The court cited with approval precedent

applying intermediate scrutiny to content-neutral time, place, and manner restrictions on speech

in general, and on commercial speech in particular "in light of its 'subordinate position in the

scale of First Amendment values.' "  Id. (citing Ward v. Rock Against Racism, 491 U.S. 781,

791 (1989), and Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 477 (1989)).

Woollard's asserted right falls within this same category of non-core Second Amendment protection. He already enjoys an unchallenged right to possess a handgun in his home; but, like Masciandaro, he also seeks to carry one into the wider world for general self-defense. The statute he challenges, therefore, is properly viewed through the lens of intermediate scrutiny, which places the burden on the Government to demonstrate a reasonable fit between the statute and a substantial governmental interest. See Chester, 628 F.3d at 683.

### B. Scope of the Right

In Masciandaro, Judge Wilkinson, writing for the panel on this issue only,[6] found it "unnecessary to explore in this case the question of whether and to what extent the Second Amendment right recognized in Heller applies outside the home." 638 F.3d at 474. Judge Wilkinson reasoned that, if the right to carry a handgun outside the home does exist, the burden placed on that right by the regulation at issue clearly withstood intermediate scrutiny. He then determined that that the principle of constitutional avoidance counseled that the case be resolved on this narrower ground. See id. at 475 (citing Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)). Because the Supreme Court had not clearly articulated the Second Amendment's reach, the Fourth Circuit declined to forge ahead into what Judge Wilkinson characterized as "a vast terra incognita." Id. Rather, the court concluded that "[t]here simply is no need in this litigation to break ground that our superiors have not tread." Id.

In considering the case at bar, this Court is mindful of Judge Wilkinson's admonition that one should venture into the unmapped reaches of Second Amendment jurisprudence "only upon necessity and only then by small degree." Id. Today, however, such necessity exists. Woollard

---

[6]     Though the balance of the opinion is authored by Judge Niemeyer, his view as to the necessity of reaching the question of the Second Amendment's scope did not garner support from a majority of the three-judge panel. Thus, Judge Wilkinson's position on that issue is controlling.

has squarely presented the question, and resolution of his case requires an answer.  While we may leave for another day the dauntingly nuanced "litigation over schools, airports, parks, public thoroughfares, and various additional government facilities," see id., the instant suit does require the Court to determine whether Maryland's broad restriction on handgun possession outside the home burdens any Second Amendment right at all.

In undertaking this imposing task, the Court finds a ready guide in Judge Niemeyer's analysis in Masciandaro.  While a majority of the panel found that Judge Niemeyer's reasoning was not essential to disposition of the case, it is both sound and persuasive.  As Judge Niemeyer points out, the Heller Court's description of its holding as applying to the home, where the need "for defense of self, family, and property is most acute," suggests that the right also applies in some form "where that need is not 'most acute.' "  Id. at 468 (Niemeyer, J., concurring)  (quoting Heller, 554 U.S. at 628).  This reasoning is consistent with the Supreme Court's historical understanding of the right to keep and bear arms as "an individual right protecting against both public and private violence."  Heller, 554 U.S. at 594.  In addition to self-defense, the right was also understood to allow for militia membership and hunting.  See id. at 598.  To secure these rights, the Second Amendment's protections must extend beyond the home: neither hunting nor militia training is a household activity, and "self-defense has to take place wherever [a] person happens to be."  Masciandaro, 638 F.3d at 468 (Niemeyer, J., concurring) (quoting Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. REV. 1443, 1515–18 (2009)).

Heller's  definition of one of the Amendment's central terms, "bear," further suggests that the right, though it may be subject to limitations, does not stop at one's front door: "To 'bear arms,' as used in the Second Amendment, is to 'wear, bear, or carry . . . upon the person or in the

clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive

action in a case of conflict with another person.' " 554 U.S. at 584 (citation omitted). The same

proposition finds additional support in McDonald, in which the Supreme Court characterized

Heller as holding that "the Second Amendment protects a personal right to keep and bear arms

for lawful purposes, most notably for self-defense within the home." 130 S. Ct. at 3044

(emphasis supplied).

In addition to its exposition of the Second Amendment's affirmative protections, the

Heller Court took pains to clarify that nothing it had written "should be taken to cast doubt on

longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws

forbidding the carrying of firearms in sensitive places such as schools and government buildings,

or laws imposing conditions and qualifications on the commercial sale of arms," measures that it

identified as "presumptively lawful." 554 U.S. at 571 & n.26.[7] What, if any, bearing this

language has on the extent of the Second Amendment's reach beyond the home is not self-

evident. As the Fourth Circuit acknowledged in Chester, "[i]t is unclear . . . whether Heller was

suggesting that 'longstanding prohibitions' such as these were historically understood to be valid

_____

[7]        The Court reiterated this point in McDonald:

> It is important to keep in mind that Heller, while striking down a
> law that prohibited the possession of handguns in the home,
> recognized that the right to keep and bear arms is not "a right to
> keep and carry any weapon whatsoever in any manner whatsoever
> and for whatever purpose." We made it clear in Heller that our
> holding did not cast doubt on such longstanding regulatory
> measures as "prohibitions on the possession of firearms by felons
> and the mentally ill," "laws forbidding the carrying of firearms in
> sensitive places such as schools and government buildings, or laws
> imposing conditions and qualifications on the commercial sale of
> arms." We repeat those assurances here. Despite municipal
> respondents' doomsday proclamations, incorporation does not
> imperil every law regulating firearms.

130 S. Ct. at 3047 (citations omitted).

limitations on the right to bear arms or did not violate the Second Amendment for some other reason."  628 F.3d at 679.

Stated otherwise, there are two ways of conceptualizing presumptively lawful restrictions.  First, these restrictions may be so ingrained in our understanding of the Second Amendment that there is little doubt that they withstand the applicable level of heightened scrutiny.  Alternatively, the right itself can be seen as failing to extend into areas where, historically, limitations were commonplace and well accepted.  While the Fourth Circuit was not required in Masciandaro to choose between these two interpretations, it did seem to indicate that the former reading is more likely correct than the latter: "The Court's use of the word 'presumptively' suggests that the articulation of sensitive places may not be a limitation on the scope of the Second Amendment, but rather on the analysis to be conducted with respect to the burden on that right."  Masciandaro, 638 F.3d at 472.

This Court shares that view.  The Supreme Court's choice of phrasing connotes that the restrictions it termed "presumptively lawful" pass muster under a heightened standard of review. It would likely not have used the modifier "presumptively" if those restrictions were subject, not to any form of elevated scrutiny, but only to the rational basis review that all laws are presumed to satisfy.  If this is correct, and laws limiting the carrying of firearms in sensitive places are indeed implicated by the Second Amendment's protections, then those protections necessarily extend outside the home, at least to some degree.[8]

---

[8]      Definitive resolution of this quandary is not essential.  To say that Heller's "presumptively lawful" regulations regarding sensitive places (e.g., schools, government buildings) are implicated by, but do not violate, a right to bear arms outside of the home obviously presumes the existence of such a right.  A determination that "presumptively lawful" regulations are outside the ambit of the Amendment's protections altogether, however, says nothing about where else those protections might extend.  This latter reading would not,

For all of these reasons, the Court finds that the right to bear arms is not limited to the home. The signposts left by recent Supreme Court and Fourth Circuit case law all point to the conclusion that Woollard's "claim to self-defense—asserted by him as a law-abiding citizen . . . —does implicate the Second Amendment, albeit subject to lawful limitations." Masciandaro, 638 F.3d at 468 (Niemeyer, J., concurring).[9]

### C. Constitutionality of the "Good and Substantial Reason" Requirement

Having determined that the Second Amendment's protections extend beyond the "core" right identified in Heller to reach the challenged statute, and having identified the proper level of scrutiny, the Court now proceeds to the substance of Woollard's challenge. Woollard attacks Maryland's statutory scheme on three separate fronts. First, he contends that it amounts to an unconstitutional prior restraint on the exercise of his Second Amendment rights because it vests unbridled discretion in the officials responsible for issuing permits. Second, he argues that while the State has an undeniable interest in public safety, the law is not sufficiently tailored to that interest to withstand intermediate scrutiny. Finally, he urges that, even if the law does comport with the Second Amendment, it violates the Equal Protection Clause of the Fourteenth Amendment. The Court addresses each of these arguments in turn.

### i.  Prior Restraint

The Court declines Woollard's request to apply a prior restraint analysis to laws challenged on Second Amendment grounds. In the First Amendment context, any law that makes "freedoms which the Constitution guarantees contingent upon the uncontrolled will of an

---

therefore, preclude application of heightened scrutiny to the statutory provision at issue in this case, which does not fall within any of Heller's presumptively lawful categories.

[9]    The Court acknowledges that courts in other jurisdictions have reached the opposite conclusion on this point. See Moore v. Madigan, --- F. Supp. 2d ----, 2012 WL 344760 (C.D. Ill. Feb. 3, 2012); Piszczatoski v. Filko, --- F. Supp. 2d ----, 2012 WL 104917 (D.N.J. Jan. 12, 2012).

official—as by requiring a permit or license which may be granted or withheld in the discretion

of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those

freedoms." Staub v. City of Baxley, 355 U.S. 313, 322 (1958) (citations omitted).

A licensing or permitting scheme is unconstitutional when characterized by "unbridled

discretion" of a government official or agency, which exists "when a licensing scheme does not

impose adequate standards to guide the licensor's discretion." Chesapeake B & M, Inc. v.

Harford Cnty., 58 F.3d 1005, 1009 (4th Cir. 1995) (en banc). Standards governing prior

restraints must be "narrow, objective and definite." Shuttlesworth v. Birmingham, 394 U.S. 147,

151 (1969). If the scheme "involves appraisal of facts, the exercise of judgment, and the

formation of an opinion," the danger of censorship is considered too great. Forsyth Cnty. v.

Nationalist Movement, 505 U.S. 123, 131 (1992) (quoting Cantwell v. Connecticut, 310 U.S.

296, 305 (1940)).

Woollard argues that the Second Amendment's right to keep and bear arms is among the

"freedoms which the Constitution guarantees" within the meaning of Staub, and that the danger

of chilling protected activity is just as great in the Second Amendment sphere as it is in free

speech cases. He further contends that, far from being guided by the type of narrow, objective,

and definite standards demanded of statutes requiring the issuance of a permit, Maryland's

regulations are "entirely arbitrary, subjective, and boundless." Pls.' Mot. Summ. J. 17.

It is true that courts have often looked to First Amendment law for guidance in navigating

uncharted Second Amendment waters.[10] No court has yet taken the quantum leap that Woollard

---

[10]     See, e.g., Ezell v. City of Chicago, 651 F.3d 684, 708 (7th Cir. 2011) ("Labels aside, we
can distill this First Amendment doctrine and extrapolate a few general principles to the Second
Amendment context."); Chester, 628 F.3d at 682 ("[W]e agree with those who advocate looking
to the First Amendment as a guide in developing a standard of review for the Second

proposes, however.  Moreover, while the First Amendment undoubtedly provides a useful framework for analysis of laws burdening Second Amendment rights, especially when choosing the appropriate level of scrutiny, this Court would be hesitant to import constitutional doctrine wholesale from one field of law into another for which it was never designed.  Those courts that painstakingly developed and expounded the prior restraint analysis on which Woollard relies today surely did not have Second Amendment challenges in mind when they did so.

Even if a prior restraint inquiry were appropriate, the Court rejects Woollard's assertion that Maryland's permitting scheme vests officials with unbridled discretion as regards its application.  In support of his position, Woollard dusts off a 1967 case in which this Court struck down a provision of the Baltimore County Code providing that no permit for a public gathering would be issued unless the person, club, association, or corporation was deemed "fit, responsible and proper" to receive one by the chief of police.  See Norton v. Ensor, 269 F. Supp. 533, 536 (D. Md. 1967).  The Court ruled the law an unconstitutional prior restraint on the freedoms of speech and assembly, notwithstanding the defendants' assertion that police review was necessary to preserve the public safety in a time when racially charged rallies and demonstrations often threatened to devolve into violence.  Id. at 536.

While Norton is superficially similar to the case at bar, the discretion of State officials who review handgun permit applications is, in point of fact, curtailed in several important respects.  It is true, as Woollard highlights, that these officials are empowered to judge whether the "[r]easons given by the applicant . . . are good and substantial," MD. CODE REGS. 29.03.02.04(G), and in so doing take into account such seemingly nebulous considerations as "[i]nformation received from personal references and other persons interviewed," and

---

Amendment.") (citing United States v. Marzzarella, 614 F.3d 85, 89 n.4 (3d Cir. 2010)); United States v. Skoien, 587 F.3d 803, 813–14 (7th Cir. 2009).

"[i]nformation received from business or employment references as may be necessary in the discretion of the investigator." MD. CODE REGS. 29.03.02.04(J), (K).  The above does not, however, constitute the full extent of the reviewing officials' guidance.

The Secretary has identified four general categories of "good and substantial reason" to carry a handgun in public: (1) business activities that involve heightened risk, such as the need to carry cash or other "street valued" commodities, (2) participation in "regulated professions," such as security guards or armored car personnel, (3) participation in "assumed risk" professions that involve the ability to restrict or take away civil liberties, such as judges, prosecutors, police officers, public defenders, and correctional officers, and (4) "personal protection."  Decl. of Sgt. Michael Jones, Maryland State Police Licensing Division Supervisor, Defs.' Mot. Summ. J. Ex. 3, at ¶¶ 8–12.  Applicants claiming to fit within each category are required to submit specific supporting documentation.  See id.

In assessing "personal protection" applications such as the one filed by Woollard, the Permit Unit is further guided by two cases from the Maryland Court of Special Appeals: Snowden v. Handgun Permit Review Bd., 413 A.2d 295 (Md. Ct. Spec. App. 1980), and Scherr v. Handgun Permit Review Bd., 880 A.2d 1137 (Md. Ct. Spec. App. 2005).  While not overly detailed, these cases provide useful interpretation of the requirement that issuance of a permit be necessary as a reasonable precaution against apprehended danger.  As construed by the Court of Special Appeals, this requirement calls for some sort of objectively heightened threat, above and beyond the " 'personal anxiety' " or "apprehension of an average person."  See Scherr, 880 A.2d at 1148 (quoting Snowden, 413 A.2d at 298).  Simply living in a dangerous or high-crime area, for example, is not enough.  See id.

Consistent with these cases, the Permit Unit considers several factors listed as persuasive by the Court of Special Appeals, including (1) the nearness or likelihood of a threat or presumed threat, (2) whether the threat can be verified, (3) whether the threat is particular to the applicant, as opposed to the average citizen, (4) if the threat can be presumed to exist, the basis for such a presumption, and (5) the length of time since the initial threat occurred.  Jones Decl. ¶ 14.

Finally, decisions of the Permit Unit may be appealed to the full Board, whose rulings are, in turn, subject to judicial review.   This judicial review yields published cases such as Scherr and Snowden, which provide further superintendence.  In sum, the Permit Unit and the Board do not enjoy unbridled discretion in the issuance of permits.  While the applicant bears the burden of demonstrating a "good and substantial reason," licensing officials are not simply left to their own views of what such a good reason might be.  Cf. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150 (1969) (striking down a permitting requirement for parades, pursuant to which "the members of the Commission were to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience' "); Staub, 355 U.S. at 322 (finding unconstitutional a statute allowing the mayor and city council to deny a permit, required to solicit membership in any organization, "if they do not approve of the applicant or of the union or of the union's 'effects upon the general welfare of citizens of the City of Baxley' ").

     **ii.**    **Intermediate Scrutiny**

As stated, Maryland's permitting scheme, insofar as it requires a "good and substantial" reason for a law-abiding citizen to carry a firearm outside his home, is subject to intermediate scrutiny.  In order to prevail, the State must demonstrate that the challenged regulation is reasonably adapted to a substantial governmental interest.  Under this standard, the "degree of fit" between the regulation and "the well-established goal of promoting public safety need not be

perfect; it must only be substantial." Heller v. Dist. of Columbia, 698 F. Supp. 2d 179, 191

(D.D.C. 2010).

Beyond peradventure, public safety and the prevention of crime are substantial, indeed

compelling, government interests. See, e.g., United States v. Salerno, 481 U.S. 739, 748–50

(1987) (noting that "the Government's regulatory interest in community safety can, in

appropriate circumstances, outweigh an individual's liberty interest" and holding that the

government's interest in preventing crime is not only important, but compelling); Schall v.

Martin, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the

community from crime cannot be doubted.") (citations and quotation marks omitted).

The Maryland statute's failure lies in the overly broad means by which it seeks to

advance this undoubtedly legitimate end. The requirement that a permit applicant demonstrate

"good and substantial reason" to carry a handgun does not, for example, advance the interests of

public safety by ensuring that guns are kept out of the hands of those adjudged most likely to

misuse them, such as criminals or the mentally ill. It does not ban handguns from places where

the possibility of mayhem is most acute, such as schools, churches, government buildings,

protest gatherings, or establishments that serve alcohol. It does not attempt to reduce accidents,

as would a requirement that all permit applicants complete a safety course. It does not even, as

some other States' laws do, limit the carrying of handguns to persons deemed "suitable" by

denying a permit to anyone "whose conduct indicates that he or she is potentially a danger to the

public if entrusted with a handgun." See Kuck v. Danaher, No. 3:07cv1390(VLB), 2011 WL

4537976 at *11 (D. Conn. Sept. 29, 2011).

Rather, the regulation at issue is a rationing system. It aims, as Defendants concede,

simply to reduce the total number of firearms carried outside of the home by limiting the

18

privilege to those who can demonstrate "good reason" beyond a general desire for self-defense. In support of this limitation, Defendants list numerous reasons why handguns pose a threat to public safety in general and why curbing their proliferation is desirable.  For example, they argue that an assailant may wrest a handgun away from its owner, and cite evidence that this possibility imperils even trained police officers.  See Defs.' Mot. Summ. J. 15, Docket No. 26.  They note that when a police officer is engaged in a confrontation with a criminal, the presence of an armed civilian can divert the officer's attention.  Id. at 16.  In addition, Defendants urge that while most permit holders are law-abiding, there is no guarantee that they will remain so.  They cite studies purporting to show that the majority of murderers have no previous felony conviction that would have prevented them from obtaining a permit.  Id. at 35.  Thus, they argue, a permitting scheme that merely denies permits to convicted felons is inadequate.

These arguments prove too much.  While each possibility presents an unquestionable threat to public safety, the challenged regulation does no more to combat them than would a law indiscriminately limiting the issuance of a permit to every tenth applicant.  The solution, then, is not tailored to the problem it is intended to solve.  Maryland's "good and substantial reason" requirement will not prevent those who meet it from having their guns taken from them, or from accidentally shooting themselves or others, or from suddenly turning to a life of crime.  Indeed, issuing permits specifically to those applicants who can demonstrate an increased likelihood that they may need a firearm would seem a strange way to allay Defendants' fear that "when handguns are in the possession of potential victims of crime, their decision to use them in a public setting may actually increase the risk of serious injury or death to themselves or others." Id. at 15.  If anything, the Maryland regulation puts firearms in the hands of those most likely to

use them in a violent situation by limiting the issuance of permits to "groups of individuals who are at greater risk than others of being the victims of crime." Id. at 40.

A law that burdens the exercise of an enumerated constitutional right by simply making that right more difficult to exercise cannot be considered "reasonably adapted" to a government interest, no matter how substantial that interest may be.  Maryland's goal of "minimizing the proliferation of handguns among those who do not have a demonstrated need for them," id. at 40, is not a permissible method of preventing crime or ensuring public safety; it burdens the right too broadly.  Those who drafted and ratified the Second Amendment surely knew that the right they were enshrining carried a risk of misuse, and states have considerable latitude to channel the exercise of the right in ways that will minimize that risk.  States may not, however, seek to reduce the danger by means of widespread curtailment of the right itself.  "[E]ven the most legitimate goal may not be advanced in a constitutionally impermissible manner." Carey v. Brown, 447 U.S. 455, 464–65 (1980).

At bottom, this case rests on a simple proposition: If the Government wishes to burden a right guaranteed by the Constitution, it may do so provided that it can show a satisfactory justification and a sufficiently adapted method.  The showing, however, is always the Government's to make.  A citizen may not be required to offer a "good and substantial reason" why he should be permitted to exercise his rights.  The right's existence is all the reason he needs.

The Court wishes to emphasize the limits of this decision.  While it finds Maryland's requirement that a permit applicant demonstrate "good and substantial reason" to be unconstitutional, the Court does not address any of the State's other regulations relating to the possession and use of firearms, many of which would qualify as presumptively lawful.  Nor does

the Court speculate as to whether a law that required a "good and substantial reason" only of law-abiding citizens who wish to carry a <u>concealed</u> handgun would be constitutional.[11]  Finally, the Court does not speak to Maryland's ability to declare that a specific applicant is unfit for a permit because of some particular aspect of the applicant's character or history.

     **iii.**     **Fourteenth Amendment Challenge**

Woollard has also challenged the Maryland statute under the Equal Protection Clause of the Fourteenth Amendment, which provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  The Equal Protection clause "is essentially a direction that all persons similarly situated should be treated alike."  <u>City of Cleburne</u>, 473 U.S. at 440.

The Court declines to conduct a separate analysis under the Equal Protection Clause for several reasons.  First, the above Second Amendment inquiry provides an adequate basis for resolution of the case.  As such, there is no need to venture further into unmapped territory by determining whether or not Maryland's permitting scheme would also be unconstitutional on Woollard's alternative grounds.

Second, while the Equal Protection Clause provides its own source of substantive protection, separate and apart from other provisions of the Constitution, Woollard's equal protection claim is essentially a restatement of his Second Amendment claim.  In the First

---

[11]    Maryland law does not differentiate between open and concealed use, but some courts have held that states have a greater interest in reducing the number of concealed handguns "because of their disproportionate involvement in life-threatening crimes of violence, particularly in streets and other public places."  <u>Peruta v. Cnty. of San Diego</u>, 758 F. Supp. 2d 1106, 1117 (S.D. Cal. 2010).

Amendment context, courts regularly refuse to hear substantive First Amendment arguments recast as equal protection claims.[12]  The same logic obtains here.

Finally, Woollard's equal protection challenge is, in part, an effort to obtain review under a more stringent standard than the intermediate scrutiny the Court has already found to be appropriate.  Woollard argues that, because the right to keep and bear arms is "fundamental" within the meaning of Fourteenth Amendment jurisprudence, the challenged law must be "given the most exacting scrutiny."  See Clark v. Jeter, 486 U.S. 456, 461 (1988).  Of course, to accept this theory would be to erase, in one broad stroke, the careful and sensible distinctions that the Fourth Circuit and other courts have drawn between core and non-core Second Amendment protections and to ignore the principle that differing levels of scrutiny are appropriate to each. The Court declines such an approach.[13]

---

[12]    See, e.g., Orin v. Barclay, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001) (finding that equal protection claim was "no more than a First Amendment claim dressed in equal protection clothing" and was "subsumed by, and co-extensive with" plaintiff's First Amendment claim); Lee v. York Cnty. Sch. Div., 418 F. Supp. 2d 816, 834 (E.D. Va. 2006) (finding it inappropriate to address equal protection argument that was " 'a mere rewording of a First Amendment claim' " because plaintiff "asks this court to do under the Fourteenth Amendment what he asks it to do under the First Amendment: to evaluate the constitutionality of [the challenged statute]") (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 250 (4th Cir. 1999)) (brackets omitted).

[13]    Nor is Woollard necessarily correct that strict scrutiny would apply to an equal protection challenge.  Again, analogy to First Amendment law is useful.  Though regulations that burden fundamental rights are generally subject to strict scrutiny, when a regulation "discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized."  Carey, 447 U.S. at 461–62 (emphasis supplied); see also Lucas v. Curran, 856 F. Supp. 260, 272 (D. Md. 1994) ("It is now well-settled that if a statute discriminates between persons exercising their First Amendment rights (placing greater or lesser burdens on the exercise of those rights by some, but not others), based upon the content of their speech, the Equal Protection Clause requires [the intermediate scrutiny standard articulated in Carey].").

IV.     CONCLUSION

The Court finds that Maryland's requirement of a "good and substantial reason" for issuance of a handgun permit is insufficiently tailored to the State's interest in public safety and crime prevention.  The law impermissibly infringes the right to keep and bear arms, guaranteed by the Second Amendment.  The Court will, by separate Order of even date, GRANT Woollard's Motion for Summary Judgment and DENY Defendants' Motion for Summary Judgment.

Dated this 2nd day of March, 2012

                                        /s/
                            _____
                            Benson Everett Legg
                            United States District Judge

23